Case 1:21-cv-06386-MKV   Document 1-1   Filed 07/27/21   Page 1 of 143

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

J.B. PLUMBING AND HEATING OF
VIRGINIA, INC. AND JERRY BUSH, JR.,
individually and on behalf of all those similarly
situated,

                              Plaintiffs,

        v.

YELLOWSTONE CAPITAL, LLC; CAPITAL
ADVANCE SERVICES LLC; CAPORLY LLC;
DAVID GLASS; YITZHAK STERN; TSVI H.
DAVIS AND THE JOHN AND JANE DOE
INVESTORS,

                              Defendants.

Index No.:

**SUMMONS**

DATE FILED: July 9, 2021

Plaintiffs designate New York County as
the place of trial

The basis of venue is the location of
Defendants.

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve

a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance, on the plaintiffs' attorneys within 20 days after the service of this summons,

exclusive of the day of service (or within thirty (30) days if this summons is not personally

delivered to you within the State of New York); and in case of your failure to appear or answer,

judgment will be taken against you by default for the relief demanded in the complaint.

Dated:  New York, New York
        July 9, 2021

                              **WHITE AND WILLIAMS LLP**

                              By:_____
                              Shane R. Heskin
                              7 Times Square
                              New York, NY  10036
                              (215) 864-7165
                              *Attorneys for Plaintiffs*

TO:    Capital Advance Services, LLC
30 Broad Street, 14th Floor, Suite 14108
New York, New York 10004

Yellowstone Capital LLC
One Evertrust Plaza, Suite 1401
Jersey City, New Jersey 07302

David Glass
200 E. Las Olas Blvd, STE 1600
Fort Lauderdale, FL 33301

Yitzhak D. Stern
220 Surrey Rd.
Hillside, NJ 07205

Tsvi H. Davis
Caporly LLC
2201 Avenue M
Brooklyn, New York 11210

2

Case 1:21-cv-06386-MKV   Document 1-1   Filed 07/27/21   Page 3 of 143

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

J.B. PLUMBING AND HEATING OF
VIRGINIA, INC. AND JERRY BUSH, JR.,
individually and on behalf of all those similarly
situated,

                    Plaintiffs,

    v.

YELLOWSTONE CAPITAL, LLC; CAPITAL
ADVANCE SERVICES LLC; CAPORLY LLC;
DAVID GLASS; YITZHAK STERN; TSVI H.
DAVIS AND THE JOHN AND JANE DOE
INVESTORS,

                    Defendants.

Index No.:

## **CLASS ACTION COMPLAINT**

Plaintiffs J.B. Plumbing and Heating of Virginia, Inc. ("JB Plumbing"), and Jerry Bush, Jr. ("Bush" together with JB Plumbing, the "Plaintiffs"), by and through their undersigned attorneys, individually and on behalf of all others similarly situated, allege as against Defendants as follows:

## **NATURE OF THE ACTION**

1.    This action seeks to save small business owners and their families from the predatory lending practices of Defendants.

2.    Between July 10, 2017 and May 31, 2018, Plaintiffs paid Defendants a staggering $347,075 in interest in less than one-year. The interest rates were grotesque, exceeding 500%.

3.    Even worse, Plaintiffs paid $68,494 in so-called "ACH Program Fees," which Defendants fraudulently represented were necessary because "the ACH program is labor

intensive and is not an automated process, requiring [Defendants] to charge this fee to cover related costs." Contrary to these intentional misrepresentations, the ACH program was, in fact, an automated process, and required no labor at all. Instead, these were sham fees fraudulently charged by Defendants.

4.      Defendant Yellowstone Capital, LLC ("Yellowstone"), which is led and/or directed by Defendants David Glass, and Yitzhak Stern, is one of the largest merchant cash advance ("MCA") companies in the country whose entire scheme preys upon struggling small businesses (the "Enterprise").

5.      Capital Advance Services, LLC ("CAS") is a wholly owned subsidiary of Yellowstone.

6.      Defendants Caporly LLC and Tsvi H. Davis are funders and investors who have participated in and conspired with Glass and Stern to further the goals of the Enterprise.

7.      The Enterprise provides funds to Plaintiffs, and other small businesses, through instruments that purport to be asset purchase agreements. In actuality, these transactions are unquestionably loans. The Enterprise, however, cannot call these transactions what they are (loans) because the whole point of its scheme is to evade the usury laws of various states, including New York. Thus, in order to charge the unlawful and unconscionable interest rates it seeks to impose, the Enterprise must call the transaction by a different name.

8.      Under a legitimate asset purchase agreement, however, all rights, title and interest are transferred to the purchaser, and the purchaser assumes all risk of non-collection. In contrast, the *sine qua non* of a loan is the absolute repayment of the money advanced.

9.      Despite the paper form of the transactions, the Enterprise treats the transactions as absolutely repayable loans.

2

10.     To be sure, since 2012, the Enterprise has filed more than 6,000 confessions of judgment against small businesses that did not generate sufficient receipts to make their required fixed daily payments.[1]  That is not the transfer of risk.

11.     The conduct by the Enterprise has resulted in a national epidemic that has sparked the attention of Governor Cuomo, the New York State Legislature, the New York Attorney General, the Manhattan District Attorney, the New Jersey Attorney General, the Federal Trade Commission, and the United States Congress.  The Enterprise is a primary target.[2]

12.     Indeed, the Attorney General of New Jersey, Yellowstone's home state, has brought suit against Yellowstone and its associated companies, directly alleging that Yellowstone engages in the practice of "[c]harging unlawful interest rates on small business loans disguised as purchases of receivables."[3]

13.     Further, the Federal Trade Commission has also brought an enforcement action against Yellowstone, alleging that the company makes systemic misrepresentations to and defrauds merchants. *Federal Trade Commission v. Yellowstone Capital LLC et. al*. Case No. 20-cv-6023 (S.D.N.Y.), attached as Ex. 3.

14.     Mr. Bush is an example of both the destruction of small businesses and the devastation to their individual owners and families.

15.     The predatory practices at issue are so disturbing that they were featured in the first in a series of Bloomberg News articles exposing the predatory MCA industry.

16.     Mr. Bush's story was so compelling that he was invited to testify before Congress to share his story.[4]

---

[1] *See* www.bloomberg.com/confessions-of-judgment.com, last visited Oct. 25, 2018; Ex. 1.
[2] *Id.,*
[3] Complaint, *Grewal v. Yellowstone Capital LLC et. al*, Civil Action No. _ (N.J. Super. Ct.), attached as Ex. 2.
[4] *See* Ex. 4.

3

17.     Mr. Bush now brings this action in order to stop the Enterprise's unlawful predatory lending and to remunerate the many hundreds of victims that have been preyed upon by Defendants through the New York Court System.[5]

### THE PARTIES

18.     Plaintiff J.B. Plumbing and Heating of Virginia is a Virginia corporation with its principal place of business located at 1547 Underhill Ave., Roanoke, Virginia.

19.     Plaintiff Jerry Bush, Jr. is an individual who is a citizen of Virginia and resides at 240 Wycombe, Rd., Hardy VA.

20.     Defendant Yellowstone Capital, LLC is a limited liability company organized and existing under the laws of the State of New York with its principal offices located at One Evertrust Plaza, Suite 1401, Jersey City, New Jersey 07302.

21.     Defendant Capital Advance Services, LLC is a limited liability company organized and existing under the laws of the State of New York with its principal offices located at 30 Broad Street, 14th Floor, Suite 14108, New York, New York 10004.

22.     Caporly LLC is a limited liability company organized and existing under the laws of the State of New York with its principal office located at 2201 Avenue M, Brooklyn, New York 11210.

23.     Defendant David Glass in an adult resident and citizen of Florida who resides at 200 E. Las Olas Blvd, STE 1600, Fort Lauderdale, FL 33301.

24.     Defendant Yitzhak D. Stern (a.k.a. Isaac Stern) is an adult resident and citizen of New Jersey who resides at 220 Surrey Rd., Hillside, NJ 07205.

---

[5] *See* Ex. 5.

4

25.     Defendant Tsvi H. Davis is an adult resident and citizen of New York who resides at 2201 Avenue M, Brooklyn, New York 11210.

26.     Upon information and belief, each of the John and Jane Doe Investor Defendants is a citizen of New York or New Jersey.

## JURISDICTION

27.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant regularly transacts business within the State of New York, has purposefully availed itself of the laws of New York for the specific transactions at issue, or has selected New York as the forum for all disputes related to the transactions.

28.     Venue is proper because at least one of the defendants resides in this county.

## FACTUAL ALLEGATIONS

**A.     The Predatory MCA Industry**

29.     As Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[6]  The MCA industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy."[7]  As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage.  There's no license you need to file for.  It's pretty much unregulated."[8]

30.     The National Consumer Law Center also recognized that these lending practices are predatory because they are underwritten based on the ability to collect, rather than the ability of the borrower to repay without going out of business.  National Consumer Law Center, *supra*.

---

[6] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

[7] *Id.*

[8] *Id.*

5

31.     This is because MCA companies "receive the bulk of their revenues from the origination process rather than from performance of the loan [and thus] may have weaker incentives to properly ensure long-term affordability, just as pre-2008 mortgage lenders did." *Id.* ("[A] fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered. Typically, such credit is underwritten predominantly on the basis of liquidation value of the collateral, without regard to the borrower's ability to service and repay the loan according to its terms absent resorting to that collateral.").

32.     The MCA companies only care about whether they can collect upon default, and not whether the small business can survive.

**B.**     **The Yellowstone Umbrella**

33.     Yellowstone was co-founded in 2009 by David Glass, an inspirational character for the movie "Boiler Room."

34.     As Mr. Glass confessed to Bloomberg News, "it's a lot easier to persuade someone to take money than to spend it buying stock."

35.     Defendant Stern, the CEO of Yellowstone, is David Glass' brother-in-law.

36.     Just like the movie, Yellowstone utilizes high pressure boiler room tactics by employing salespersons with absolutely no financial background whatsoever.

37.     In fact, Yellowstone's number one funder, who is dubbed "the Closer," has no financial experience whatsoever.  Rather, his apparent expertise came from working for Verizon, as a customer sales representative.  He now generates over $47 million in funding a year.[9]

---

[9]  deBanked, The Closer – Meet the Yellowstone Capital Rep that Originated $47 Million in Deals Last Year, dated Feb. 10, 2016.

6

Case 1:21-cv-06386-MKV   Document 1-1   Filed 07/27/21   Page 9 of 143

38.     Stern actively solicits and recruits these boiler room salespersons on his personal social media websites.

39.     Although many of these high pressure sales pitches use the promise of helping these small businesses grow, in reality, all they do is fatten the pockets of the Enterprise.

40.     In addition to charging unlawful interest, the scheme is designed to trap the small businesses in a never-ending spiral of debt similar to payday lending where the small business has to take out additional loans to pay off the prior one.

41.     Since being founded in 2009, Yellowstone has expanded its umbrella to include numerous other MCA companies that operate under its management and control but exist under other corporate names.  These MCA companies include Advance Merchant, LLC, Arch, Capital Advance Services, LLC, Capital Merchant Services, LLC, HSC, World Global Capital, LLC, Green Capital Funding, LLC, Merchant Funding Services, LLC, and YCW.  With the exception of Arch, each of these other MCA companies use the same location of 30 Broad Street, 14th Floor, New York, NY 10004 on their contracts but are actually operated out of Yellowstone's headquarters at 1 Evertrust Plaza, Jersey City, New Jersey 07302.

42.     Although each of these MCA entities operates out of New Jersey, they were strategically organized under the laws of New York so that they could utilize New York's confession of judgment statute and post-judgment collection devices.

43.     In addition to its fleet of MCA companies, Yellowstone utilizes a vast network of Independent Sales Offices ("ISOs") and brokers to sell their criminally usurious loans.

44.     In 2017, Yellowstone and its related companies issued over $400 million in loans.

7

C.      **The Investors**

45.     On January 16, 2015, the Enterprise, through Stern, entered into an agreement with various investors for the sole purpose of funding the Enterprise's unlawful loansharking scheme (the "Pinnex Agreement").

46.     The Pinnex Agreement provided over $55 million to fund the Enterprise.

47.     Stern personally contributed over $20 million.

48.     Although the Pinnex Agreement does not identify Glass as an investor, on information and belief, Glass is a silent investor through Stern.

49.     Davis and Caporly contributed $4,230,000.

50.     On information and belief, through the Pinnex Agreement, the Investors became aware of the true nature of Yellowstone's business: namely, that it treated its agreements as absolutely repayable loans.

51.     The other potential John and Jane Doe investors that provided funding to the Enterprise are Pinnex Capital Partners LLC, Redwood Investments Group, Inc., Steve Cramer, Jeff Reece, Chris Clarke, Moshe Mandelbaum, Robin Spence, and Steve Weinrib.

D.      **Yellowstone and its Employees Admit That its MCA Agreements are Loans**

52.     In or around early 2016, Yellowstone and other MCA companies responded to increasing lawsuits and regulatory scrutiny by ensuring that their advertising materials were consistent with the language in their sham agreements.

53.     Yellowstone, however, cannot take back the statements it made about its MCA agreements before it learned that telling the truth was bad for business.

54.     Yellowstone has previously admitted in advertising and promotional materials that it was a direct lender and that its MCA agreements are loans.

8

55.     Yellowstone targets small businesses in need of "a loan":



56.     Yellowstone employees, including, Stern, also have admitted at various times on social media and/or industry forums that Yellowstone is really a lender.

57.     While Yellowstone's employees, at times, have also tried to distinguish MCAs from loans, their description of Yellowstone's MCA program actually reinforces the notion that the transactions are loans.

58.     In or around August 2013, Yellowstone retained a professional marketing company to create promotional videos that were marketed to the public on YouTube.

59.     Yellowstone created a channel for the videos, which it called EZBusinessLoans. EZBusinessLoans, *EZBusinessLoans*, YOUTUBE, https://www.youtube.com/channel/UCqIxvb 0kQMfrHcaEFM9nNuw/videos?shelf_id=0&sort=dd&view=0 (last visited Nov. 29, 2017).

60.     The actors in the videos were all employees of Yellowstone.

61.     The premise of each video is that small businesses cannot get approved for a loan from a traditional bank, but anyone with a pulse can get a loan from Yellowstone.

62.     One of the Yellowstone employees portrayed a character by the name of Dr. Daniel Dershowitz, a.k.a., Dynamite Disco Danny.[10]

---

[10] EZBusinessLoans, *Bad Credit Business Loans™ | 855-445-9649*, YOUTUBE (Aug. 2, 2013), https://www.youtube.com/watch?v=WsPZSgnms lE&pbjreload= 10.

9

Case 1:21-cv-06386-MKV   Document 1-1   Filed 07/27/21   Page 12 of 143

63.     This video is titled "Bad Credit Business Loans $^{TM}$ | 855-445-9649." *Id.*

64.     The premise of the video is that Dr. Dershowitz went to Las Vegas after his divorce, whereupon he overindulged, maxed out his credit cards and started dipping into his business account. *Id.* This video clearly targeted these loans for personal consumer use.

65.     Dr. Dershowitz then makes the following statements about his experience with a traditional lender and his experience with Yellowstone:

> When the funds got low, I was in over my head. The only way out was to get a business loan. So I went to the bank and when they ran my credit, the lady laughed at me**. So I went online and found Yellowstone Capital. I applied for a <u>loan</u> on Monday based on my monthly sales and on Wednesday they gave me my money.** It's crazy because my heartrate is higher than my credit score. So if you need money you need to apply right now while their computers are still giving out money to basically any business owner with a pulse. *Id.* (emphasis added).

66.     Below the video is the following link: "CLICK HERE TO APPLY! http://www.yellowstonecap.com/FundsToday." *Id.*

67.     As the video played, subtitles described Yellowstone's MCA program:

> Bad credit business loans are, and forever will be, extremely hard to obtain. Luckily, **Yellowstone Capital makes it easy to obtain an <u>unsecured bad credit business loan</u> if you have been turned away by your bank in search of an unsecured bad credit business loan, or unsecured business funding.**

> We keep our application process super short, and super easy. Once you submit your application, your business funding offer can be approved in the same day. Many of your clients receive their **<u>bad credit business loans</u>** in as little as three days.

> Been turned away for a small business credit card? **Apply at Yellowstone Capital for a <u>bad credit business loan, also known as a business cash advance</u>, or a merchant cash advance.**

> Need money for remodeling, upgrades, or to buy a new location? Our small business loans are easy to obtain for these things.

> **<u>Our business loans</u>** are unsecured. There are no set minimum monthly payments, which means there are never any late fees. So what are you waiting for? Click the

10

link at the top of the description to get started with your **bad credit business loan** application today!  *Id.* (emphasis added).

68.     These videos all link to a loan application on Yellowstone's website. *Id.*

69.     On or about April 1, 2013, Stern posted a video titled: "It's Morning in America – Yellowstone Capital Helps Small Business."[11]

70.     The man in the video makes the following statement:

For the past 4 years, Yellowstone Capital has successfully helped small businesses navigate cash flow issues.  With verifiable monthly revenue of just $25,000 through credit card processing or bank statements, **a simple loan** is at your disposal despite FICO score.  We are in this together. Call 877-972-2748 now or visit us at www.yellowstonecap.com  *Id.* (emphasis added).

71.     Below the video, Yellowstone described its services as follows:

**We have the money and we want to help. Let Yellowstone Capital lend you a helping hand today and just see how far we can go together.**

**D.     The MCA Agreements Are Substantively And Procedurally Unconscionable.**

72.     The Enterprise agreements (the "MCA Agreements"), including those entered into by the Plaintiffs, are unconscionable contracts of adhesion that are not negotiated at arms-length.

73.     Instead, they contain one-sided terms that prey upon the desperation of the small business and their individual owners and help conceal the fact that the transactions (collectively, the "Transactions"), including those involving the Plaintiffs, are really loans.

74.     Among these one-sided terms, the MCA Agreements include:  (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) moving or selling the business or any assets without permission from the MCA company, (4) a one-sided attorneys' fees provision

---

[11] Isaac Stern, *It's Morning in America – Yellowstone Capital Helps Small Business*, YOUTUBE (Apr. 1, 2013), https://m.youtube.com/ watch?v=98D9aCaHKbo.

obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of obtaining financing from other sources, (11) the maintenance of business interruption insurance, (12) an assignment of lease of merchant's premises in favor of the MCA company, (13) the right to direct all credit card processing payments to the MCA company, (14) a power-of-attorney "to take any and all action necessary to direct such new or additional credit card processor to make payment to Yellowstone," and (15) a power of attorney authorizing the MCA company "to take any action or execute any instrument or document to settle all obligations due…."

75.     The MCA Agreements are also unconscionable because they contain numerous knowingly false statements.   Among these knowingly false statements are that:   (1) the transaction is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA company to charge an exorbitant ACH Program Fee or Origination Fee.

76.     The MCA Agreements are also unconscionable because they are designed to fail. Among other things, the MCA Agreements are designed to result in a default in the event that the merchant's business suffers any downturn in sales by (1) forcing the merchant to wait until the end of the month before entitling it to invoke the reconciliation provision, (2) preventing the merchant from obtaining other financing, (3) and requiring the merchant to continuously

12

represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant.

77. The MCA Agreements also contain numerous improper penalties that violate New York's strong public policy. Among these improper penalties, the MCA Agreements (1) require the merchant to sign a confession of judgment entitling the MCA company to liquidated attorneys' fees based on a percentage of the amount owed rather than a good-faith estimate of the attorneys' fees required to file a confession of judgment, (2) accelerate the entire debt upon an Event of Default, and (3) require the merchant to turn over 100% of all of its receivables if it misses just one fixed daily payment.

**E. The Enterprise Uses a Sham Reconciliation Provision to Disguise the Loans.**

78. In order to evade state usury laws, the Enterprise includes a sham reconciliation provision to give the appearance that the loans do not have a definite term.

79. Under a legitimate reconciliation provision, if a merchant pays more through its fixed daily payments than it actually received in receivables, the merchant is entitled to seek the repayment of any excess money paid. Thus, if sales decrease, so do the payments.

80. For example, if an MCA company purchased 25% of the merchant's receivables, and the merchant generated $100,000 in receivables for the month, the most that the MCA company is entitled to keep is $25,000. Thus, if the merchant paid $40,000 through its daily payments, then the merchant is entitled to $15,000 back under the sham reconciliation provision.

81. In order to ensure that a merchant can never use their sham reconciliation provision, however, the Enterprise falsely represents that the fixed daily payment amount is a good-faith estimate of the percentage of receivables purchased. By doing so, the Enterprise ensures that if sales decrease, the required fixed daily payments remain the same.

13

82.     For example, if 25% of a merchant's actual monthly receivables would result in a daily payment of $1,000, the enterprise falsely states that the good-faith estimate is only $500 per day so that if sales did in fact decrease by 50%, the merchant would not be able to invoke the reconciliation provision.

83.     On information and belief, the Enterprise does not have a reconciliation department, does not perform reconciliations, and has never refunded a merchant money as required under their sham reconciliation provision.

**E.      The Enterprise Intentionally Disguised the True Nature of the Transaction.**

84.     Despite their documented form, the Transactions are, in economic reality, loans that are absolutely repayable.  Among other hallmarks of a loan:

(a)     The Daily Payments were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the Purchased Amount was to be repaid within a specified time;

(b)     The default and remedy provisions purported to hold the merchants absolutely liable for repayment of the Purchased Amount.  The loans sought to obligate the merchants to ensure sufficient funds were maintained in the Account to make the Daily/Weekly Payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants were in default and, upon default, the outstanding balance of the Purchased Amount became immediately due and owing;

(c)     While the agreements purport to "assign" all of the merchant's future account receivables to the Enterprise until the Purchased Amount was paid, the merchants retained all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables, the Enterprise merely acquired a security interest in the merchant's accounts to secure payment of the Purchased Amount;

(d)     The transaction was underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)     The Purchased Amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by the Enterprise based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

14

(f)      The amount of the Daily Payments was determined based upon when the Enterprise wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)      The Enterprise assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements;

(h)      The Enterprise required that the merchants to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(i)      The Enterprise required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew were breached from day one.

## THE UNDERLYING J.B. PLUMPBING TRANSACTIONS

**A.      J.B. Plumbing and Jerry Bush.**

85.      J.B. Plumbing is a family owned plumbing business, which was began after Jerry Bush, Sr. after serving in the U.S. Army.

86.      It is now operated by his son Jerry Bush, Jr.

87.      In 2015, J.B. did not get paid by one of his contractors on $350,000 project.

88.      In an attempt to dig out of the considerable financial whole that created, Mr. Bush was introduced to perhaps the lowest of the low in the MCA world, Mr. John Braun of Richmond Capital, LLC.

89.      Mr. Braun induced Mr. Bush to enter into a high-interest MCA loan, which Mr. Bush clearly could not afford.

15

90.     Shortly thereafter, Mr. Bush was approached by a broker who told Mr. Bush that he could offer more money at longer terms.  He assured Mr. Bush that doing so would not result in a default on his current loan with Richmond.

91.     Immediately after taking the new MCA loan, Richmond declared a default, filed a confession of judgment, and then drained J.B. Plumbing's bank account through a NYC Marshal.

92.     On information and belief, Mr. Braun referred Mr. Bush to Davis given their close relationship and partnering on other MCA deals.

93.     Davis, through CAS, then induced Mr. Bush to enter into a series of MCA loans, which would ultimately destroy J.B. Plumbing's business and induce Mr. Bush to attempt suicide.

94.     Davis was as cold-hearted as it gets.  In January 2018, Mr. Bush's wife was at the hospital battling cancer.  Davis called Mr. Bush on his way to the hospital demanding that Mr. Bush enter into a new MCA loan to payoff the existing one.  When Mr. Bush refused, Davis told Mr. Bush that he would have his bank accounts frozen just like what had happened with Richmond before he got to his wife's hospital room.  Mr. Davis callously added that he would nonetheless send his wife flowers.

95.     By summer of 2018, the burden of the MCA debt became to onerous to bear, and Mr. Bush made the difficult decision to close the business.

96.     In response, Davis told Mr. Bush that he still had to pay and that there were only two ways out:  "(1) win the lottery, or (2) die because [Davis] could not collect money from a dead body."

97.     Mr. Bush took Mr. Davis's advice and attempted suicide shortly thereafter.[12]

---

[12] *See* Ex. 6 (suicide notes).

98.     Fortunately, Mr. Bush was saved, and is now alive to tell his story and fight for all of those similarly situated.

**B.      The Enterprise Loans to J.B. Plumbing.**

**The First Usurious Loan Charging 351% Effective Interest[13]**

99.     On July 10, 2017, J.B. Plumbing entered into its first MCA loan with CAS.

100.    The loan amount was $80,000 and the principal and interest was $119,600.

101.    While on its face, J.B. Plumbing was to repay the loan based on 15% of its daily receivables, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

102.    As expressly negotiated by the parties in advance, J.B. Plumbing was to repay the loan in eighteen weeks through 70 fixed daily payments.  This negotiated amount is reflected in an Addendum to the loan, which fixes the payments at $1,699 per day.

103.    In order to avoid the usury laws, the Enterprise disguised this fixed daily payment by falsely representing that $1,699 per day is a good-faith estimate of 15% of J.B. Plumbing's daily receivables.

104.    As negotiated by the parties, the Enterprise intended to charge and collect the full repayment amount in exactly 14 weeks, which would have resulted in a simple interest rate in excess of 99%.

105.    The actual interest rate charged and received by the Enterprise, however, was even worse because the Enterprise also charged a $7,999 "ACH Program Fee," which the Defendants fraudulently represented were necessary because "the ACH program is labor intensive and is not an automated process, requiring [Defendants] to charge this fee to cover

---

[13] *See* Ex. 7.

17

related costs." Contrary to these intentional misrepresentations, the ACH program was, in fact, an automated process, and required no labor at all. Instead, these were sham fees fraudulently charged by, and shared among, Defendants.

106.    The effective interest rate on this loan was in excess of 351%.

### The Second Usurious Loan Charging 330% Effective Interest

107.    On September 7, 2017, J.B. Plumbing entered into its sixth MCA loan with CAS.

108.    The loan amount was $100,000 and the principal and interest was $149,500.

109.    While on its face, J.B. Plumbing was to repay the loan based on 15% of its daily receivables, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

110.    As expressly negotiated by the parties in advance, J.B. Plumbing was to repay the loan in fifteen weeks through 75 fixed daily payments. This negotiated amount is reflected in an Addendum to the loan, which fixes the payments at $1,994 per day.

111.    In order to avoid the usury laws, the Enterprise disguised this fixed daily payment by falsely representing that $2,135 per day is a good-faith estimate of 15% of J.B. Plumbing's daily receivables.

112.    As negotiated by the parties, the Enterprise intended to charge and collect the full repayment amount in exactly 15 weeks, which would have resulted in a simple interest rate in excess of 99%.

113.    The actual interest rate charged and received by the Enterprise, however, was even worse because the Enterprise also charged a $9,999 "ACH Program Fee," which the Defendants fraudulently represented were necessary because "the ACH program is labor intensive and is not an automated process, requiring [Defendants] to charge this fee to cover

18

related costs."  Contrary to these intentional misrepresentations, the ACH program was, in fact,

an automated process, and required no labor at all.  Instead, these were sham fees fraudulently

charged by, and shared among, Defendants.

114.    The effective interest rate on this loan was in excess of 330%.

**<u>The Third Usurious Loan Charging 309% Effective Interest</u>**

115.    On October 25, 2017, J.B. Plumbing entered into its second MCA loan with CAS.

116.    The loan amount was $130,000 and the principal and interest was $194,350.

117.    While on its face, J.B. Plumbing was to repay the loan based on 15% of its daily

receivables, the Enterprise unilaterally included this term to disguise the true nature of the

transaction.

118.    As expressly negotiated by the parties in advance, J.B. Plumbing was to repay the

loan in eighteen weeks through 80 fixed daily payments.  This negotiated amount is reflected in

an Addendum to the loan, which fixes the payments at $2,430 per day.

119.    In order to avoid the usury laws, the Enterprise disguised this fixed daily payment

by falsely representing that $2,430 per day is a good-faith estimate of 15% of J.B. Plumbing's

daily receivables.

120.    As negotiated by the parties, the Enterprise intended to charge and collect the full

repayment amount in exactly 16 weeks, which would have resulted in a simple interest rate in

excess of 99%.

121.    The actual interest rate charged and received by the Enterprise, however, was

even worse because the Enterprise also charged a $12,999 "ACH Program Fee," which the

Defendants fraudulently represented were necessary because "the ACH program is labor

intensive and is not an automated process, requiring [Defendants] to charge this fee to cover

19

related costs." Contrary to these intentional misrepresentations, the ACH program was, in fact, an automated process, and required no labor at all. Instead, these were sham fees fraudulently charged by, and shared among, Defendants.

122. The effective interest rate on this loan was in excess of 309%.

**The Fourth Usurious Loan Charging 331% Simple Interest**

123. On January 2, 2018, J.B. Plumbing entered into its fourth MCA loan with CAS.

124. The loan amount was $150,000 and the principal and interest was $224,250.

125. While on its face, J.B. Plumbing was to repay the loan based on 15% of its daily receivables, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

126. As expressly negotiated by the parties in advance, J.B. Plumbing was to repay the loan in fifteen weeks through 75 fixed daily payments. This negotiated amount is reflected in an Addendum to the loan, which fixes the payments at $2,990 per day.

127. In order to avoid the usury laws, the Enterprise disguised this fixed daily payment by falsely representing that $2,990 per day is a good-faith estimate of 15% of J.B. Plumbing's daily receivables.

128. As negotiated by the parties, the Enterprise intended to charge and collect the full repayment amount in exactly 15 weeks, which would have resulted in a simple interest rate in excess of 99%.

129. The actual interest rate charged and received by the Enterprise, however, was even worse because the Enterprise also charged a $14,999 "ACH Program Fee," which the Defendants fraudulently represented were necessary because "the ACH program is labor intensive and is not an automated process, requiring [Defendants] to charge this fee to cover

20

related costs." Contrary to these intentional misrepresentations, the ACH program was, in fact, an automated process, and required no labor at all. Instead, these were sham fees fraudulently charged by, and shared among, Defendants.

130.    The effective interest rate on this loan was in excess of 331%.

**The Fifth Usurious Loan Charging 496% Effective Interest**

131.    On April 23, 2018, J.B. Plumbing entered into its fifth MCA loan with CAS.

132.    The loan amount was $100,000 and the principal and interest was $149,500.

133.    While on its face, J.B. Plumbing was to repay the loan based on 15% of its daily receivables, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

134.    As expressly negotiated by the parties in advance, J.B. Plumbing was to repay the loan in ten weeks through 50 fixed daily payments. This negotiated amount is reflected in an Addendum to the loan, which fixes the payments at $2,999 per day.

135.    In order to avoid the usury laws, the Enterprise disguised this fixed daily payment by falsely representing that $2,999 per day is a good-faith estimate of 15% of J.B. Plumbing's daily receivables.

136.    As negotiated by the parties, the Enterprise intended to charge and collect the full repayment amount in exactly 10 weeks, which would have resulted in a simple interest rate in excess of 99%.

137.    The actual interest rate charged and received by the Enterprise, however, was even worse because the Enterprise also charged a $9,999 "ACH Program Fee," which the Defendants fraudulently represented were necessary because "the ACH program is labor intensive and is not an automated process, requiring [Defendants] to charge this fee to cover

21

related costs." Contrary to these intentional misrepresentations, the ACH program was, in fact, an automated process, and required no labor at all. Instead, these were sham fees fraudulently charged by, and shared among, Defendants.

138. The unconscionable interest rate on this loan was in excess of 496%.

**The Sixth Usurious Loan Charging 430% Simple Interest**

139. On May 31, 2018, J.B. Plumbing entered into its sixth MCA loan with CAS.

140. The loan amount was $125,000 and the principal and interest was $194,850.

141. While on its face, J.B. Plumbing was to repay the loan based on 15% of its daily receivables, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

142. As expressly negotiated by the parties in advance, J.B. Plumbing was to repay the loan in eighteen weeks through 65 fixed daily payments. This negotiated amount is reflected in an Addendum to the loan, which fixes the payments at $2,999 per day.

143. In order to avoid the usury laws, the Enterprise disguised this fixed daily payment by falsely representing that $2,990 per day is a good-faith estimate of 15% of J.B. Plumbing's daily receivables.

144. As negotiated by the parties, the Enterprise intended to charge and collect the full repayment amount in exactly 15 weeks, which would have resulted in a simple interest rate in excess of 111%.

145. The actual interest rate charged and received by the Enterprise, however, was even worse because the Enterprise also charged a $12,499 "ACH Program Fee," which the Defendants fraudulently represented were necessary because "the ACH program is labor intensive and is not an automated process, requiring [Defendants] to charge this fee to cover

22

related costs." Contrary to these intentional misrepresentations, the ACH program was, in fact, an automated process, and required no labor at all. Instead, these were sham fees fraudulently charged by, and shared among, Defendants.

146.    The unconscionable interest rate on this loan was in excess of 309%.

## CLASS ALLEGATIONS

147.    Plaintiffs and the putative Classes repeat and re-allege the allegations of each of the foregoing paragraphs as if fully alleged herein.

148.    Plaintiffs bring this action pursuant CPLR §§ 901-909.

149.    Plaintiff J.B. Plumbing brings this action individually and on behalf of classes of similarly situated persons defined as follows:

> **RICO Merchant Class:** All persons in the United States who, on or after July 9, 2017 paid money to the Enterprise pursuant to an MCA Agreement with an effective interest rate exceeding twenty-five percent.

> **RICO and Fraud Merchant Fee Class:** All persons in the United States who, on or after July 9, 2017 paid a fee to the Enterprise pursuant to an MCA Agreement.

150.    Plaintiff Jerry Bush, Jr. brings this action individually and on behalf of classes of similarly situated persons defined as follows:

> **RICO Principal Class:** All persons in the United States who, on or after July 9, 2017, individually as a principal, paid money to a member of the Enterprise pursuant to an MCA Agreement with an effective interest rate exceeding twenty-five percent.

> **RICO and Fraud Merchant Fee Class:** All persons in the United States who, on or after July 9, 2017, individually as a principal, paid a fee to the Enterprise pursuant to an MCA Agreement.

151.    The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their

23

parents have a controlling interest and its current or former employees, officers, and directors;
(3) persons who properly execute and file a timely request for exclusion from the Classes and
Subclasses; (4) persons whose claims in this matter have been finally adjudicated on the merits
or otherwise released or waived, unless that final adjudication, release, or waiver consists solely
of a confession of judgment entered within Rockland County; (5) Plaintiffs' and Defendants'
counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

152.    **Numerosity**:  The exact number of members of the Classes and Subclasses is
unknown and is not available to Plaintiffs at this time, but individual joinder in this case is
impracticable. Based on publicly available documents, each of the Classes and Subclasses likely
numbers in the hundreds.

153.    **Commonality and Predominance**:  There are many questions of law and fact
common to the claims of Plaintiffs and the other Class and Subclass members, and those
questions predominate over any questions that may affect individual members of the Class and
Subclasses. Common questions for the Class and Subclasses but are not limited to the following:

a.    Whether the MCA Agreements are loans;

b.    Whether the MCA Agreements are usurious;

c.    Whether the fees charged under the MCA agreements were fraudulent;

d.    Whether Plaintiffs and the Classes may recover any moneys or property
paid to the Enterprise pursuant to the MCA agreements; and

e.    Whether Defendants' conduct was willful or knowing.

154.    **Typicality**: Plaintiffs' claims are typical of the claims of the other members of the
Classes and Subclasses. Plaintiffs and members of the Classes and Subclasses sustained damages

24

as a result of Defendants' uniform wrongful conduct during transactions with Plaintiffs and the Classes and Subclasses.

155. **Adequate Representation**: Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Classes, and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes.

156. **Superiority**: This case is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by the individual members of the Classes are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendants' actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Classes to obtain effective relief from Defendants. Even if members of the Classes themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented herein. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

25

Case 1:21-cv-06386-MKV Document 1-1 Filed 07/27/21 Page 28 of 143

## FIRST CAUSE OF ACTION
### (RICO: 18 U.S.C. § 1962)

**By Plaintiffs and the Classes against
Yitzhak Stern, David Glass, Tsvi Davis, and the John and Jane Doe Investors**

157.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.    The Unlawful Activity.**

158.    More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

159.    In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

160.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

161.    As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

162.    This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

163.    As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

26

Case 1:21-cv-06386-MKV Document 1-1 Filed 07/27/21 Page 29 of 143

164.  The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

165.  Like here, this was a purely artificial device used by the loanshark to evade the law—an evasion that the Legislature sought to prevent.

166.  Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

**B.   Culpable Persons.**

167.  Glass, Stern, Davis and the John and Jane Doe Investors are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

168.  At all relevant times, each of Glass, Stern, Davis and the John and Jane Doe Investors was, and is, a person that exists separate and distinct from the Enterprise, described below.

169.  Glass has an ownership interest in Yellowstone and is the mastermind of the Enterprise.

170.  Stern has an ownership interest in Yellowstone, and was the Chief Executive Officer of Yellowstone at all relevant times.

171.  Davis has an ownership interest in Yellowstone, and was the Chief Underwriting Officer of Yellowstone at all relevant times.

172.  Through their operation of Yellowstone, the RICO Persons solicit, underwrite, fund, service and collect upon lawful debt incurred by small businesses in states that do not have usury laws.

27

Case 1:21-cv-06386-MKV   Document 1-1   Filed 07/27/21   Page 30 of 143

### C.      The Enterprise.

173.   Yellowstone, Caperly, and MCA Recovery, constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

174.   Yellowstone, Caperly and MCA Recovery are associated in fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

175.   Since at least 2012 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States, including J.B. Plumbing.

176.   The debt, including such debt evidenced by the Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

177.   Since at least 2012 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

178.   The Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1).  Its repeated and

28

continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**D.** **The Roles of the RICO Persons in Operating the Enterprise, and the roles of the individual companies within the Enterprise.**

179. The RICO Persons have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

**i.** **Defendant Glass**

180. Upon information and belief, Glass is an owner and the mastermind of the Enterprise. Together with Stern, Glass is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan, including the loans extended to J.B. Plumbing.

181. In his capacity as the mastermind of the Enterprise, Glass, together with Stern, is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations. All such forms were used to make

29

Case 1:21-cv-06386-MKV   Document 1-1   Filed 07/27/21   Page 32 of 143

and collect upon the unlawful loans including, without limitation, loans extended to J.B. Plumbing and the Classes and Subclasses.

182.    Glass has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

183.    While Glass purports to have divested from Yellowstone prior to the transactions at issue, Glass in fact maintained an interest, operating the company through Defendant Stern.

184.    Additionally, Glass's continued involvement in the management of Yellowstone is evidenced by a January 17, 2019 text message exchange with Davis, regarding Davis's desire to divest himself of Yellowstone equity:

> DAVIS: Hey I'm looking to get rid of my equity of Yellowstone. I'm looking into my options of selling it and have some intrest [sic] from some people. Any intrest [sic] in taking it over and saving all the trouble?
> Glass: Are you familiar with a local governmental employee call [sic] the NEW YORK STATE ATTORNEY GENERAL?
> DAVIS: lol
> DAVIS: Yes
> GLASS: I'm on a flight
> GLASS: Call u after
> DAVIS: Ok what's the prob with all of that?
> DAVIS: I don't think it's in anyone's best intrest [sic] for me to have eq
> DAVIS: So I got to see what my options are to sell it
> GLASS: we are living on different planets. you are trying to cash out and we are hoping to not be charged
> GLASS: I doubt you have any options right now
> GLASS: Let's see if we can get thru this
> DAVIS: Not looking to cash out and win the lottery. Looking to cut ties and get discounted price for it. Or try to get someone else to buy in which obviously you have first right and tag along options but looking at all options and not looking to wait months to do it
> GLASS: Probably best u wait for the IPO no?

30

> DAVIS: Lol
> DAVIS: I'm not a fan of penny stocks
> GLASS: The company is up to its *** in lawsuits and government investigations. The industry is under a microscope. There is no market for these shares at all. All there is now is unlimited personal liability all around.

185.    Glass has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to Yellowstone, Stern, Davis, MCA Recovery and to the Investors of the deals in which he has personally participated.

**ii.    Defendant Stern**

186.    Stern is an owner of Yellowstone and was its Chief Executive Officer at all relevant times.  Together with Glass, Stern is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan, including the loans extended to J.B. Plumbing and the Classes and Subclasses.

187.    In his capacity as the day-to-day leader of the Enterprise, Stern, together with Glass, is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to J.B. Plumbing and the Classes and Subclasses.

31

188.     Stern has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, soliciting and recruiting members of the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

189.     Stern has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to Yellowstone, MCA Recovery, Glass, Davis and to the Investors of the deals in which he, upon information and belief, has personally participated.

### iv.   Defendant Davis

190.     Davis is an owner of Yellowstone and was its Chief Underwriting Officer at all relevant times.  Davis was responsible for the day-to-day funding operations of the Enterprise and had final say on the funding decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan, including the loans extended to J.B. Plumbing and the Classes.

191.     In his capacity as the day-to-day funder of the Enterprise, Davis was responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the

32

borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to J.B. Plumbing and the Classes.

192.    Davis has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, soliciting and recruiting members of the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

193.    Davis has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to Yellowstone, MCA Recovery, Glass, and to the Investors of the deals in which he, upon information and belief, has personally participated.

iv.    **Defendants Yellowstone and CAS**

194.    Yellowstone is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of MCA Recovery and the Investors.  CAS is wholly owned and controlled by Yellowstone.

195.    Glass, Stern, Davis and the Investors have operated Yellowstone as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud. Pursuant to its membership in the Enterprise, Yellowstone has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals

Case 1:21-cv-06386-MKV   Document 1-1   Filed 07/27/21   Page 36 of 143

used by the Enterprise to collect upon the unlawful debt; and (v) obtained judgments in its name to further collect upon the unlawful debt.

196.     In this case, Yellowstone, through Defendant CAS: (i) solicited borrowers, including J.B. Plumbing; (ii) pooled funds from Investors to fund the Agreements; (iii) underwrote the Agreements; (iv) entered into the Agreements; and (v) collected upon the unlawful debt evidenced by the Agreements by effecting daily ACH withdrawals from the bank accounts of J.B. Plumbing.

**v.      The Investors**

197.     The Investors are a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of Yellowstone and MCA Recovery.

198.     Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing Yellowstone with all or a portion of the pooled funds necessary to fund the usurious loans, including the Agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

199.     The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

viii.    **Non-Party MCA Recovery**

200.    MCA Recovery is a debt collection company.  It is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of the Investors and Yellowstone.

201.    Upon default of a borrower's obligations under the usurious loan agreements and in furtherance of the Enterprise's goal of collecting upon the unlawful debt, at the Defendants' direction, MCA Recovery prepares affidavits for execution by employees of Yellowstone that falsely represent the transactions constitute the sale and purchase of future receivables in order to conceal the usurious and unlawful nature of the transactions and induce Courts of New York and elsewhere to enter judgments in favor of Yellowstone, including the Judgment entered against J.B. Plumbing and the Classes.

202.    Together with these affidavits and in furtherance of the Enterprise's goal of collecting upon the unlawful debt, MCA Recovery has filed thousands of Affidavits of Confessions with the Clerks of the Courts of New York.  In reliance upon the false affidavits of Davis and other employees of Yellowstone, the Clerks of the Courts of New York enter judgments in favor of Yellowstone that, based upon the representations made by Yellowstone in the supporting affidavits, include not only the outstanding sums of principal and usurious interest allegedly due and owing under the loans, but also fees for attorneys' services that have not, and may never be, rendered.

203.    Specifically, as alleged by the New Jersey Attorney General, on at least one occasion, MCA Recovery refused to accommodate a merchant's request to lower daily payments due to a cash flow issue, indicating that MCA Recovery treated the agreements as absolutely repayable. Ex. 2 ¶ 57(b).

35

### E.    Interstate Commerce

204.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

205.    Specifically, members of the Enterprise maintain offices in New York and New Jersey and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in Virginia, including J.B. Plumbing, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

206.    In the present case, all communications between the members of the Enterprise, J.B. Plumbing were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements and collect the Daily Payments via interstate electronic ACH debits.

207.    In addition, at the direction of Yellowstone, each of the Agreements was executed in states outside of New Jersey, and original copies of the Agreements and the applicable Confession Affidavits were sent from Virginia to Yellowstone, through CAS, at their offices in New Jersey via Federal Express using labels prepared by Yellowstone.

### F.    Injury and Causation.

208.    Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

209.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited

to, hundreds of thousands of dollars in improperly collected criminally usurious loan payments and the unlawful entry and enforcement of judgments.

210.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

211.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the Class Members are entitled to treble damages, plus costs and attorneys' fees from Defendants.

**SECOND CAUSE OF ACTION**
**(Conspiracy under 18 U.S.C. § 1962(d))**

**By Plaintiffs and the Classes against**
**Stern, Glass, Davis and the John and Jane Doe Investors**

212.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

213.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

214.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.   Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

215.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts,

37

Case 1:21-cv-06386-MKV Document 1-1 Filed 07/27/21 Page 40 of 143

including the Agreements, in violation of 18 U.S.C. § 1962(c). In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

216. Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c

217. The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

218. Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

219. The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments and the unlawful entry and enforcement of judgments.

220. Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

221. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants. The Court should also enter such equitable relief as it deems just and proper to preclude the Defendants from continuing to solicit, fund and collect upon unlawful debt, including the Agreements.

38

### THIRD CAUSE OF ACTION
### (Fraud)
### By Plaintiffs and the Classes against all Defendants

222.    Plaintiffs and the Classes repeat and re-allege the allegations set forth above.

223.    Each of the MCA loans was funded by Davis through his company Caporly.

224.    Each of the MCA loans was executed through an instrument drafted and authorized by Yellowstone through CAS.

225.    Stern, Glass and Davis each were aware of the language used in the form MCA loans used by Yellowstone through CAS.

226.    In connection with each of the MCA loans, Defendants represented that "the ACH program is labor intensive and is not an automated process, requiring [Defendants] to charge this fee to cover related costs."

227.    Contrary to these material, intentional misrepresentations, the ACH program was, in fact, an automated process, and required no labor at all.  Instead, these were sham fees fraudulently charged by Defendants.

228.    Plaintiffs and the Classes reasonably relied upon these knowingly false representations by agreeing to pay these fees.

229.    Plaintiffs and the Classes have, in fact, paid substantial fees as a direct and proximate result of these knowingly false representations by Defendants.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, jointly and severally, and seek an order from the Court:

a)    Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiffs as Class representatives, and appointing their attorneys as class counsel;

39

Case 1:21-cv-06386-MKV   Document 1-1   Filed 07/27/21   Page 42 of 143

b)      Declaring each of Plaintiffs' and the Class' agreements with Yellowstone and CAS to be a usurious loan in violation of New York Penal Law §190.40 and thus void and unenforceable;

c)      Permanently enjoining Defendants from engaging in the unlawful conduct described above, including entering into or collecting on any further usurious loan agreements;

d)      Awarding compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined a trial;

e)      Awarding treble damages;

f)      Requiring Defendants to pay Plaintiffs' and the Classes' attorneys' fees and costs; and

g)      Any further relief deemed appropriate by the Court.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class Members demand a trial by jury on all issues properly so tried.

Dated:  July 9, 2021

WHITE AND WILLIAMS LLP

By: _____

Shane R. Heskin
7 Times Square, Suite 2900
New York, NY 10036-6524
(215) 864-6329
heskins@whiteandwilliams.com
*Attorneys for Plaintiffs and the Putative Classes*

40

# EXHIBIT 1

Sign Here to Lose Everything

Part 1

# "I Hereby Confess Judgment"

Story by Zachary R. Mider and Zeke Faux

Data analysis by David Ingold and Demetrios Pogkas

November 20, 2018

The caller had Janelle Duncan's attention. Perpetually peppy at 53, with sparkly jewelry and a glittery manicure, Duncan was running a struggling Florida real estate agency with her husband, Doug. She began each day in prayer, a vanilla latte in her hand and her Maltese Shih Tzu, Coco, on her lap, asking God for business to pick up. She'd answered the phone that Friday morning in January hoping it would be a new client looking for a home in the Tampa suburbs.



The man identified himself as a debt counselor. He described a bizarre legal proceeding that he said was targeting Duncan without



▲ Featured in *Bloomberg Businessweek*, Nov. 26, 2018. Subscribe now. PHOTOGRAPHER: JAMIE CHUNG FOR BLOOMBERG BUSINESSWEEK

her knowledge. A lender called ABC had filed a court judgment against her in the state of New York and was planning to seize her possessions. "I'm not sure if they already froze your bank accounts, but they are RIGHT NOW moving to do just that," he'd written in an email earlier that day. He described the lender as "EXTREMLY AGGRESSIVE." Her only hope, the man said, was to pull all her money out of the bank immediately.

His story sounded fishy to the Duncans. They *had* borrowed $36,762 from a company called ABC Merchant Solutions LLC, but as far as they knew they were paying the money back on schedule. Doug dialed his contact there and was assured all was well. They checked with a lawyer; he was skeptical, too. What kind of legal system would allow all that to happen 1,000 miles away without notice or a hearing? They shrugged off the warning as a scam.

But the caller was who he said he was, and everything he predicted came true. The following Monday, Doug logged in at the office to discover he no longer had access to his bank accounts. A few days on, $52,886.93 disappeared from one of them. The loss set off a chain of events that culminated a month later in financial ruin. Not long after her agency went bankrupt, Janelle collapsed and was rushed to the hospital, vomiting bile.

As the Duncans soon learned, tens of thousands of contractors, florists, and other small-business owners nationwide were being chewed up by the same legal process. Behind it all was a group of financiers who lend money at interest rates higher than those once demanded by Mafia loan sharks. Rather than breaking legs, these lenders have co-opted New York's court system and turned it into a high-speed debt-collection machine. Government officials enable the whole scheme. A few are even getting rich doing it.

The lenders' weapon of choice is an arcane legal document called a confession of judgment. Before borrowers get a loan, they have to sign a statement giving up their right to defend themselves if the lender takes them to court. It's like an arbitration agreement, except the borrower always loses. Armed with a confession, a lender can, without proof, accuse borrowers of not





paying and legally seize their assets before they know what's happened. Not surprisingly, some lenders have abused this power. In dozens of interviews and court pleadings, borrowers describe lenders who've forged documents, lied about how much they were owed, or fabricated defaults out of thin air.

"Somebody just comes in and rips everything out," Doug said one evening in August, pulling up a stool at a Starbucks and recounting the events that killed the Duncans' business. After a long day spent selling houses for another company, the name tag pinned to his shirt had flipped upside down like a distress signal. "It's cannibalized our whole life."



Middle Ages, intended as a way to enforce debts without the fuss and expense of trial. Concerns about their potential abuse are almost as old. In Charles Dickens's 1837 novel *The Pickwick Papers*, a landlady who's tricked into signing one ends up in debtors' prison. Some U.S. states outlawed confessions in the middle of the 20th century, and federal regulators banned them for consumer loans in 1985. But New York still allows them for business loans.

For David Glass, they were the solution to a problem: People were stealing his money. Among the hustlers and con men who work the bottom rungs of Wall Street, Glass is a legend. Before he was 30, he'd inspired the stock-scam movie *Boiler Room*. Later busted by the FBI for insider trading, he avoided prison by recording incriminating tapes of his old colleagues. Even his enemies say Glass, who declined to comment for this story, is one of the sharpest operators they've ever dealt with.

In 2009, while still on probation, Glass and a friend named Isaac Stern started a company called Yellowstone Capital LLC. (ABC, the firm that wiped out the Duncans, is one of more than a dozen corporate names

used by Yellowstone's sales force.) Operating out of a red-walled office above an Irish bar in New York's financial district, these salespeople phoned bodegas and pizzerias and pitched their owners on loans. The rates sometimes exceeded 400 percent a year, and daily payments were required, but borrowers were desperate.



In the aftermath of the financial crisis, banks were cutting back on lending just when small businesses most needed cash. Companies such as Yellowstone stepped in. They got around lending regulations by calling what they did "merchant cash advances," not loans–a distinction judges recognize though there's little practical difference. The same people who'd pushed stock swindles in the 1990s and subprime mortgages a decade later started talking small businesses into taking on costly debt. The profits were huge, and the industry grew. Last year it extended about $15 billion in credit, according to an estimate by investment bank Bryant Park Capital.

Yellowstone would hire anyone who could sell. A nightclub bouncer sat next to ultra-Orthodox Jews fresh out of religious school. The best brokers earned tens of thousands of dollars a month, former employees say; others slept at the office, fought, sold loose cigarettes, and stole from each other. A video posted on YouTube shows Glass firing an employee. "Get the f-- out of my firm," he yells. "Why are you still sitting there, fat ass? Get out of my company!" To keep the troops focused, management would stack a pile of cash on a table and hold a drawing for closers.

Glass's problem was that some borrowers took Yellowstone's money with no intention of paying it back. Lawsuits against deadbeats proved pointless, dragging on for months or years. Then a lawyer who worked for

Yellowstone and other cash-advance outfits came up with the idea of requiring borrowers to sign confessions of judgment before receiving their loans. That way, at the first sign of trouble, lenders could start seizing assets, catching borrowers unawares.

In May 2012, Yellowstone became what appears to be the first company in the industry to file a confession in court. Others copied the trick. The innovation didn't just make collections easier; it upended the industry's economics. Now, even if a borrower defaulted, a company stood a chance of making a full recovery. By tacking on extra fees, it might even make more money, and faster, than if the borrower had never missed a payment. In some cases, the collections process became a profit engine.

Confessions aren't enforceable in Florida, where the Duncans signed theirs. But New York's courts are especially friendly to confessions and will accept them from anywhere, so lenders require customers to sign documents allowing them to file there. That's turned the state into the industry's collections department. Cash-advance companies have secured more than 25,000 judgments in New York since 2012, mostly in the past two years, according to data on more than 350 lenders compiled by *Bloomberg Businessweek*. Those judgments are worth an estimated $1.5 billion. The biggest filer by far, with a quarter of the cases: Yellowstone Capital.

a broker promising term loans of as much as $1 million at a cheap rate. The couple had owned their agency, a Re/Max franchise, for three years and now had 50 employees, but they still weren't turning a profit. A planned entry into the mortgage business was proving more expensive than expected. Doing some quick math, Doug figured he could borrow $800,000 to fund the expansion, pay off some debt, and come out with a lower monthly payment. The spam fax felt like a gift from God.

On the phone, the broker said that to qualify for a big loan, Doug would first have to accept a smaller amount and make a few payments as a tryout. He sent over the paperwork for a cash advance, not a term loan–and included confessions for both Doug and Janelle to sign. Without talking to a lawyer, they did. Why not? Doug thought. They intended to pay the money back on time.

The advance turned out to be for $36,762, repaid in $800 daily debits from their bank account starting the day after they got the money. This would continue for about three months, until they'd repaid $59,960, amounting to an annualized interest rate of more than 350 percent. A small price to pay, Doug figured–soon he'd have all the money he needed in cheaper, longer-term debt. But when he followed up the next month to

inquire about the status of the bigger loan, he got no response. The trouble started soon after.



A few hours after learning that their bank accounts had been frozen, the Duncans met with a local attorney, Jeffrey Dowd, in a law office squeezed between a nail salon and a transmission shop. Their bank, SunTrust, refused to tell them who was behind the freeze. It wasn't clear why Yellowstone would target them. Their contact there was still pleading

ignorance; the lender had collected its $800 payment as recently as the previous business day. Janelle was on the verge of tears.

A broad-shouldered man with a white goatee, Dowd handles everything from wills to lawsuits for small-business owners in the Tampa suburbs. After assuring the Duncans he'd get to the bottom of it, he logged on to his computer. He soon found a legal website showing that Yellowstone had won a judgment against the Duncans a few hours after Janelle received the warning phone call. The lender had gone to a court in the village of Goshen, 60 miles north of New York City.

"I hereby confess judgment," read the documents Doug and Janelle had signed. Attached was a statement signed by the same person at Yellowstone who'd assured Doug everything was fine. It said the Duncans had stopped making payments.

That wasn't true. The Duncans' bank records show that Yellowstone had continued to get its daily $800 even after going to court. The company's sworn statement also inflated the size of the couple's debt. But by the time Dowd found the case, it was already over. A clerk had approved the judgment less than a day after Yellowstone's lawyer asked for it. No proof was demanded, no judge was involved, and the Duncans didn't have a chance to present their side in court.

Beau Phillips, a Yellowstone spokesman, said in an email to *Businessweek* that the company was within its rights, because the Duncans had blocked one payment and never made up for it. The Duncans respond that if a block had taken place, it must have been a computer error. Why stop paying and then resume the next day?

The court papers revealed the name of Yellowstone's lawyer, and on a whim, Dowd searched for her other cases and found more than 1,500 results. The Duncans' predicament was no aberration. "It was like a rabbit hole," Dowd says. He dove in, clicking on case after case after case.





the Hudson River. Not far from the track, in the Orange County Clerk's office, women with ID lanyards around their necks sit behind Plexiglas windows, processing pistol permits and recording deeds. One clerk prints out proposed judgments sent electronically by cash-advance companies and makes them official with three rubber stamps.

Orange is one of a handful of counties in upstate New York that together handle an outsize share of the nation's cash-advance collections. Industry lawyers pick offices known to sign judgments quickly; there's no need for the borrower or lender to have a connection to the area. In even smaller Ontario County, cash-advance filings make up about three-quarters of the civil caseload. No matter how abusive the confessions might be, clerks have no choice but to continue processing them, says Kelly Eskew, a deputy clerk in Orange County.

To obtain a judgment, a lawyer for a cash-advance company must send in the confession along with a sworn affidavit explaining the default and how much is still owed. The clerk accepts the statement as fact and enters a judgment without additional review. Once signed, this judgment is almost impossible to overturn. Borrowers rarely try. Few lawyers will take on a client whose money is already gone, and getting a ruling can take months–too long to save a desperate business. It's a trap with no escape.

Clicking around a database of New York state court records, Dowd did find some cases in which cash-advance borrowers had sought to overturn judgments. They'd almost always failed. New York judges took the view that debtors waived their rights when they signed the papers. Dowd concluded it would probably cost the Duncans $5,000 to retain a lawyer to travel to Orange County. He advised them not to bother.

It's possible that if the Duncans had tried to overturn the judgment, they would have discovered that the confessions they'd signed were later altered. The signed originals contain an apparent drafting error, failing to identify the Duncans' company as subject to the judgment, a flaw that

might have prevented Yellowstone from seizing their money. In the version filed in court, someone had replaced the first two pages of each confession with the mistake corrected. Asked by *Businessweek* about the discrepancy, Phillips didn't provide an explanation.

> 1) I am a principal, owner, and an officer of STAR PERFORMANCE REALTY INC. d/b/a REMAX SOUTH SHORE REALTY, a Corporation located at 10445 GIBSENTON DR, RIVERVIEW, FL 33578 in the County of PASCO, and as such, I have the authority to act on behalf of STAR PERFORMANCE REALTY INC. d/b/a REMAX SOUTH SHORE REALTY, and have been authorized to execute this affidavit of confession of judgment. (DOUGLAS W DUNCAN, and JANELLE M DUNCAN are collectively referred to as "Merchant Defendant".)

> 1) I am a principal, owner, and an officer of STAR PERFORMANCE REALTY INC. d/b/a REMAX SOUTH SHORE REALTY, a Corporation located at 10445 GIBSENTON DR, RIVERVIEW, FL 33578 in the County of PASCO, and as such, I have the authority to act on behalf of STAR PERFORMANCE REALTY INC. d/b/a REMAX SOUTH SHORE REALTY, and have been authorized to execute this affidavit of confession of judgment. (STAR PERFORMANCE REALTY INC. d/b/a REMAX SOUTH SHORE REALTY is referred to as "Merchant Defendant".)

Borrowers have accused Yellowstone of forgery before. Just in the past year, a Georgia contractor presented evidence in court that a confession used against him was a complete fabrication, and a Maryland trucker complained to Yellowstone that a key term in his confession had been changed after the fact, as had happened with the Duncans. The company backed off from those borrowers but faced no further consequences. Phillips declined to comment on the accusations.

While Dowd didn't challenge the ruling against the Duncans in court, he did think he could get SunTrust to help them. He told the bank that one of the couple's accounts held funds that didn't belong to them because it was used to collect rent on behalf of landlords. Dowd says a banker at the local branch wanted to help but was overruled by higher-ups. The account remained frozen. A spokesman for SunTrust declined to comment.

When Dowd finally reached Yellowstone's lawyer, she referred him to a marshal who she said was handling the case. Dowd was confused. Why would a U.S. marshal be involved? His clients weren't fugitives. He called the phone number, and somebody with a Russian accent answered.

Brooklyn office of Vadim Barbarovich, who holds the title of New York City marshal. He'd stumbled onto an arcane feature of the city's government that's become another powerful tool for cash-advance companies.

New York's 35 marshals are government officers, appointed by the mayor, who collect private debts. They evict tenants and tow cars, city badges dangling from their necks. When they recover money, they get a fee of 5 percent. The office dates to Dutch colonial days, formed by a decree of Peter Stuyvesant's council. Fees for the biggest jobs were initially set at a dozen stivers, less than one-tenth the price of a beaver pelt.

Barbarovich's office is in the immigrant enclave of Sheepshead Bay. Before he was appointed in 2013, he'd tracked inventory at a Brooklyn hospital and volunteered as a Russian translator. He's now the go-to marshal for the cash-advance business and has gotten rich in the process. Last year, city records show, he cleared $1.7 million after expenses.

As soon as Yellowstone had obtained its judgment against the Duncans, it had sent a copy to Barbarovich, who had issued legal orders demanding money from Atlanta-based SunTrust and another bank in Alabama where the couple kept their personal funds. By law, New York marshals' authority is limited to the city's five boroughs, but a loophole vastly extends their reach: They're allowed to demand out-of-state funds as long as the bank has an office in the city, as SunTrust does. A few big banks refuse to comply with the orders, but most just hand over their customers' money.

SunTrust proved accommodating. Three days after freezing the Duncans' accounts, it took $52,886.93 and mailed a check to Barbarovich, enough to satisfy the judgment plus the 5 percent marshal's fee. Almost all of it was rent money the Duncans were holding for landlords, not their own funds. Barbarovich didn't respond to questions about the couple's case but said in an email that he follows the rules when issuing a demand for money. Phillips, the Yellowstone spokesman, said no one told the company that the money belonged to third parties until seven weeks after it was seized. Even then, Yellowstone refused to return it.

The Duncans scrambled to make up the shortfall. Doug got another, larger cash advance from a different company to keep afloat. The daily payments on that loan were too much for them to handle, though, and they were soon short of cash again. Sensing trouble, employees fled.

One evening, Janelle thought she was having a heart attack. Her pulse raced, her limbs went numb, and she grew nauseous. An ambulance rushed her to the hospital. Her heart was fine. Her insurance claim was denied.

*Businessweek* really did fall behind on their debt payments. Their

experiences were no less wrenching. They spoke of divorce, of lost friendships, of unpaid medical bills.

"You can't defend yourself," says Richard Schilg, the owner of a human resources company in Ohio who borrowed hundreds of thousands of dollars with at least six advances. "As long as you still have a business, as long you have a personal checking account, they're going to hound you. Your life is ruined by their contract." Schilg says he always tried to honor his debts. But his access to money has been so restricted by cash-advance judgments that he's had to sell furniture to buy food.

He's one of many borrowers who've received nasty threats from debt collectors. "I will make this my personal business to f--- you," a Yellowstone executive named Steve Davis told Schilg on a voicemail heard by *Businessweek*. Davis texted another: "I will watch you crash and burn." Asked about the messages, Davis says, "People defraud us. When that happens we have to do what's best for us."

Jerry Bush, who ran a plumbing business with his father in Roanoke, Va., signed confessions for at least six cash advances from companies including Yellowstone, taking one loan after another as his payments mounted to $18,000 a day. In January, Davis called him while he was accompanying his wife to a chemotherapy appointment and threatened him with the confession in a dispute over payment terms. Davis denies menacing Bush, but according to Bush's account of their conversation, Davis said he would pursue Bush until his death and take all of his money, leaving nothing to pay for his wife's treatment. Bush also says Davis then offered to send flowers to Bush's wife.



In August, Bush closed his business, laid off his 20 employees, and stopped making payments on his loans. Yellowstone never filed its signed confession in court, but other lenders went after him over theirs. One sunny day that month, he walked to a wooded area near his home, swallowed a bottle of an oxycodone painkiller, and began streaming video to Facebook. To anyone who might have been watching, he explained that he'd taken out cash advances in a failed attempt to save his business. Now the lenders had seized his accounts, Bush said, his voice wavering. One had even grabbed his father's retirement money.

"I signed 'em, I take the blame for it," he said. "This will be my

last video. I am taking this on me."

He asked his friends to take care of his family, then sobbed as he told his wife and teenage son he loved them.

Someone who saw the video alerted the police. They found Bush unconscious in the woods a few hours later—he credits them with saving his life. But the pressure from his confessions of judgment hasn't relented. "I wake up every morning afraid what else they will take," he says. "And every morning I throw up blood."

Bush's contracts with Yellowstone show that the company advanced him a total of about $250,000 and that he paid them back more than $600,000. Davis, who parted ways with Yellowstone in August, says he didn't mistreat Bush or other borrowers and always followed the company's protocols. "You know why people put the blame on me is because I'm successful," he says. "It's just haters."

As for the Duncans, each morning at their house still begins with a prayer and a Bible verse. Their retirement savings evaporated with their agency, but they've been able to keep their house. They continue to believe God has a plan for every one of his children, but they've learned to trust some of those children less. "If we don't have peace from God, and we live in outrage, it destroys us," Janelle says. "So I'm choosing to have hope to start again, and we're relying on the Lord to replace what the enemy has stolen and turn it around for good."

By seizing their bank deposits, Yellowstone had managed to collect its money ahead of schedule and tack on $9,990 in extra legal fees, payable to a law firm in which it owns a stake. In about three months, the company and its affiliates almost doubled their money. At that rate of return, one dollar could be turned into 10 in less than a year.

Everyone else involved in the collection process got a slice, too. SunTrust got a $100 processing fee. Barbarovich's office got approximately $2,700, with about $120 of that passed along to the city. The Orange County Clerk's office got $41 for its rubber stamps. The New York state court system got $184.

To date, no state or federal regulator has tried to police the merchant-cash-advance industry. Its lawyers designed it to avoid scrutiny, sidestepping usury laws and state licensing requirements by keeping the word "loan" out of paperwork and describing the deals as cash advances against future revenue. And because the customers are technically businesses, not individuals, consumer protection laws don't apply, either.

With regulators sidelined and lawmakers oblivious, Yellowstone and its peers keep growing. After Glass stepped back a couple of years ago from day-to-day operations—his criminal record was making it harder to find investors—Wall Street investment bankers arranged a $120 million line of credit to finance more advances. In 2016 the company moved from its grimy downtown Manhattan offices to a shiny building in Jersey City,

pocketing $3 million in state tax incentives. On Instagram, a top salesman shows off flights on private jets, a diamond-encrusted watch, and a Lamborghini. Yellowstone advanced $553 million last year, its highest total ever.

In April, on the same day Janelle Duncan was selling the last of her office furniture, Yellowstone executives marked the company's ninth anniversary with a luncheon in Jersey City. In a celebratory email marking the occasion, Stern, the co-founder, wrote, "I am continually blown away at the success and achievements we continue to have."



▲  A stack of cash about to be raffled off to a lucky Yellowstone employee.   SOURCE: FACEBOOK

Share this article:   Share   Tweet   Post   Email



**The Year in Money 2018**





**Investors Are Piling Into Loans That Banks Have Avoided Since the Crash**

Dec. 17, 2018

Dec. 19, 2018

**Wall Street's Billionaire Machine, Where Almost Everyone Gets Rich**

Dec. 20, 2018

**The Cost of Dirty Money**

Jan. 29, 2019







# EXHIBIT 2

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street - 5th Floor
P.O. Box 45029-5029
Newark, New Jersey 07101
Attorney for Plaintiffs

By:    Chanel Van Dyke (165022015)
       Deputy Attorney General
       (973) 648-7819

                                    SUPERIOR COURT OF NEW JERSEY
                                    CHANCERY DIVISION, HUDSON COUNTY
                                    DOCKET NO. _____

| | |
|---|---|
| GURBIR S. GREWAL, Attorney General of the State of New Jersey, and PAUL R. RODRÍGUEZ, Acting Director of the New Jersey Division of Consumer Affairs, <br><br> Plaintiffs, <br><br> v. <br><br> YELLOWSTONE CAPITAL LLC; FUNDRY.US LLC; HIGH SPEED CAPITAL LLC; WORLD GLOBAL CAPITAL LLC d/b/a YES FUNDING; HFH MERCHANT SERVICES LLC; MCA RECOVERY LLC; GREEN CAPITAL FUNDING LLC; MAX RECOVERY GROUP LLC; and JANE and JOHN DOES 1-10, individually and as owners, officers, directors, shareholders, founders, managers, members, agents, servants, employees, representatives and/or independent contractors of YELLOWSTONE CAPITAL LLC, FUNDRY.US LLC, HIGH SPEED CAPITAL LLC, WORLD GLOBAL CAPITAL LLC d/b/a YES FUNDING, HFH MERCHANT SERVICES LLC, MCA RECOVERY LLC, GREEN CAPITAL FUNDING LLC, and MAX RECOVERY GROUP LLC; and XYZ CORPORATIONS 1-10, <br><br> Defendants. | Civil Action <br><br><br><br><br> **COMPLAINT** |

Plaintiffs Gurbir S. Grewal, Attorney General of the State of New Jersey ("Attorney General"), with offices located at 124 Halsey Street, Fifth Floor, Newark, New Jersey, and Paul R. Rodríguez, Acting Director of the New Jersey Division of Consumer Affairs ("Director") (collectively, "Plaintiffs"), with offices located at 124 Halsey Street, Seventh Floor, Newark, New Jersey, by way of Complaint, state:

## PRELIMINARY STATEMENT

1.      The Attorney General and the Director commence this action against New Jersey-based Yellowstone Capital LLC ("Yellowstone"); Yellowstone's parent Fundry.US LLC ("Fundry"); Yellowstone's subsidiaries High Speed Capital LLC ("High Speed"), World Global Capital LLC d/b/a YES Funding ("World Global"), HFH Merchant Services LLC ("HFH"), Green Capital Funding LLC ("Green Capital"), and MCA Recovery LLC ("MCA Recovery"); and Yellowstone's affiliate Max Recovery Group LLC ("Max Recovery").[1] Defendants, acting in concert with each other as well as other third-party entities and individuals, have engaged in unconscionable business practices, deceived consumers, and/or made false or misleading statements in the (i) sale of unlawful, predatory and usurious loans to small businesses and their owners, which Defendants masked as merchant cash advances ("MCAs"); (ii) marketing and advertising of the purported MCAs; and (iii) servicing and collection of the purported MCAs.

2.      The Yellowstone MCA Defendants have advertised, marketed, offered, and sold short-term, high-cost financing to small businesses and their owners who need quick access to funds but who may not qualify for traditional financing such as bank loans. Under their "Merchant

---

[1] Yellowstone, Fundry, High Speed, World Global, HFH, and Green Capital are, collectively, the "Yellowstone MCA Defendants." MCA Recovery and Max Recovery are, collectively, the "MCA Collection Defendants." The "Defendants" include all named and unnamed entity and individual defendants.

Agreement" contracts with small businesses and their owners ("Consumers"), the Yellowstone MCA Defendants have purported to provide an MCA—a lump sum payment to purchase a portion of a business's future receivables at a discount—to be repaid by the Consumer as set forth in the contract. Yellowstone has induced these Consumers—often struggling, unsophisticated small businesses whose owners have "bad credit" or need "fast cash"—to enter the Merchant Agreements with false and misleading advertising promising MCAs with flexible repayment terms that are tied to the business's receivables and that do not require the owner's personal guarantee.

3.      In reality, the Yellowstone MCA Defendants' Merchant Agreements have subjected Consumers to far less favorable repayment terms than the Consumers would have enjoyed under a legitimate MCA contract, and Defendants have doubled down on their abuse of Consumers through numerous unconscionable, deceptive, and fraudulent servicing and collection practices. Among other things, the Yellowstone MCA Defendants drafted their Merchant Agreements to bury myriad unconscionable terms that, among other things, eliminate the distinctions between loans (with fixed regular payments over a defined term) and legitimate MCAs (with variable payments tied to actual receivables and an undefined term) that Yellowstone touts in its advertising. Under these Merchant Agreements, unlike legitimate MCA contracts, the fixed daily payments extracted from Consumers' accounts have little to no relation to the businesses' receivables, and Consumers whose businesses are struggling have been either stymied in their efforts to adjust their daily payment amounts or driven by Defendants into an even worse financial situation. Meanwhile, the Yellowstone MCA Defendants have, through various other devices, shifted risk onto Consumers—both businesses and their owners—in ways that are inconsistent with legitimate MCA contracts and that have facilitated Defendants' unconscionable collection practices. In short, by masking their MCAs as purchases of accounts receivables, as opposed to

what they really are—unlawful and usurious loans—Defendants have sought to avoid responsibility for their predatory lending.

4.      Defendants' misconduct has led to the financial ruin of small businesses and owners across the United States.  As of 2017, Yellowstone had reported advancing $553 million to small businesses.  From 2012 to 2018, MCA companies collected more than $1.5 billion in judgments through the filing of over 25,000 Confessions of Judgment ("COJs").  Yellowstone was responsible for 25% of those filings, making it the biggest filer by far in the MCA industry—an industry that stands to grow substantially as a result of the COVID-19 pandemic, which has caused large numbers of small businesses to struggle and close.

5.      For the reasons stated herein, Plaintiffs bring this action to seek redress for Defendants' violations of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -226 ("CFA"), and the Regulations Governing General Advertising, N.J.A.C. 13:45A-9.1 to -9.8 ("Advertising Regulations").  Plaintiffs therefore seek to permanently enjoin Defendants' unconscionable and deceptive business practices, and to recover statutory civil penalties, consumer restitution, and other equitable and monetary relief.

## PARTIES AND JURISDICTION

6.      The Attorney General is charged with the responsibility of enforcing the CFA and the Advertising Regulations.  The Director is charged with the responsibility of administering the CFA and the Advertising Regulations on behalf of the Attorney General.  Plaintiffs bring this action pursuant to their authority under the CFA, specifically N.J.S.A. 56:8-8, 56:8-11, 56:8-13, and 56:8-19.

7.      Venue is proper in Hudson County, pursuant to R. 4:3-2, because it is a county in which Defendants have done business.

8.      Defendant Yellowstone is the primary business platform from which Defendants operate.  Yellowstone is a limited liability company established in New York and registered to do business in New Jersey on July 16, 2015.  Yellowstone presently maintains a principal place of business located at 1 Evertrust Plaza, 14th Floor, Jersey City, New Jersey 07302.

9.      Yellowstone's registered agent in New Jersey is Yitzhak Stern, who maintains a mailing address at 1 Evertrust Plaza, Suite 1401, Jersey City, New Jersey 07302.

10.      Defendant Fundry is Yellowstone's parent corporation. Fundry is a limited liability company established in New Jersey on May 26, 2016, with a principal place of business at 1 Evertrust Plaza, Suite 1401, Jersey City, New Jersey 07302.

11.       Fundry's registered agent in New Jersey is Fundry.US, which maintains a mailing address at 1 Evertrust Plaza, 14th Floor, Attention B. Klein, Jersey City, New Jersey 07302.

12.      Defendant High Speed is Yellowstone's wholly owned subsidiary.  High Speed is a limited liability company established in New York on May 5, 2014.  Upon information and belief, High Speed presently maintains a principal place of business and mailing address at 1 Evertrust Plaza, 14th Floor, Jersey City, New Jersey 07302.  High Speed failed to register in New Jersey pursuant to N.J.S.A. 14A:13-3(1), despite doing business in New Jersey and, upon information and belief, maintaining a principal place of business in New Jersey.

13.      High Speed's registered agent in New York is Business Filings Incorporated, which maintains a mailing address at 187 Wolf Road, Suite 101, Albany, New York 12205.

14.      Defendant World Global is Yellowstone's wholly owned subsidiary.  World Global is a limited liability company established in New York on June 27, 2016.  Upon information and belief, World Global presently maintains a principal place of business located at 1 Evertrust Plaza, 14th Floor, Jersey City, New Jersey 07302.  World Global failed to register in New Jersey pursuant

to N.J.S.A. 14A:13-3(1), despite doing business in New Jersey and, upon information and belief, maintaining a principal place of business in New Jersey.

15.     World Global's registered agent in New York is Business Filings Incorporated, which maintains a mailing address at 187 Wolf Road, Suite 101, Albany, New York 12205.

16.     Defendant HFH is Yellowstone's wholly owned subsidiary.  HFH is a limited liability company established in New York on January 9, 2017.  Upon information and belief, HFH presently maintains a principal place of business and mailing address at 1 Evertrust Plaza, 14th Floor, Jersey City, New Jersey 07302.  HFH failed to register in New Jersey pursuant to N.J.S.A. 14A:13-3(1), despite doing business in New Jersey and, upon information and belief, maintaining a principal place of business in New Jersey.

17.     HFH's registered agent in New York is Business Filings Incorporated, which maintains a mailing address at 187 Wolf Road, Suite 101, Albany, New York 12205.

18.     Defendant Green Capital is Yellowstone's wholly owned subsidiary.  Green Capital is a limited liability company established in New York on April 28, 2015.  Green Capital presently maintains a principal place of business and mailing address at 1 Evertrust Plaza, 14th Floor, Jersey City, New Jersey 07302.  Green Capital has never registered as a business in New Jersey as required pursuant to N.J.S.A. 14A:13-3(1), despite doing business in New Jersey and maintaining a principal place of business in New Jersey.

19.     Green Capital's registered agent in New York is Business Filings Incorporated, which maintains a mailing address at 187 Wolf Road, Suite 101, Albany, New York 12205.

20.     Defendant MCA Recovery is Yellowstone's wholly owned subsidiary.  MCA Recovery is a limited liability company established in New York on November 30, 2012.  Upon

Case 1:21-cv-06386-MKV   Document 1-1   Filed 07/27/21   Page 64 of 143

information and belief, MCA Recovery presently maintains a principal place of business and mailing address at 17 State Street, Suite 4000, New York, New York 10004.

21.      MCA Recovery's registered agent in New York is Business Filings Incorporated, which maintains a mailing address at 187 Wolf Road, Suite 101, Albany, New York 12205.

22.      Defendant Max Recovery is a debt collection company affiliated with Yellowstone. Max Recovery is a limited liability company established in New York on January 18, 2017. Upon information and belief, Max Recovery presently maintains a principal place of business and mailing address at 55 Broadway, 3rd Floor, New York, New York 10006.

23.      Max Recovery's registered agent in New York is Business Filings Incorporated, which maintains a mailing address at 187 Wolf Road, Suite 101, Albany, New York 12205.

24.      At various times, Defendant Yellowstone employed, contracted with, and/or acted through and in concert with a web of third parties, including entities and/or individuals described by Yellowstone as Independent Funding Organizations ("Funders"), Independent Sales Organizations ("ISOs"), and Sales Representatives (collectively, "Third Parties"), in its MCA transactions with Consumers.

25.      Upon information and belief, Jane and John Does 1 through 10 are fictitious individuals meant to represent the owners, officers, directors, shareholders, founders, managers, members, agents, servants, employees, representatives, and/or independent contractors of Yellowstone, Fundry, High Speed, World Global, HFH, MCA Recovery, Green Capital, and/or Max Recovery, who have been involved in the conduct that gives rise to this Complaint, but are heretofore unknown to the Plaintiffs. As these defendants are identified, Plaintiffs shall amend this Complaint to include them.

26.      Upon information and belief, XYZ Corporations 1 through 10 are fictitious entities

meant to represent any additional entities that have been involved in the conduct that gives rise to this complaint, but are heretofore unknown to the Plaintiffs. As these defendants are identified, Plaintiffs shall amend this Complaint to include them.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

27.     Since at least July 2015, the Yellowstone MCA Defendants—Yellowstone, Yellowstone's parent Fundry, and Yellowstone's subsidiaries High Speed, World Global, HFH, and Green Capital—in concert with each other and related or affiliated entities and the Third Parties, have advertised, marketed, offered for sale, and sold MCAs to Consumers in this State and elsewhere, and have serviced the repayment of the MCAs by such Consumers. The MCA Collection Defendants—MCA Recovery and Max Recovery—in concert with the Yellowstone MCA Defendants and/or other related or affiliated Third Parties, have engaged in debt collection from Consumers on behalf of the Yellowstone MCA Defendants.

28.     The Yellowstone MCA Defendants purport to provide Consumers an MCA—a lump sum payment to purchase a portion of a business's future receivables at a discount—to be repaid by the Consumers as set forth in the Yellowstone MCA Defendants' Merchant Agreements.

29.     As set forth herein, however, the Yellowstone MCA Defendants' Merchant Agreements contain numerous unconscionable terms that, among other things, cause them to operate as unlawful, usurious loans rather than legitimate MCAs. The Yellowstone MCA Defendants, and Yellowstone in particular, relied on false and misleading advertising and misrepresentations to induce Consumers to enter their unlawful, one-sided Merchant Agreements. And, once they induced Consumers to enter the Merchant Agreements, Defendants engaged in myriad unconscionable, deceptive, and fraudulent practices in connection with servicing the repayment of the MCAs and collection of debts they alleged to be owed on those MCAs.

## A.   Background on MCAs

30.     In a typical merchant agreement involving the purchase and sale of receivables, a small business agrees to sell a percentage of its future receivables in exchange for a lump sum payment—an MCA.  The business agrees to a repayment amount exceeding the amount of the MCA, and that amount is repaid through daily payments reflecting a percentage of the business's estimated average daily receivables (with that percentage being equal to the percentage of the business's receivables purchased by the MCA company).

31.     Estimated daily payments typically are calculated based on a review of several months of receivables. That information is used to determine the business's average monthly receivables, which are then divided by the average number of business days in a month to determine the average daily receivables. The average daily receivables are then multiplied by the percentage of receivables purchased by the MCA company to calculate the estimated daily payments.

32.     Unlike a loan, a legitimate MCA contract does not guarantee the issuer regular payments or payment over a fixed, finite term. Instead, if a business's receivables change over time, its daily payment amount can be adjusted through a process called "reconciliation." A decrease in receivables decreases the merchant's daily payments, and the MCA will be repaid over a longer period. In addition, the MCA company's recourse in the event of default typically lies with the small business's receivables.

33.     The variability and lack of security associated with legitimate MCA contracts create certain risks for the MCA company – and corresponding protections for the merchant – in the event of a downturn in the merchant's business. In part because legitimate MCAs, unlike traditional closed-end installment loans, do not involve fixed regular payments and a finite repayment period,

MCAs generally are excluded from certain consumer protections that apply to loans, such as usury caps.

**B.**     **The Yellowstone MCA Defendants' Merchant Agreements Include Numerous Unconscionable Terms and Conditions and Are Implemented in an Unconscionable Manner**

34.     Although the Yellowstone MCA Defendants' Merchant Agreements were presented to Consumers as MCA contracts, the Merchant Agreements include numerous terms and conditions that made them substantially less favorable to Consumers than typical MCA contracts, that were individually and collectively unconscionable, and that were implemented by Defendants in an unconscionable manner.

**1.**     **Yellowstone Advertised the Merchant Agreements As Having the Benefits of Typical MCA Contracts**

35.     Notwithstanding the disadvantageous terms and conditions that distinguished the Yellowstone MCA Defendants' Merchant Agreements from typical MCA contracts, Yellowstone specifically touted the substantial distinctions between traditional loans and MCAs in its marketing to small business owners in need of "fast cash" or with bad credit.

36.     Yellowstone's advertising described its MCA repayment terms as flexible, "not fixed," and "calculated as a set percentage of your sales":

> One of the biggest advantages to taking out a cash advance is the fact that repayments are not fixed. You won't pay X amount until the debt is settled, instead you'll pay a different amount each month, which is calculated as a set percentage of your sales. This means that your business will never be crippled with high repayment fees – because they'll always be in proportion with your actual sales.

37.     Similarly, in another advertisement, Yellowstone described its flexible repayment terms as "based directly on sales":

> When it comes to repaying your cash advance we know that fixed monthly payments can be very challenging for businesses to accommodate – especially if your business is in a seasonal market.

> For that reason the repayments that you make will be based directly on the sales that you make that month. So if sales are up[,] you'll pay a larger repayment, but if sales are down, you'll pay less. Repayments are calculated by a percentage of your sales – which offers great flexibility.

38.     In addition, Yellowstone promoted its MCAs as not requiring a personal guarantee:

a.     "Here at Yellowstone Capital we provide no personal guarantee capital for most businesses"; and

b.     "We Provide Capital With No Personal Guarantee."

39.     Yellowstone also advertised its MCAs as "unsecured" in YouTube promotional videos.

## 2.     Consumers' Daily Payments Were Fixed, Instead of Calculated As a Percentage of Receivables As Advertised

40.     Despite specifically citing these distinctions between traditional loans and MCAs as a selling point, the Yellowstone MCA Defendants structured their Merchant Agreements to eliminate these distinctions altogether, and to include unconscionable terms that shift risk to the Consumers. The Merchant Agreements in fact obligate Consumers to pay a fixed amount subject to interest, over a defined period, untethered from the Consumers' receivables – just as the Consumers would be obligated to repay a traditional loan, but without the legal protections afforded to loan borrowers.

41.     In addition, as part of the Merchant Agreement, the Yellowstone MCA Defendants compelled Consumers to execute additional documents including unconscionable terms and conditions that not only obligated the small business owners to personally guarantee repayment of these usurious loans, but also made it exceedingly simple for Defendants to obtain a one-sided judgment against and/or to freeze and seize the assets of not only the small business, but the small business owner.

42.     The Merchant Agreement consists of the front page and Terms and Conditions Sheet; Addendum to Secured Merchant Agreement; Appendix A – Fee Structure; ACH Authorization Form; a Security Agreement and Guaranty; and/or an Affidavit of Confession of Judgment. At various times, the Yellowstone MCA Defendants printed the Merchant Agreements in small, illegible type, with material provisions appearing in 5.5-point to 6-point font size.

43.     The first page of the Merchant Agreement[2] states:

### **PURCHASE AND SALE OF FUTURE RECEIVABLES**

> Merchant hereby sells, assigns and transfers to [Yellowstone] (making [Yellowstone] the absolute owner) in consideration of the funds provided ("Purchase Price") specified below, all of Merchant's future accounts, contract rights and other obligations arising from or relating to the payment of monies from Merchant's customers' . . . (the "Receipts" . . . ), for the payment of Merchant's sale of goods or services until the amount specified below (the "Purchased Amount") has been delivered by Merchant to [Yellowstone].

> The Purchased Amount shall be paid to [Yellowstone] by Merchant's irrevocably authorizing <u>only one</u> depositing account acceptable to [Yellowstone] (the "Account") to remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each transaction, until such time as [Yellowstone] receives payment in full of the Purchased Amount. . . . [Yellowstone] may, upon Merchant's request, adjust the amount of any payment due under this Agreement at [Yellowstone]'s sole discretion and as it deems appropriate . . . .

44.     Immediately below this text in large letters are listed the Purchase Price, the Specified Percentage (usually between 10% and 25%), and the Purchased Amount. For example, one Consumer's Merchant Agreement stated:

> **Purchase Price: $ <u>20,000.00</u> Specified Percentage: <u>20  %</u> Receipts Purchased Amount: <u>$28,600.00</u>**

---

[2] There are minor, immaterial differences among the Merchant Agreements, Addendum, and other documents used by the multiple Yellowstone MCA Defendants with different Consumers.

Thus, in exchange for a $20,000 lump sum (less certain inadequately disclosed fees) that Yellowstone would pay to the Consumer, Yellowstone would be owed $28,600 from the Consumer's future receivables to be paid in daily payments of 20% of receivables. Specifically, the Merchant Agreement provides that the Consumer is required to pay the Specified Percentage (in this case 20%) "of the Merchant's settlement amounts due from each transaction" and that Yellowstone would debit that "specified remittance from the merchant's bank account on a daily basis."

45.     Although this language in the Merchant Agreement provides that the Daily Payment should be calculated as the Specified Percentage of expected receivables – as in a legitimate MCA contract – the language is modified by the "Addendum to the Secured Merchant Agreement" ("Addendum"). The Addendum, which is executed simultaneously with the Merchant Agreement and controls in the event of a conflict with the Merchant Agreement, automatically converts the Specified Percentage to a fixed Daily Payment:

> By signing below, the Merchant hereby requests and acknowledges that the Specified Percentage **shall be revised** to [AMOUNT] per business [d]ay (the "Daily Payment") **which the parties agree is a good-faith approximation of the Specified Percentage, based on the Merchant's prior receipts due to [Yellowstone] pursuant [to] the Agreement**.

> [Emphasis added.]

46.     The Daily Payment is set so that the full Purchased Amount is absolutely payable in a fixed period, often as short as 100 days. For the exemplar Consumer noted above, the revised Daily Payment was $358, and the repayment term was just 80 business days or 102 calendar days, resulting in an annual interest rate that exceeds the interest rates codified in New Jersey's usury laws.

**3.** **Consumers' Daily Payment Obligations Were Not Tethered to Estimated or Actual Receivables**

47.     Despite the Addendum stating that "the parties agree" that the Daily Payment "is a good-faith approximation of the Specified Percentage, based on the [Consumer]'s prior receipts due to [the Yellowstone MCA Defendants] pursuant [to] the Agreement," on information and belief, the Yellowstone MCA Defendants did not review Consumers' receipts to determine the Daily Payment amount.

48.     At various times, contrary to representations in the Merchant Agreement, Yellowstone's advertising, and the Addendum itself, the fixed Daily Payment bore no meaningful relationship to the Specified Percentage of Consumers' actual estimated receivables.

49.     Unlike the typical review of accounts receivable performed by the purchaser prior to entering an agreement to purchase future receivables, the Yellowstone MCA Defendants only review, at most, the merchant's prior bank statements.

50.     To obtain financing from the Yellowstone MCA Defendants, Consumers are only required to submit their "last three months of business banking statements and a completed application."  The Merchant Agreements do not require Consumers to identify their customers or to provide the Yellowstone MCA Defendants with copies of the merchant's invoices.

**4.** **Consumers Were Unable to Modify Daily Payments Through Reconciliation**

51.     The Yellowstone MCA Defendants do not modify the Daily Payments or provide a right to modify the Daily Payments to account for changes in Consumers' receivables as stated in Yellowstone's advertising and as is typical in legitimate MCA contracts.

52.     The Merchant Agreement provides that Consumers may request a reconciliation to adjust the fixed Daily Payment to account for changes in the Consumers' receivables, but the terms of the Merchant Agreement and Addendum make this option illusory. First, the Merchant

Agreement provides that modification of the Consumer's fixed Daily Payment rests in the MCA Defendant's "sole discretion and as it deems appropriate." Similarly, the Addendum provides that reconciliation is "only a courtesy" that the Yellowstone MCA Defendants are "under no obligation to provide[.]"

53.      Even worse, provisions buried in small print in the Addendum impose severe restrictions on the availability of reconciliation and on Consumers' ability to even request it. The Addendum provides that the Consumer may request reconciliation only within five (5) days following the end of the month (and in some contracts, only within three (3) days) and within that same limited window the Consumer also must provide all "evidence and documentation" demanded by the Yellowstone MCA Defendant in its "sole and absolute discretion."

54.      Prior to November 2018, Defendant Yellowstone provided inadequate notice to Consumers of their ability to request reconciliation under the Merchant Agreements by burying the relevant provisions in the Addendum at the end.  It was only after facing public criticism in November 2018 that Yellowstone began to provide a separate notice to Consumers at the time of funding to ensure that they were aware of their ability to request reconciliation under the Merchant Agreements.

55.      When Consumers did attempt to notify Defendant Yellowstone of financial difficulties and request reconciliation, after executing the Merchant Agreements, they often could no longer reach Yellowstone.

56.      At various times, Defendants have refused to adjust the Daily Payment amount, despite Consumers' lack of incoming receivables.

57.      The following Consumer experiences illustrate the challenges Consumers faced when seeking reconciliation:

a. Before defaulting and being forced into an unfavorable settlement agreement with Defendant Yellowstone, a Pennsylvania Consumer had emailed Yellowstone twice "asking for relief and to slow down my payback." Yellowstone replied that the Consumer "was a new customer and that [the Consumer] was not far enough in to [her] loan, when in fact [she] was more than 60% through [her] second loan with Yellowstone."

b. One Consumer sent an email to Defendant MCA Recovery providing in pertinent part: "this week will be a severe cash flow crunch for me – leading up to Memorial Day weekend sales have been slower than usual. Can you please postpone pulls for a week until after the holiday?" MCA Recovery responded by asking if the Consumer had another account that it could debit from. In response to subsequent emails from the Consumer explaining that "I'm 62 with a young disabled son, I'm about to lose our home, and file for bankruptcy" and again requesting a revised repayment plan, MCA Recovery forwarded that email to Defendant Yellowstone with the message: "CONTROL YOUR GIRL. Craziest fucking merchant ever."

c. When a New York Consumer contacted Defendant Yellowstone to advise that his account was overdrawn and to request a "temporary daily payment decrease from $750 to $100 for 3 weeks," Yellowstone "stated they needed several documents of which all were sent. Then they needed one more document[,] [but] when it was sent[,] they stated since I had taken out a loan after theirs[,] they could not work with me even though I informed them that my account was overdrawn and if I didn't get the issue resolved I would not have the ability to keep my bank account opened. They were not concerned and still refused to negotiate." In responding to the Consumer, Yellowstone noted that he "accepted funds based on set terms that he ultimately could not meet" and that the Consumer "had taken the full funding amount based on a contractually predetermined agreement in terms of payback schedule."

58.     By converting the Specified Percentage to a fixed Daily Payment of specified duration untethered from Consumers' receivables and/or making reconciliation to account for changes in Consumers' receivables largely unavailable, the Yellowstone MCA Defendants eliminated much of the variability with legitimate sales of receivables and effectively converted them to fixed-rate, finite-term loans.

**5.    Other Hidden and Unconscionable Contract Terms Empowered the Yellowstone MCA Defendants at Consumers' Expense and Put Consumers' Assets at Risk**

59.    Additional documents that must be signed as a condition of entering the Merchant Agreement contained other onerous provisions that shifted risk from the Yellowstone MCA Defendants to the Consumers.

60.    As discussed further below, Consumers were required to execute a Security Agreement, Guaranty, and an Affidavit of COJ as part of the Merchant Agreement.

61.    The Merchant Agreement required the Consumer to enter into an irrevocable Power of Attorney appointing a Yellowstone MCA Defendant,

> as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to [the Yellowstone MCA Defendants] . . . in the case of . . . the occurrence of an Event of Default . . . from Consumer, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign [Consumer]'s name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to [the MCA Defendant]; and (v) to file any claims or take any action or institute any proceeding which [the MCA Defendant] may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount[.]

62.    The Merchant Agreement prohibited Consumers from interrupting, transferring, moving, selling, disposing, or otherwise conveying their businesses or assets without "the express prior written consent of [the Yellowstone MCA Defendants]."

63.    The Merchant Agreement's ACH Authorization Form required Consumers to provide the Yellowstone MCA Defendants with all information necessary to access the Consumers' bank accounts, including their bank name, bank portal website, username, password,

security question/answer 1, security question/answer 2, and security question/answer 3.

64.     Acceleration clauses within the Merchant Agreement provided that upon any of the specified events of default, "[t]he full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately"; Defendants may immediately and without notice to the Consumer enter and execute on the COJ "in the amount of the Purchase Amount stated in the Agreement, plus attorneys' fees calculated at twenty-five percent (25%) of the balance due hereunder at the time of breach"; and Defendants may immediately and without notice to the Consumer initiate a lawsuit, and in the event a judgment is recovered, the Consumer "shall be liable for all of [Defendants'] costs of lawsuit, including but not limited to all reasonable attorneys' fees and court costs" in addition to attorneys' fees calculated at twenty-five percent (25%) of the balance due at the time of the breach.

65.     At various times, the Merchant Agreement provided that the inability of the Consumer to pay its debts, general assignment for the benefit of creditors, interruption, suspension, dissolution or termination of its business, and a voluntary or involuntary bankruptcy filing are events of default triggering the acceleration clause and the one-sided protections afforded the Yellowstone MCA Defendants by the Security Agreement, Guaranty, and COJ.

66.     Appendix A to the Merchant Agreement (which provides a list of fees) provided that a fee will be assessed upon an event of default.  Buried within that provision, Appendix A provided at various times that just two (or four depending on the Merchant Agreement) missed Daily Payments constituted a default, thereby triggering the acceleration clause and enforcement mechanisms available to the Yellowstone MCA Defendants through the Security Agreement, Guaranty, and COJ.

67.     The Merchant Agreement also provided at various times that Consumers "consent[]

to the waiver of notice prior to [the Yellowstone MCA Defendants] exercising any and all rights provided for in this Agreement[.]"

68.     Further, the Merchant Agreement required Consumers to acknowledge that the Yellowstone MCA Defendants "may be using 'doing business as' or 'd/b/a' names in connection with various matters relating to the transaction between [the Yellowstone MCA Defendants] and [Consumer]," including notices or filings, and the Security Agreement equally permitted the Yellowstone MCA Defendants to "use another legal name and/or D/B/A" in notices or filings.

69.     In the event of default, the Security Agreement enabled Defendants to collect all amounts due under the Merchant Agreement by reaching beyond the small business's receivables to the Consumer's assets "now owned, or hereafter acquired, including without limitation: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the 'UCC'), now or hereafter owned or acquired by [Consumer]; and (b) all proceeds, as that term is defined by Article 9 of the UCC."

70.     Through the Security Agreement, the MCA Defendants obtain a security interest in the Consumer's assets.  To perfect that security interest, Defendants must issue a UCC-1 Financing Statement.  A UCC-1 Financing Statement provides notice to all interested parties of Defendants' right to seize the Consumer's assets and serves as a lien on secured collateral.  Upon the occurrence of an alleged event of default under the Merchant Agreement, the MCA Defendants may seek to perfect the UCC-1 Financing Statement by filing it with the Secretary of State in the small business's state of incorporation.

71.     The broad Guaranty provided recourse beyond the assets of the small business to its owner's personal assets.

72.     At various times, the Yellowstone MCA Defendants could invoke this personal guarantee "at the time [Consumer] admits its inability to pay its debts, or makes a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against [Consumer] seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts."

**6.      Consumers Were Required to Sign an Unconscionable Affidavit of COJ and Waive Their Rights**

73.     Defendants told Consumers that the only way to obtain an MCA was to execute an Affidavit of COJ.

74.     The Affidavit of COJ permitted the MCA Collection Defendants to obtain a judgment against the small business and its individual owner in the event of a future default.  By signing the Affidavit of COJ in advance of any purported default, the Consumer waived his or her rights and consented to the entry of judgment for the entire balance owed under the Merchant Agreement.

75.     The Yellowstone MCA Defendants failed to inform Consumers prior to signing the COJ that they required the small business owners to sign both in their individual capacity and on behalf of their business, thereby allowing a judgment against both the Consumer's business assets and personal assets in the event of a purported default.

76.     Defendants' one-sided Affidavit of COJ also provided for judgment against the Consumer for liquidated attorneys' fees in the amount of 25% of the outstanding balance, costs, expenses, disbursements, and "interest at the rate of 16% per annum from [the date of the Merchant Agreement], or the highest amount allowed by law, whichever is greater."   The attorneys' fees

Case 1:21-cv-06386-MKV   Document 1-1   Filed 07/27/21   Page 78 of 143

provisions provide for excessive fees compared to the minimal work required to file the COJs and related documents.

77.     Upon an alleged default, the MCA Collection Defendants—on behalf of the Yellowstone MCA Defendants—would file the Affidavit of COJ, along with their own Affidavit of Non-Payment, and a proposed form of judgment with the County Clerk without notice to the Consumer.  The County Clerk then filed the judgment without notice to the Consumer, and without a hearing, or any review by a judge.

78.     At various times, Defendants engaged in robo-signing, or filing the same generic Affidavit of Non-Payment form in support of COJs, wherein they accuse Consumers of stopping Daily Payments, when in fact those Consumers were still current in their Daily Payments.

79.     Defendants also facilitated their filing of COJs by designating 10 New York counties in the COJ as permissible filing locations, despite New York law requiring that COJs only designate one county where the affidavits may be filed.

80.     In addition, as a condition of the Merchant Agreement, Defendants required Consumers to waive any claims against the Yellowstone MCA Defendants "under any legal theory" and also to waive the right to a jury trial or to bring a class action.

81.     Defendants also required Consumers, in advance, to "waive any and all objections to jurisdiction or venue" and to "waive any right to oppose any motion or application made by either party to transfer such proceeding to an Acceptable Forum[.]"

82.     After entry of the judgment by the County Clerk, the MCA Collection Defendants then sought to collect on the judgment by freezing Consumers' bank accounts, often before the Consumers even became aware a COJ was filed against them.

83.     Indeed, at various times, as a result of Defendants' actions, Consumers only became

aware of a judgment when they could not make payroll or pay critical operating expenses after their bank accounts were frozen. Adding to the confusion and unfairness, the Consumers often do not recognize the names of the entities attempting to collect on the judgments.

84.     Many states have banned COJs as against public policy, and in August 2019, New York amended its COJ statute to prevent Defendants, among other MCA companies, from enforcing COJs against Consumers located outside of New York.

## C.     The Yellowstone MCA Defendants' Merchant Agreements Operate as Usurious Loans

85.     Although the Yellowstone MCA Defendants characterize the MCAs as "purchase[s] and sale[s] of future receivables," which are not subject to certain borrower protections such as usury laws, and state that the Purchase Price "is not intended to be, nor shall it be construed as a loan," the terms of the Merchant Agreements make the MCAs operate as loans.

86.     Unlike legitimate purchases and sales of receivables, loans provide a greater degree of certainty to creditors through their fixed, regular payments and finite repayment terms.  In exchange for the rigid payment terms loans impose on borrowers, interest is capped to protect borrowers from usurious rates, and lenders are regulated by certain additional state and federal laws.

87.     The stream of payments back to the Yellowstone MCA Defendants is not variable in either amount or number of payments to be made.

88.     Specifically, the fixed Daily Payment amounts are not meaningfully tied to receivables, do not vary from day to day, have a finite repayment term for the full Purchased Amount, and the ability to adjust those payments based on receivables is virtually non-existent.

89.     And, as noted, the Merchant Agreements provide the Yellowstone MCA Defendants with recourse far beyond the Consumer's receivables in the event of default, through security interests, guarantees, and COJs.

90.     The Yellowstone MCA Defendants structured the MCAs to be just as secure as and to operate as traditional fixed-payment, finite-term loans, but without the statutory interest protections afforded to borrowers of those loans.

91.     Yellowstone even advertises its MCAs as loans (e.g., "No Personal Guarantee Loans"; "Need a loan for your business?"; "Bad Credit Business Loans"; "Yellowstone Capital makes it easy to obtain an unsecured bad credit business loan") and characterizes itself as a "direct lender" in certain email solicitations sent to Consumers, although such advertising is inconsistent with other representations made by the Yellowstone MCA Defendants.

92.     For example, Yellowstone used the following advertisement describing the MCAs it offers as a "loan" and "line of credit" to obtain "fast cash":



93.     In or around August 2013, Yellowstone also advertised its MCA program as "bad credit business loans."

94.     New Jersey's civil usury statute, specifically N.J.S.A. 31:1-1, caps interest rates on loans at 6% per annum, or 16% per annum when there is a written contract specifying the rate of

interest. New Jersey's criminal usury statute, specifically N.J.S.A. 2C:21-19, caps annual interest rates at 30% for non-corporate borrowers, and 50% for corporate borrowers.

95.    The Yellowstone MCA Defendants regularly charge Consumers annual interest rates on their loans that far exceed the maximum rates permitted by New Jersey law. For example:

    a.    Defendant Green Capital loaned a Colorado Consumer $125,000 (the "Purchase Price") and required the Consumer to pay back $186,875 (the "Purchased Amount") in daily payments of $1,995 (the "Daily Payment") over the course of approximately 93 business days, or approximately 119 calendar days.[3] Thus, the annual interest rate charged by Green Capital exceeds the rates permitted by New Jersey usury laws.

    b.    A Florida Consumer's Merchant Agreement with Defendant Yellowstone provided for a Purchase Price of $3,000, a Purchased Amount of $4,377, a Daily Payment of $65 per business day, and repayment term of 85 days. Thus, the annual interest rate charged by Yellowstone exceeds the rates permitted by New Jersey usury laws.

    c.    A Maryland Consumer's Merchant Agreement with Defendant World Global provided for a Purchase Price of $285,000, a Purchased Amount of $427,215, a Daily Payment of $4,299 per business day, and repayment term of 127 days. Thus, the annual interest rate charged by World Global exceeds the rates permitted by New Jersey usury laws.

**D.    Defendants Engaged in False and Misleading Advertising**

**1.    Yellowstone Misrepresented That it Provides MCAs Regardless of Credit or Collateral**

96.    Until at least April 18, 2019, the "home" page of the Yellowstone Website offered small businesses funding, claiming to "say yes to more small businesses, regardless of collateral or credit":

---

[3] To calculate the repayment term, the Purchased Amount is divided by the Daily Payment (e.g., $186,875 ÷ $1,995 = approximately 93 days, which equates to approximately 13 weeks). To account for weekends, as the Daily Payment is only withdrawn on business days, add two days for each week (e.g., 13 x 2 = 26 weekend days). Therefore, the approximate total repayment term is 119 days (e.g., 93+26).

Yellowstone Capital| Home



97.     As noted, the Merchant Agreements in fact require Consumers to simultaneously execute Security Agreements providing "Collateral," and in some instances, "Additional Collateral" and "Cross-Collateral," to secure the payment and performance obligations due to Yellowstone.

98.     In addition, the Merchant Agreements expressly permit "[Yellowstone], [its] agents and representatives and any credit-reporting agency engaged by [Yellowstone], to . . . pull a credit report at any time now or for so long as Merchant and/or Owner(s) continue to have any obligation owed to [Yellowstone] as a consequence of this Agreement or for [Yellowstone's] ability to determine Merchant's eligibility to enter into any future agreement with [Yellowstone]."

99.     Indeed, contrary to the representations on the Yellowstone Website, Yellowstone does investigate Consumer credit, as Yellowstone or its affiliates have made unauthorized and/or

excessive credit inquiries that negatively affected the Consumers' credit scores.

> **2.** **Yellowstone Misrepresented That Its MCAs Are "Unsecured" and/or Do Not Require a Personal Guarantee**

100.    Defendant Yellowstone marketed its MCAs as "unsecured" in YouTube promotional videos. However, Yellowstone's Merchant Agreements are often specifically labeled as "secured" in bold, underlined type at the top of the agreement:

# YELLOWSTONE CAPITAL LLC

30 Broad Street, 14th Floor, Suite 1462, New York, New York 10004
One Evertrust Plaza, Suite 1401, Jersey City, New Jersey 07302

## SECURED MERCHANT AGREEMENT

101.    Moreover, the Merchant Agreements are secured by: personal guarantees from the small business owners; UCC security interests over the merchants' accounts and other assets; and signed, notarized COJs from the merchants and their guarantors.

102.    In another advertisement, Defendant Yellowstone stated that it provides "no personal guarantee loans." But Yellowstone required Consumers to execute a Guaranty and Affidavit of COJ as part of the Merchant Agreement. These documents required the individual business owner to personally guarantee repayment of the MCA and expressly enabled Yellowstone to obtain a judgment against the small business's assets and the owner's personal assets in the event of a purported default.

> **3.** **Yellowstone Misrepresented That it Provides Flexible Repayment Terms**

103.    In at least two advertisements, Defendant Yellowstone advertised its flexible repayment terms by representing:

- "if sales are up[,] you'll pay a larger repayment, but if sales are down, you'll pay less";

Case 1:21-cv-06386-MKV Document 1-1 Filed 07/27/21 Page 84 of 143

- "repayments are not fixed"; and

- "your business will never be crippled with high repayment fees – because they'll always be in proportion with your actual sales[.]"

104.   These advertisements were false and deceitful. As noted, Yellowstone's Merchant Agreements, particularly the Addendum, provided for fixed Daily Payments that are not meaningfully tied to Consumers' receivables. The Addendum also imposed severe restrictions on Consumers' ability to request reconciliation due to a reduction in their receivables. In addition, Defendants either failed to respond to Consumer requests to reduce the Daily Payment amount where the Consumer's actual sales did not support them, or simply refused to reduce payments and instead required the MCAs to be paid back within a specified time period.

105.   For example, a Michigan Consumer tried to reach Yellowstone, after one of his clients stopped paying him, to notify Yellowstone that the client's non-payment was impacting his ability to make the Daily Payments, but every time the Consumer called Yellowstone, no one answered. Eventually, Yellowstone filed a COJ and UCC lien against this Consumer.

106.   Another North Carolina Consumer repeatedly called Yellowstone to advise that no money was coming in, but Yellowstone kept demanding the same Daily Payment and never mentioned reconciliation.

E.    **Defendants Engaged in Numerous Other Fraudulent Business Practices**

107.   Compounding the effects of their one-sided Merchant Agreements, Defendants engaged in misrepresentations and unconscionable business practices that harm Consumers in their origination-, servicing-, and collection-related activities. Defendants' fraudulent business practices have included misrepresenting the amounts of financing they will provide and fees they will charge; misrepresenting their office locations and staff identities; making unauthorized withdrawals from Consumers' accounts; unconscionably deploying COJs, Security Agreements,

and UCC filings in their collection activities; fraudulently inducing Consumers to refinance their MCAs; employing threatening and harassing collection tactics; conducting unauthorized and excessive credit checks; and misleading Consumers as to their relationships with various Third Parties.

      **1.**    **The Yellowstone MCA Defendants Made Material Misrepresentations to Consumers**

         **a. Misrepresentations of the Amounts of Financing Provided and Fees Charged**

108.    At various times, the Yellowstone MCA Defendants misrepresented to Consumers the amount of the Purchase Price they would receive, the amount of fees the Yellowstone MCA Defendants would debit from their bank accounts, and the upfront fees they charged.

109.    The Yellowstone MCA Defendants failed to conspicuously disclose that various fees buried toward the end of the Merchant Agreements are withdrawn upfront from the promised Purchase Price. As a result, Consumers enter these Merchant Agreements expecting to receive the full Purchase Price in their bank accounts, only to then receive a significantly lower amount than they were promised.

110.    For example, Defendant Yellowstone underfunded the $3,000 Purchase Price specified in a Florida Consumer's Merchant Agreement by $150, without informing the Consumer that any of the fees disclosed in the Merchant Agreement would reduce the Purchase Price amount to be transferred to the Consumer's bank account.

111.    Similarly, Defendant Green Capital withheld $6,250 in fees from the Purchase Price of $125,000 pursuant to a Colorado Consumer's Merchant Agreement, without disclosing in that Merchant Agreement that certain fees would be deducted upfront from the Purchase Price and the respective amount of each such fee.

112.    On at least one occasion, Defendant Yellowstone failed to accurately disclose the

Origination Fee amount in the Merchant Agreement.

113.    Specifically, for that Michigan Consumer, the Merchant Agreement provided for the Origination Fee to be "$295.00," but then a Fee Sheet provided to the Consumer for the same Merchant Agreement stated that the Origination Fee would be "5%." The latter equated to an Origination Fee of $1,430.00, which is significantly more than the $295.00 Origination Fee specified in the Merchant Agreement.

114.    Alternatively, at various times, the Yellowstone MCA Defendants' Merchant Agreements provided that several of the fees would be either a defined amount or a percentage of the funded amount (e.g., ACH Program Fee of "$395.00 or up to 10% of the funded amount," Bank Fee of "$195.00 or up to 10% of the funded amount"), but then failed to notify Consumers what the specific amount of each of those fees would be and whether those amounts would be withheld from the Purchase Price.

115.    At various times, the Yellowstone MCA Defendants withheld amounts greater than the specified fee amount from the Purchase Price or failed to disclose additional withheld fee(s).

116.    At various times, Defendants Yellowstone and MCA Recovery charged Consumers additional fees not disclosed in the Merchant Agreements.

117.    For example, a Washington Consumer sent an email to Defendant MCA Recovery regarding her Merchant Agreement with Defendant Yellowstone.  The email provided in pertinent part: "I had also asked about the smaller fees that have been applied throughout – there is no explanation of what these are and you did not answer my questions about this either. I was not aware of any additional fees being added on. This was not explained to me. If this is written somewhere, then I need to see where that is written so I can look it up."  Upon information and belief, Defendant MCA Recovery never responded to the Consumer.

INDEX NO. 654273/2021

118.    Similarly, a Utah Consumer sent an email to Defendant Yellowstone stating in pertinent part: "I am being lied to about additional fees but not being provided a statement of those fees. My repayment contract already included $8857.61 in fees."  Upon information and belief, Defendant Yellowstone never responded to the Consumer.

119.    On at least one occasion, the Yellowstone MCA Defendants promised Consumers a specific amount of financing in the Merchant Agreement, but then underfunded the Purchase Price and instead provided Consumers with a smaller amount of financing than promised.

120.    For example, Defendant HFH entered two Merchant Agreements with a Maryland Consumer providing for Purchase Prices of $50,000 and $150,000, but then underfunded the Purchase Prices by $5,366 and $12,862, respectively.

121.    Subsequently, Defendants World Global and High Speed entered two more Merchant Agreements with that same Consumer providing for Purchase Prices of $285,000 and $425,000, but then underfunded the Purchase Prices by $24,096 and $21,744, respectively.

122.    Collectively, the Consumer received $64,068 less than the amounts promised in the four Merchant Agreements she entered with Defendants HFH, World Global, and High Speed.

### b.  Misrepresentations of Office Location and Staff Identities

123.    At various times, Defendants Yellowstone and MCA Recovery misrepresented to Consumers that they maintained an office in New York.

124.    When at least two Consumers flew from Michigan and Texas, respectively, to Defendants' purported offices in New York after Defendants repeatedly failed to respond to the Consumers' attempts to contact them, the Consumers found no office at the location provided by Yellowstone and MCA Recovery.

125.    At various times, Defendants held individuals or entities out as employees to Consumers by permitting those individuals or entities to work out of desktops on Yellowstone

premises, or to send emails to Consumers from Yellowstone email addresses, but then later claimed those individuals or entities were "Third Parties" for which Defendants were not responsible.

### 2. The Yellowstone MCA Defendants Made Unauthorized Withdrawals From Consumers' Accounts

126.    At various times, the Yellowstone MCA Defendants made unauthorized withdrawals from Consumers' accounts. Because Consumers were not expecting the Yellowstone MCA Defendants' unauthorized debits, these withdrawals often caused additional financial harm to Consumers such as overdraft fees and lost operating capital.

127.    The Yellowstone MCA Defendants continued withdrawing purported Daily Payments from Consumers' bank accounts after the Consumers had fully repaid the "Purchased Amount." After unlawfully withdrawing additional amounts sometimes totaling thousands of dollars from individual Consumers, the Yellowstone MCA Defendants failed to timely refund the Consumers either in whole or in part and/or to respond at all to Consumers' inquiries regarding the unauthorized withdrawals.

128.    Examples of Consumers from whose accounts the Yellowstone MCA Defendants made unauthorized withdrawals include:

a.  An Illinois Consumer who complained that Defendant Yellowstone had withdrawn excess payments amounting to more than $5,000 and that he was unable to contact anyone at Yellowstone to address the issue.

b.  A Rhode Island Consumer who reported that after she had repaid the Purchased Amount in full, Defendant Yellowstone continued to debit the Daily Payment amount from her account until she was forced to request that her bank issue a stop payment order.

c.  Defendant Yellowstone withdrew an additional $7,100 from a New York Consumer's account without his approval after he had repaid the Purchased Amount in full. When the Consumer complained, Yellowstone provided a partial refund of $2,900 and then stopped responding to him.

    d. A Utah Consumer complained that after making the required payments to Defendant Yellowstone under the Merchant Agreement, Yellowstone withdrew an additional $3,480, and the Consumer was subsequently unable to reach anyone from Yellowstone.

    e. A Florida Consumer had to pay her bank a stop payment fee to stop Defendant Yellowstone from continuing to withdraw purported Daily Payments from her account after she had already repaid the Purchased Amount in full.  At the time of the stop payment, Yellowstone had debited the Consumer's account for a total of $4,550, or $173 more than the $4,377 Purchased Amount the Consumer owed, but Yellowstone only provided the Consumer with a partial refund of $108.

129.    At various times, the Yellowstone MCA Defendants withdrew double the amount of the agreed-upon Daily Payment. For example:

    a. After a Colorado Consumer entered into a Merchant Agreement with Defendant Green Capital for a specified Daily Payment amount, Green Capital started debiting his account each day in an amount that was twice the agreed upon Daily Payment without the Consumer's knowledge or authorization.  When the Consumer brought this to the attention of Green Capital, it acted surprised and represented that it would not happen again, but then the double debits continued.  As a result of the unauthorized double debits, the Consumer's account had a negative balance, and other attempted payments bounced.

    b. Defendant Yellowstone's internal email correspondence reveals that Yellowstone repeatedly instructed that a Missouri Consumer's bank account be debited twice on the same day (e.g., "[d]ebit [] twice tomorrow . . . ."; and "[f]ire 2 more of these payments debits next Monday").

    c. On at least one occasion, after a Maryland Consumer put a hold on her account following Defendant High Speed's withdrawal of twice the Daily Payment amount for multiple days in a row, High Speed immediately filed a COJ against the Consumer allegedly based on her failure to maintain sufficient funds in her account.  High Speed made no effort to speak with the Consumer prior to filing the COJ. High Speed falsely asserted in the COJ filing that the Consumer had defaulted under the terms of the Merchant Agreement. Moreover, the Consumer emailed High Speed to explain that she had overpaid as a result of the duplicate withdrawals by High Speed, but High Speed refused to return the duplicate withdrawals to her account.

130.    On at least two occasions, Defendants Yellowstone and Green Capital debited Consumer accounts in excess of the agreed-upon amount specified in settlement agreements. For example:

a. Defendant Green Capital debited a Colorado Consumer's account for $966 more than the total amount authorized by the Consumer pursuant to a settlement agreement to resolve a COJ, thereby causing the Consumer to pay his bank a stop payment fee to prevent additional, unauthorized debits thereafter. Green Capital did not respond to the Consumer's repeated requests for a refund of the overpayment.

b. Defendant Yellowstone withdrew $6,152.39 from a Utah Consumer's account above the settlement amount authorized by the Consumer. When the Consumer brought this overpayment to Yellowstone's attention, she was "called stupid."

131.    In nearly all of these circumstances, when Consumers attempted to contact Defendants regarding the unauthorized withdrawals, they had difficulty receiving assistance.

132.    In the few instances where the Consumer was able to speak with a representative, Defendant Yellowstone typically failed to refund the unauthorized debits in part or in full. For example, when three Consumers from Nevada, Minnesota, and California contacted Yellowstone to complain that Yellowstone was continuing to debit their accounts after they had repaid the Purchased Amount in full, Yellowstone responded by: (1) refusing to return the excess payments to one Consumer; (2) advising another Consumer that its lending partners were refusing to return the excess funds; and (3) claiming to the third Consumer that its system did not reflect any amount owed to the Consumer.

**3.    Defendants Unconscionably Used COJs and UCC-1 Financing Statements**

    **a.  Unconscionable Use of COJs**

133.    As noted, the Yellowstone MCA Defendants required Consumers to execute an Affidavit of COJ as part of the Merchant Agreement. By demanding that Consumers sign the Affidavit of COJ, the Yellowstone MCA Defendants compelled Consumers to waive their procedural rights and consent to the entry of judgment against them without notice or a hearing.

134.    Until recently, upon the occurrence of a Consumer's purported default, the MCA Collection Defendants would immediately file the COJ in New York (even against out-of-state

Consumers), obtain a judgment, and begin to enforce that judgment before the Consumers even learned of the judgment. With the judgment, the MCA Collection Defendants would freeze the Consumers' personal and business assets until the full, accelerated balance owed under the Merchant Agreements plus interest and fees was satisfied.

135.    At various times, Defendants filed COJs and obtained judgments against Consumers who did not default or otherwise breach the Merchant Agreements. Defendants' enforcement of these improperly obtained judgments against these Consumers threatened the viability of their businesses.

136.    Examples of Defendants' fraudulent and unconscionable use of COJs include the following:

    a.  Green Capital fraudulently filed a COJ and obtained a judgment against a Colorado Consumer that was not permitted by the terms of the Merchant Agreement. Green Capital falsely claimed in its Affidavit of Non-Payment filed in support of the COJ that the Consumer had ceased remitting payments and otherwise prevented Green Capital from debiting the Consumer's account. Contrary to Green Capital's claims, the Consumer was still making payments to Green Capital as of the date of the filing. The Consumer did not receive any notice prior to entry of the fraudulent COJ and resulting judgment. After obtaining the judgment in New York, Green Capital levied the Consumer's Colorado bank account, which had no New York branches, seized the Consumer's personal and business assets, and sent notifications to the Consumer's vendors. The wrongfully-obtained judgment significantly harmed the Consumer's landscaping business during its peak season, interfered with the Consumer's ability to pay his employees and vendors, and resulted in a debt that had not gone into default appearing on the Consumer's credit report. The Consumer also lost many of his long-term clients, and vendors, whom he had worked with for 20 to 25 years.

    b.  High Speed improperly filed a COJ and obtained a judgment against a Maryland Consumer. The Consumer was forced to put a hold on her account because High Speed continued debiting twice the amount of the Daily Payment provided in the Merchant Agreement after the Consumer contacted High Speed to explain that she had overpaid as a result of the unauthorized withdrawals and to request a refund. High Speed refused to provide a refund. Instead, High Speed filed a COJ without informing the Consumer, falsely claiming that the Consumer had defaulted under the Merchant Agreement and obtained a judgment against the Consumer. Following the fraudulent COJ filing and resulting judgment, High

Speed levied the Consumer's business and personal bank accounts and unlawfully obtained thousands of dollars. High Speed later falsely claimed it was unaware of the levies and promised to return the funds and lift the levies. High Speed delayed for approximately six weeks before removing the levy on the Consumer's personal account, which caused her to incur thousands of dollars in overdraft fees, returned payment fees, and other significant damages. High Speed's wrongfully obtained judgment and levy hindered the Consumer's ability to access her own funds, to obtain legitimate financing, and effectively to continue operating until High Speed removed the fraudulent judgment and levy.

137.    At various times, Defendants Yellowstone and MCA Recovery agreed to revise repayment terms or provided the required "prior written consent" for a bank change, but when the Consumers acted on that agreement or authorization, Yellowstone and MCA Recovery immediately filed COJs and obtained judgments against them.   For example:

a.    Yellowstone and MCA Recovery filed a COJ and obtained a judgment against a Michigan Consumer who had changed banks based on a purported "default" caused when the Consumer switched banks.  No actual "default" occurred under the terms of the Merchant Agreement because the Consumer had obtained the required "prior written consent" from Yellowstone before timely continuing to make payments from a new bank account.   The Consumer contacted Yellowstone and requested a new ACH Authorization Form so he could designate a new bank and continue making timely payments.  Yellowstone agreed and provided the Consumer with the new ACH Authorization Form, which he timely completed and returned to Yellowstone. Yet, Yellowstone and MCA Recovery still filed the COJ and obtained a judgment against the Consumer, despite providing the "prior written consent."  After obtaining the judgment, Yellowstone and MCA Recovery immediately sent credit card processing freezes to the Consumer's bank and unlawfully attempted to enforce the judgment in Michigan, a state where Yellowstone and MCA Recovery were not licensed.  Yellowstone and MCA Recovery also froze the monies owed to the Consumer from his financing company, thereby causing: vehicles not to be paid for; titles, registrations, and license plates not to be issued; vehicles to be impounded; and the Consumer to vacate his business premises because he could not make payments to the land contract vendor.

b.    After agreeing to revised repayment terms, Yellowstone filed a COJ and obtained a judgment against a North Carolina Consumer even though it was debiting the Consumer's account for the revised Daily Payment.   After obtaining a judgment against the Consumer, Yellowstone garnished the wages of the Consumer's employees and seized both the merchant's business assets and the personal assets of the guarantor – the small business owner.  The Consumer's business suffered greatly and several of his employees lost their

jobs even though the Consumer was making his Daily Payments on time.  In addition, a debt that was never in default now appears on the Consumer's credit report.

138.    At various times, Defendants Green Capital, High Speed, Yellowstone, and MCA Recovery filed false Affidavits of Non-Payment in support of COJs that misrepresented to the court the facts of alleged defaults.  For example:

a.  Green Capital filed an Affidavit of Non-Payment in court on June 24, 2019 claiming that the Colorado Consumer had ceased making payments on June 18, 2019, when the Consumer had continued making Daily Payments.  In fact, the Consumer made Daily Payments on June 21 (Friday), June 24 (Monday), and June 25 (Tuesday) and only stopped making payments after learning that Green Capital had wrongfully filed the COJ seeking a judgment in breach of the Merchant Agreement.  Green Capital's sworn Affidavit also misrepresented that the Consumer had obstructed Green Capital's access to the designated bank account.

b.  High Speed filed a sworn Affidavit of Non-Payment on August 7, 2018, falsely claiming that a Maryland Consumer was in default when the Consumer had complied with all of her obligations under multiple Merchant Agreements.  The Consumer stopped payment as a result of High Speed's continued duplicate withdrawals and refusal to refund the excess amounts.  At that time the Consumer had actually paid more to High Speed than what was due under the Merchant Agreements at the time the Affidavit was filed.

c.  Yellowstone and MCA Recovery filed a sworn Affidavit of Non-Payment claiming a Michigan Consumer was in default under the Merchant Agreement. In fact, the Consumer had simply changed banks with Yellowstone's "prior written consent" and timely submitted a revised ACH Authorization Form to Yellowstone.

139.    Defendants' fraudulent and unconscionable practices in connection with the filing of COJs have caused substantial harm to small businesses and their owners.

**b.  Unconscionable Use of Security Agreements and UCC Filings**

140.    As noted above, the Yellowstone MCA Defendants also required Consumers to execute Security Agreements before they would advance any funds, which enable Defendants to file UCC-1 financing statements in the event of an alleged default.

141.    Defendant Yellowstone and the MCA Collection Defendants have also filed

fraudulent and wrongful UCC-1 financing statements to the financial detriment of Consumers. For example:

     a.  Yellowstone and Max Recovery filed a UCC-1 financing statement against a Missouri Consumer claiming she had an outstanding balance when the Consumer had already fulfilled all of her obligations under the Merchant Agreement.  As a result, the Consumer needed to file an application with the Missouri Secretary of State to have the UCC-1 filing removed.  Relying on the wrongfully obtained UCC-lien, Yellowstone and Max Recovery contacted and directed at least one of the Consumer's customers to pay Yellowstone and Max Recovery instead of the Consumer, thereby threatening the Consumer's relationship with the customer.

     b.  Yellowstone and MCA Recovery wrongfully filed a UCC-1 financing statement against a Michigan Consumer who was not in default under the terms of the Merchant Agreement.  As a result, the Consumer was compelled to file an application with the Michigan Department of State to terminate the UCC filing.  Based on the information provided by the Consumer, the UCC Filing Office terminated the financing statement after finding that it was "fraudulent or wrongfully filed."   However, Yellowstone's and MCA Recovery's fraudulent UCC filing had already caused substantial damage to the Consumer's business because they had already sent UCC lien notices to third parties based on the false default, fraudulently seized the Consumer's assets with the financing company for the Consumer's business, and even failed to release the Consumer's assets after the UCC termination.

142.    Defendants' fraudulent and unconscionable practices in connection with the filing of UCC-1 financing statements have caused substantial harm to small businesses and their owners.

### c. Unconscionable Use of Improperly Obtained Judgments and UCC Filings to Extract Inequitable Settlements

143.    At various times, Defendants have abused the immense leverage they gained over financially distraught Consumers as a result of wrongfully obtained judgments and UCC liens to extract unfair settlement agreements from Consumers. For example:

     a.  High Speed induced the Maryland Consumer referenced in paragraph 136, acting without counsel, to enter into two settlement agreements by representing to the Consumer that executing the settlement agreements was the only way for the Consumer to regain access to her bank accounts and avoid going out of business.  After doing so, High Speed then failed to honor its obligation under those settlement agreements to remove the improperly obtained judgment and lien, which prevented the Consumer from finalizing a lending agreement with

the Small Business Administration.  High Speed further violated the agreement terms by illegally withdrawing several thousand dollars from the Consumer's personal account, resulting in significant damages in excess of the amounts unlawfully converted.

b. Yellowstone and MCA Recovery attempted to obtain a substantial settlement from the Michigan Consumer referenced in paragraph 141, representing that a settlement was a prerequisite to Yellowstone and MCA Recovery terminating the UCC filing, releasing any held accounts, and filing a satisfaction of judgment for the Consumer.  Yellowstone and MCA Recovery made this representation on July 21, 2016, when the Michigan Department of State had already terminated the UCC filing on July 13, 2016 after finding that it was "fraudulent or wrongfully filed."   Nonetheless, Yellowstone and MCA Recovery refused to release the Consumer's assets seized pursuant to the fraudulent UCC filing in the hopes of extorting a settlement from the Consumer (e.g., emailing the Consumer "[m]ake me an offer to settle this and everything will be released," even as the Consumer protested that Yellowstone and MCA Recovery had "locked up everything where there is no money whatsoever and customers that purchased vehicles can[']t get titles or plates for [their] vehicles" and that "the credit card processors are eating up the money that is sitting in [their] account [and] trying to debit my account for service charges").

**4.   The Yellowstone MCA Defendants Fraudulently Induced Consumers to "Refinance" Their MCAs Rather than Engage in Reconciliation**

144.   On at least one occasion, Defendants High Speed, HFH, and World Global, together with Third Parties acting on their behalf, induced a Maryland Consumer seeking to lower her payment to "refinance" the outstanding balance of an existing MCA into a second MCA despite the fact that reconciliation was an option.

145.   Defendants High Speed, HFH, and World Global failed to disclose that this strategy would result in double the interest on the same principal amount, and thus an outstanding balance that is significantly greater than the balance the Consumer would have owed had it simply paid off the first MCA without "refinancing."

146.   Defendants High Speed, HFH, and World Global misrepresented that refinancing her Merchant Agreements would enable her to keep up with Daily Payments under the prior agreements and to maintain sufficient cash flow to operate her business, rather than advising the

Consumer of her ability to reconcile the current Daily Payment amounts with her company's actual receivables under her existing Merchant Agreements.

147.    The "refinancing" resulted in a substantially higher total repayment amount for the Consumer, as High Speed, HFH, and World Global inflated her carryover balances from prior agreements and charged her double the interest on the same outstanding debt in each new agreement.

### 5.    Defendants Engaged in Threatening and Harassing Collection Efforts

148.    Defendants Yellowstone, MCA Recovery, Green Capital, and High Speed have engaged in harassing and threatening collection calls to Consumers to induce them to continue making their Daily Payments. For example:

a.   A Tennessee Consumer explained that when the small business "ran into hard times," Yellowstone "[did]n't listen and ke[pt] pushing for more and more money." Instead of pursuing reconciliation with the Consumer due to the business's hard times, Yellowstone continued its near-constant calls and harassment. The Consumer reported that the Yellowstone representative would get angry, yell, threaten to shut down the business, and hang up.

b.   A New Jersey Consumer reported: "[w]e are in the construction business and have experienced a lull this winter. We missed 1 payment and in just a very short time have been harassed and threatened by [Defendant Green Capital] that they're coming after our assets, our family, freezing our bank account, threatened bodily harm, etc. [Defendant Green Capital] ha[s] conducted multiple federal offenses including running our credit without our consent [and] spoofing our phones[.]"

c.   High Speed bullied a Maryland Consumer by not letting her speak when she attempted to ask for reconciliation, as well as for an explanation of the inflated carryover balances and resulting usurious interest. The Consumer described a collection call she received from High Speed as follows:

High Speed said, "You know you have a balance right?" – I started by saying, "I don't know" - and was abruptly cut off by High Speed who was telling me my head was up my ass and whatever else. If he had let me finish my sentence, it would have sounded like this, "I don't know what the balance should be because I noticed that the carry over balances were getting interest added each time which calculated to 132% interest. Could

you take a look at my info and please adjust in the event I am missing something?"

d. After Yellowstone and MCA Recovery learned that a Michigan Consumer had contacted the State of Michigan's Secretary of State in an effort to terminate Yellowstone's fraudulent UCC filing, Yellowstone's and MCA Recovery's representatives called the Consumer and threatened him: "[They were] really mad and threatened me that I will get 5 years in prison for terminating the UCC filing."

e. A Colorado Consumer was "constantly threatened [by Defendant Green Capital] that the COJ would be filed if [he] missed a payment."

f. The same day Yellowstone and MCA Recovery filed a COJ against a North Carolina Consumer, their attorney started calling to threaten the Consumer and his employees.  Prior to the COJ filing, the Consumer had reached out to Yellowstone repeatedly to advise that no money was coming in, but Yellowstone kept demanding the same Daily Payment and never mentioned reconciliation.  On the day of the COJ filing, Yellowstone and/or MCA Recovery started to make threatening calls to the Consumer 40 to 50 times a day.  During collection calls, Defendant Yellowstone "threatened to have [the Consumer] arrested, threatened to have all accounts seized which they did, [and] threatened to come . . . take care of things."  Yellowstone called "every day saying no payment or not enough" and threatened "legal action[,] . . . jail, property seized, and assets taken."  At one point, the threats escalated to a point where the attorney for Yellowstone and MCA Recovery claimed he was in front of the Consumer's store (in North Carolina) and was coming in.  After the COJ was filed, Yellowstone and MCA Recovery obtained a judgment and froze all of the Consumer's assets and shut the Consumer's business down.  The Consumer lost all his bank accounts, lost his point-of-sale system, and ultimately lost his business.  Despite losing everything, the Consumer continued to be harassed and threatened through multiple daily calls, including calls made by Defendant Yellowstone from spoofed phone numbers.

## 6.     Defendants Conducted Unauthorized and Excessive Credit Checks

149.    At various times, Defendants Yellowstone and MCA Recovery have conducted unauthorized and/or excessive credit checks.

150.    For example, a Michigan Consumer discovered that Yellowstone and MCA Recovery had provided Arch Capital Funding LLC ("Arch Capital") with permission to do an unauthorized hard inquiry into his credit without first obtaining the Consumer's prior authorization, and that they had then used that credit check from Arch Capital also without the

Case 1:21-cv-06386-MKV   Document 1-1   Filed 07/27/21   Page 98 of 143

Consumer's prior authorization. Defendant Yellowstone released the Consumer's personal information to Defendant MCA Recovery, who forwarded the personal information to Arch Capital, an entity formerly affiliated with Yellowstone, who then conducted the hard credit inquiry.

151. On another occasion, Yellowstone harmed a Consumer's credit score and subsequent loan terms by conducting excessive credit checks in connection with the Consumer's MCA applications. Specifically, in connection with two MCA applications a Mississippi Consumer submitted to Yellowstone for a business loan, Yellowstone conducted eight hard inquiries on the Consumer's credit. Yellowstone never provided a loan or any funding to the Consumer, but Yellowstone's eight credit checks caused the Consumer's credit score to decline by 36 points.

152. Likewise, in connection with a Maryland Consumer's application for an MCA, Defendant Yellowstone conducted an unauthorized hard credit inquiry negatively impacting the Consumer's credit, despite the Consumer's express authorization of a soft inquiry only.

### 7. **Defendant Yellowstone Is Responsible for and Conducted Little to No Oversight of Third Parties' Underwriting, Servicing, and Collections In Its Name**

153. At various times, Defendant Yellowstone employed, contracted with, and/or acted through and in concert with a web of Third Parties, including entities and/or individuals described by Yellowstone as Independent Funding Organizations ("Funders"), Independent Sales Organizations ("ISOs"), and Sales Representatives, in its MCA transactions with Consumers.

154. Yellowstone claims these Third Parties have assumed a number of functions, including acting as a broker, underwriting, evaluating, and negotiating potential Merchant Agreements, and servicing and collecting amounts owed on Merchant Agreements in the event of default.

155. Between at least July 2015 and July 2019, Defendant Yellowstone held out Third

Parties to Consumers as indistinguishable from Yellowstone itself. During this period, Yellowstone did not disclose to Consumers the Third Parties' functions and/or involvement with the performance of the Merchant Agreement. Meanwhile, Yellowstone permitted Third Parties to use Yellowstone email addresses in correspondence with Consumers.

156. At various times, Third Parties operated out of Yellowstone's Jersey City, New Jersey office.

157. At various times, Third Parties and/or their employees were either former employees or management of Yellowstone and/or current employees or management of Yellowstone.

158. At various times, Yellowstone allowed Third Parties to use the Yellowstone platform to perform Consumer credit checks without notice to or the consent of Consumers.

159. At all relevant times, the Consumers transacting with Yellowstone believed that they negotiated their Merchant Agreements with Yellowstone, and that Yellowstone remained their point of contact for subsequent correspondence relating to their Merchant Agreements.

160. At various times, Yellowstone shared the Consumer's Merchant Agreement, including the Consumer's sensitive banking information, with Third Parties, without first obtaining the Consumer's express informed consent.

161. To the extent Defendant Yellowstone and/or any of the other Yellowstone MCA Defendants acting in concert with Yellowstone seek to disclaim liability for any of the acts and/or conduct alleged herein on the grounds that the Third Parties purportedly engaged in the underlying misconduct, Yellowstone and/or the other Yellowstone MCA Defendants are responsible for the Third Parties' performance of their roles and responsibilities relating to the Merchant Agreements.

162. Not only has Defendant Yellowstone failed to disclose and held the Third Parties

out to Consumers as Yellowstone's employees, representatives, and/or agents, but it has also failed to conduct any meaningful supervision of the Third Parties' brokering, underwriting, negotiating, servicing, and collection activities relating to Yellowstone's Merchant Agreements with Consumers.

## COUNT I

### VIOLATION OF THE CFA BY DEFENDANTS
### (UNCONSCIONABLE COMMERCIAL PRACTICES)

163.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 162 above as if more fully set forth herein.

164.    The CFA, N.J.S.A. 56:8-2, prohibits:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing[] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . .

165.    The CFA defines "merchandise" as including "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c).

166.    At all relevant times, the Yellowstone MCA Defendants have engaged in the advertisement and sale of merchandise within the meaning of N.J.S.A. 56:8-1(c), including MCAs, and the MCA Collection Defendants have engaged in the advertisement and sale of merchandise within the meaning of N.J.S.A. 56:8-1(c), including debt collection services.

167.    In the operation of their business, Defendants have engaged in the use of unconscionable commercial practices, false promises, misrepresentations and/or the knowing

concealment, suppression or omission of material facts.

168.   At various times, Defendants have engaged in unconscionable commercial practices including, but not limited to, the following:

   a.   Charging unlawful interest rates on small business loans disguised as purchases of receivables, in excess of the maximum rates permitted by New Jersey usury laws;

   b.   Refusing Consumers' requests for reconciliation and directing that the advance be paid back within a specified time period even where the Consumers' businesses have no incoming receivables, or simply failing to respond to Consumers' inquiries regarding reconciliation;

   c.   Making unauthorized withdrawals from Consumers' accounts, including by withdrawing double the amount of the agreed-upon Daily Payment, often causing additional financial harm to Consumers such as overdraft fees and lost operating capital;

   d.   Continuing to withdraw purported Daily Payments from Consumer bank accounts after the Consumers had fully repaid the "Purchased Amount," and then failing to timely refund the Consumers either in whole or in part and/or to respond at all to Consumer inquiries regarding the unauthorized withdrawals;

   e.   Debiting Consumer accounts in excess of the agreed-upon amount specified in settlement agreements;

   f.   Failing to respond to Consumer complaints, inquiries, and/or refund requests in a timely manner or at all;

   g.   Compelling Consumers to execute an Affidavit of COJ as part of the Merchant Agreement, thereby waiving their procedural rights and consenting to the entry of judgment against them without notice or a hearing;

   h.   Filing COJs and obtaining judgments against Consumers who did not default or otherwise breach the Merchant Agreements;

   i.   Enforcing improperly obtained judgments against Consumers, thereby threatening the viability of their businesses;

   j.   Filing false Affidavits of Non-Payment in support of COJs that misrepresented to the court the facts of alleged defaults;

   k.   Filing fraudulent and wrongful UCC-1 financing statements to the financial detriment of Consumers;

l.  Abusing the immense leverage Defendants gained over financially distraught Consumers as a result of wrongfully obtained judgments and UCC liens to extract unfair settlement agreements from Consumers;

m.  On at least one occasion, levying an out-of-state bank account in Colorado with no New York branches, thereby resulting in the Consumer's loss of long-term clients;

n.  On at least one occasion, knowingly preventing a Consumer's business from finalizing its lending agreement with the Small Business Administration by failing to timely honor the provision in the settlement agreement requiring withdrawal of the COJ and removal of the lien on the Consumer's bank accounts;

o.  On at least one occasion, illegally withdrawing several thousand dollars from a Consumer's personal account, thereby causing significant damages in excess of the amounts unlawfully converted;

p.  Falsely inflating carryover balances to be "refinanced" in each successive deal and charging the Consumer double the interest on the same outstanding debt from prior agreements in each new agreement;

q.  Engaging in harassing and threatening collection calls to Consumers to induce them to continue making their Daily Payments;

r.  Fixing attorneys' fees in the Merchant Agreement at an arbitrary percentage (25%) of the accelerated balance that is grossly disproportionate to the fees actually incurred in filing COJs and related documents;

s.  Including substantively unconscionable contract provisions in the Merchant Agreements (e.g., clauses requiring Consumers to execute a COJ, thereby forcing Consumers to waive their rights to notice and a hearing; clauses providing that Consumers "consent[] to the waiver of notice" prior to the Yellowstone MCA Defendants exercising any rights under the Merchant Agreements; "No Liability" clauses requiring Consumers to waive any claims against the Yellowstone MCA Defendants "under any legal theory"; power of attorney clauses requiring the merchant to "irrevocably appoint[] [the Yellowstone MCA Defendants] as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations" due to the Yellowstone MCA Defendants from Consumers upon the occurrence of an Event of Default under the Merchant Agreement, including to collect monies that have become due with respect to any of the collateral, to endorse checks related to that collection, to sign the Consumer's name on any invoice directing the Consumer's customers to make their payments directly to the

Yellowstone MCA Defendants, and "to enforce its rights with respect to payment of the Purchased Amount"; and clauses providing for both jury trial waivers and class action waivers);

t.  Conducting unauthorized and/or excessive credit checks;

u.  Allowing Third Parties to use the Yellowstone platform to perform Consumer credit checks without notice to or the consent of Consumers;

v.  Sharing the Consumer's Merchant Agreement, including the Consumer's sensitive banking information, with Third Parties, without first obtaining the Consumer's express informed consent;

w.  Failing to conduct any meaningful supervision of the Third Parties' brokering, underwriting, negotiating, servicing, and collection activities relating to Defendant Yellowstone's Merchant Agreements with Consumers;

x.  Filing Affidavits of COJ designating 10 counties for filing, in violation of the requirement in N.Y. C.P.L.R. § 3218 that the Affidavit designate only one county where the Affidavit may be filed;

y.  Failing to advise Consumers that the following documents are all part of their contract with the Yellowstone MCA Defendants and/or explain the impact of these documents on the contract: the Addendum converting the Specified Percentage of receivables to a fixed Daily Payment, the Security Agreement requiring Consumers to provide the Yellowstone MCA Defendants with a security interest in all of their assets, the Guaranty requiring the individual owner to personally guarantee the performance of the small business, and the Affidavit of COJ allowing Defendants to immediately obtain a judgment in the event of an alleged default without notice or a hearing;

z.  Burying the Consumer's right to request a reconciliation in small print in the Addendum to the Merchant Agreement;

aa. Failing to specify in the "Events of Default" section of the Merchant Agreement that in some instances, just two or four missed payments constitutes a default, thereby triggering the enforcement mechanisms available to Defendants through the Security Agreement, the Guaranty, and the COJ, and instead burying this event of default under "NSF Fee" in Appendix A to the Merchant Agreement that provides a list of fees;

bb. Providing the Merchant Agreements in small, illegible type, with material provisions in some instances appearing in 5.5-point to 6-point font size; and

cc. Providing in the Merchant Agreements and Security Agreements that

the Yellowstone MCA Defendants may use another legal name and/or doing business as name when filing UCC-1 financing statements and other notices or filings, without identifying other legal names or doing business as names that the Yellowstone MCA Defendants might use.

169. Each unconscionable commercial practice by Defendants constitutes a separate violation under the CFA, specifically N.J.S.A. 56:8-2.

## COUNT II

### VIOLATION OF THE CFA BY DEFENDANTS
### (FALSE PROMISES, MISREPRESENTATIONS, DECEPTION AND KNOWING OMISSIONS OF MATERIAL FACT)

170. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 169 above as if more fully set forth herein.

171. Defendants' conduct in violation of the CFA includes, but is not limited to, the following acts of false promises, misrepresentations and/or deception:

a. Misrepresenting or concealing from Consumers the true nature of the MCA transactions as usurious loans;

b. Misrepresenting to Consumers the amount of the Purchase Price they would receive, the amount of fees the Yellowstone MCA Defendants would debit from their bank accounts, and the upfront fees they charged;

c. Failing to conspicuously disclose that various fees buried towards the end of the Merchant Agreements are withdrawn upfront from the promised Purchase Price;

d. Providing that several of the fees would be either a defined amount or a percentage of the funded amount (e.g., ACH Program Fee of "$395.00 or up to 10% of the funded amount," Bank Fee of "$195.00 or up to 10% of the funded amount"), but then failing to notify Consumers what the specific amount of each of those fees would be and whether those amounts would be withheld from the Purchase Price;

e. Withholding amounts greater than the specified fee amount from the Purchase Price or failing to disclose additional withheld fee(s);

f. Fraudulently inducing Consumers to "Refinance" their MCAs rather than engage in reconciliation;

g. Concealing from a Consumer the compounded interest charges for

"refinancing" previous balances under prior Merchant Agreements;

h.    Representing on the Yellowstone Website that "we say yes to more small businesses, regardless of collateral or credit," but then requiring Consumers to execute Security Agreements providing collateral to Defendants in the event of a default and repeatedly conducting excessive and/or unauthorized credit checks in considering Consumer applications for MCAs;

i.    Representing in advertising that Yellowstone's business loans are "unsecured," but then specifically labeling the Merchant Agreements as "secured" and requiring Consumers to provide various forms of security to Yellowstone as a prerequisite to receiving MCAs;

j.    Representing in advertising that Yellowstone offers flexible repayment terms (e.g., "if sales are up[,] you'll pay a larger repayment, but if sales are down, you'll pay less"), but then ignoring or refusing Consumer requests to pay less when their sales were down;

k.    Representing in advertising that "We Provide Capital With No Personal Guarantee," but then requiring Consumers to execute a Guaranty and Affidavit of COJ as part of the Merchant Agreements that require the Consumer to personally guarantee the MCA in the event of a default;

l.    Representing to Consumers that Defendants Yellowstone and MCA Recovery maintained an office in New York, when at least two Consumers flew from different states to Defendants' office in New York only to find that there was no office at the location provided by Defendants;

m.    Holding individuals or entities out as employees to Consumers by permitting those individuals or entities to work out of desktops on Yellowstone premises, or to send emails to Consumers from Yellowstone email addresses, but then later claiming those individuals or entities were "Third Parties" for which Defendant Yellowstone was not responsible;

n.    Prior to July 2019, failing to disclose to Consumers the Third Parties' functions and/or involvement with the performance of the Merchant Agreements at the time of funding, despite permitting Third Parties to use Yellowstone email addresses in correspondence with Consumers;

o.    Requiring Consumers to execute Affidavits of COJ as part of the Merchant Agreements without providing any explanation of what the COJ was or its impact on the Consumers (e.g., sending the COJ with the Merchant Agreement as an attachment to an email and directing the Consumer to return same within a short period of time);

p.   Agreeing to revise repayment terms or providing the required "prior written consent" for a bank change, but then, when the Consumers acted on that agreement or authorization, immediately filing COJs and obtaining judgments against them;

q.   Misrepresenting the availability of reconciliation, but then refusing Consumers' requests for reconciliation and directing that the advance be paid back within a specified time period, or simply failing to respond to Consumers' inquiries regarding reconciliation;

r.   Prior to November 2018, failing to adequately inform Consumers of their right to request reconciliation (under the Merchant Agreements) at the time of funding; and

s.   Entering settlement agreements with Consumers, but then failing to abide by the terms of those agreements, thereby causing additional financial harm to Consumers.

172.   Each false promise, misrepresentation, deception, and/or knowing omission of material fact by Defendants constitutes a separate violation under the CFA, specifically N.J.S.A. 56:8-2.

## COUNT III

### VIOLATION OF THE CFA BY YELLOWSTONE MCA DEFENDANTS (USE OF UNREGISTERED, ASSUMED OR FICTITIOUS NAMES)

173.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 172 above as if set forth more fully herein.

174.   N.J.S.A. 56:1-2, which prohibits a person from conducting business under an assumed name that is not registered, provides in pertinent part:

No person shall conduct or transact business under any assumed name, or under any designation, name or style, corporate or otherwise, other than the real name or names of the individual or individuals conducting or transacting such business, unless such person shall file a certificate in the office of the clerk of the county or counties in which such person conducts or transacts, or intends to conduct or transact, such business, together with a duplicate thereof

for filing in the office of the Secretary of State, as provided in section 56:1-3 of this Title.

[N.J.S.A. 56:1-2.]

175.     Pursuant to N.J.S.A. 56:1-5, corporations are exempted from the requirements of N.J.S.A. 56:1-2; however, individuals and limited liability companies must register their assumed names.

176.     At all relevant times, the Yellowstone MCA Defendants were limited liability companies required to register their assumed names.

177.     At all relevant times, the Yellowstone MCA Defendants included a provision in the Merchant Agreements and Security Agreements purporting to permit them to conduct business under unregistered assumed names.

178.     The Yellowstone MCA Defendants have engaged in conduct in violation of N.J.S.A. 56:1-2 by providing in the Merchant Agreements and Security Agreements that the Yellowstone MCA Defendants may use another legal name and/or doing business as name when filing UCC-1 financing statements and other notices or filings, without identifying other legal names or doing business as names that the Yellowstone MCA Defendants might use.

179.     The Yellowstone MCA Defendants' conduct constitutes an unconscionable commercial practice in violation of the CFA, specifically N.J.S.A. 56:8-2.

## COUNT IV

### VIOLATION OF THE ADVERTISING
### REGULATIONS BY DEFENDANT YELLOWSTONE

180.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 179 above as if more fully set forth herein.

181.     The Advertising Regulations, N.J.A.C. 13:45A-9.1 to -9.8, address, among other

issues, general advertising practices.

182. Specifically, the Advertising Regulations governing general advertising practices

provide, in relevant part:

(a)  Without limiting the application of N.J.S.A. 56:8-1 [to -226], the following
     practices shall be unlawful with respect to all advertisements:

     . . . .

     9.    The making of false or misleading representations of facts
           concerning the reasons for, existence or amounts of price reductions,
           the nature of an offering or the quantity of advertised merchandise
           available for sale.

           [N.J.A.C. 13:45A-9.2(a)(9).]

183. Defendant Yellowstone violated the Advertising Regulations by engaging in

certain conduct including, but not limited to:

a.  Representing on the Yellowstone Website that "we say yes to more
    small businesses, regardless of collateral or credit," but then requiring
    Consumers to execute Security Agreements providing collateral to
    Yellowstone in the event of a default and repeatedly conducting
    excessive and/or unauthorized credit checks in considering Consumer
    applications for MCAs;

b.  Representing in advertising that Yellowstone's business loans are
    "unsecured," but then specifically labeling the Merchant Agreements as
    "secured" and requiring Consumers to provide various forms of security
    to Yellowstone as a prerequisite to receiving MCAs;

c.  Representing in advertising that Yellowstone offers flexible repayment
    terms (e.g., "if sales are up[,] you'll pay a larger repayment, but if sales
    are down, you'll pay less"), but then ignoring or refusing Consumer
    requests to pay less when their sales were down; and

d.  Representing in advertising that "We Provide Capital With No Personal
    Guarantee," but then requiring Consumers to execute a Guaranty and
    Affidavit of COJ as part of the Merchant Agreements that require the
    Consumer to personally guarantee the MCA in the event of a default.

184. Defendant Yellowstone's conduct constitutes multiple violations of the Advertising

Regulations, specifically N.J.A.C. 13:45A-9.2(a)(9), each of which constitutes a per se violation

of the CFA, specifically N.J.S.A. 56:8-2.

## **PRAYER FOR RELIEF**

WHEREFORE, based upon the foregoing allegations, Plaintiffs respectfully request that

the Court enter judgment against Defendants:

(a)     Finding that the acts and practices of Defendants constitute multiple instances of unlawful practices in violation of the CFA, N.J.S.A. 56:8-1 to -226 and that the acts and practices of Defendant Yellowstone constitute multiple instances of unlawful practices in violation of the Advertising Regulations, N.J.A.C. 13:45A-9.1 to -9.8;

(b)     Permanently enjoining Defendants and their owners, officers, directors, shareholders, founders, managers, members, agents, servants, employees, representatives, independent contractors and all other persons or entities under their control, from engaging in, continuing to engage in or doing any acts or practices in violation of the CFA, N.J.S.A. 56:8-1 to -226, and the Advertising Regulations, N.J.A.C. 13:45A-9.1 to -9.8, including, but not limited to, the acts and practices alleged in this Complaint, as authorized by the CFA, specifically N.J.S.A. 56:8-8;

(c)     Directing Defendants, jointly and severally, to restore to any affected person, whether or not named in this Complaint, any money or real or personal property acquired by means of any practice alleged herein to be unlawful and found to be unlawful, as authorized by N.J.S.A. 56:8-8;

(d)     Directing Defendants, jointly and severally, to pay the maximum statutory civil penalties for each and every violation of the CFA, in accordance with N.J.S.A. 56:8-13;

(e)     Directing Defendants, jointly and severally, to pay costs and fees, including attorneys' fees, for the use of the State of New Jersey, as authorized by N.J.S.A. 56:8-11 and N.J.S.A. 56:8-19;

(f)     Directing Defendants, jointly and severally, to disgorge all profits unlawfully acquired or retained, as authorized by N.J.S.A. 56:8-8;

(g)     Ordering the rescission of each ongoing agreement entered into between the Yellowstone MCA Defendants and any Consumer in connection with an MCA, including each Merchant Agreement; Addendum to Secured Merchant Agreement; Appendix A – Fee Structure; ACH Authorization Form; a Security Agreement and Guaranty; and/or an Affidavit of COJ;

(h)   Ordering Defendants to apply to vacate all unlawfully obtained judgments issued in their favor against Consumers by all courts that have issued such judgments, in papers acceptable to the Plaintiffs;

(i)   Ordering Defendants to file papers sufficient to terminate all unlawfully obtained liens or security interests related to their MCAs;

(j)   Ordering Defendants to file papers or take other actions sufficient to stay the execution of or collection of unlawfully obtained judgments;

(k)   Ordering Defendants to provide an accounting to Plaintiffs of the names and addresses of each Consumer from whom Defendants collected or received monies since July 16, 2015, in connection with MCAs and a complete history, by dates, amounts, and sources, of all monies collected or received by Defendants from all such Consumers (whether through daily payments, execution of judgments, or any other avenue), and all moneys provided by Defendants to such Consumers; and

(l)   Granting such other relief as the interests of justice may require.

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _____
Chanel Van Dyke
Deputy Attorney General
Consumer Fraud Prosecution Section

Dated:  December 8, 2020
        Newark, New Jersey

## RULE 4:5-1 CERTIFICATION

I certify, to the best of my information and belief, that the matter in this action involving the aforementioned violations of the CFA, N.J.S.A. 56:8-1 to -226, and the Advertising Regulations, N.J.A.C. 13:45A-9.1 to -9.8, is not the subject of any other action pending in any other court of this State. I further certify, to the best of my information and belief, that the matter in controversy in this action is not the subject of a pending arbitration proceeding in this State, nor is any other action or arbitration proceeding contemplated. I certify that there is no other party who should be joined in this action at this time.

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _Chanel Van Dyke_

Chanel Van Dyke
Deputy Attorney General
Consumer Fraud Prosecution Section

Dated: December 8, 2020
Newark, New Jersey

Case 1:21-cv-06386-MKV   Document 1-1   Filed 07/27/21   Page 112 of 143

## RULE 1:38-7(c) CERTIFICATION OF COMPLIANCE

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with R. 1:38-7(b).

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _____
Chanel Van Dyke
Deputy Attorney General
Consumer Fraud Prosecution Section

Dated:  December 8, 2020
Newark, New Jersey

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, Deputy Attorney General Chanel Van Dyke is hereby designated as trial counsel for the Plaintiffs in this action.

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _____
Chanel Van Dyke
Deputy Attorney General
Consumer Fraud Prosecution Section

Dated:  December 8, 2020
Newark, New Jersey

Case 1:21-cv-06386-MKV   Document 1-1   Filed 07/27/21   Page 113 of 143

# EXHIBIT 3

Case 1:20-cv-06023   Document 1-1 Filed 08/03/2021   Page 114 of 143

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>YELLOWSTONE CAPITAL LLC, a New York limited liability company,<br><br>FUNDRY LLC, a New York limited liability company,<br><br>YITZHAK D. STERN, a/k/a Isaac Stern, individually and as an officer of Yellowstone Capital LLC and Fundry LLC, and<br><br>JEFFREY REECE, individually and as an officer of Yellowstone Capital LLC and Fundry LLC,<br><br>    Defendants. | **Case No. 20-cv-6023**<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.  The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), in connection with their business financing activities.

## JURISDICTION AND VENUE

2.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

3.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. § 53(b).

## DEFENDANTS

6.      Defendant **Yellowstone Capital LLC** ("Yellowstone") is a New York limited liability company with its principal place of business at 1 Evertrust Plaza, Jersey City, New Jersey 07302.  Until at least March 2016, its principal place of business was 160 Pearl Street, New York, New York 10005, and it continues to use business addresses located in this District in connection with acts and practices alleged below.  Yellowstone transacts or has transacted business in this District and throughout the United States.  At times material to this Complaint, acting alone or in concert with others, Yellowstone has advertised, marketed, offered, or distributed financing to businesses throughout the United States.

7.      Defendant **Fundry LLC** ("Fundry") is a New York limited liability company with its principal place of business at 1 Evertrust Plaza, Jersey City, New Jersey 07302.  Until at least March 2016, its principal place of business was 160 Pearl Street, New York, New York 10005.  Fundry transacts or has transacted business in this District and throughout the United

States.  At times material to this Complaint, acting alone or in concert with others, Fundry has

advertised, marketed, offered, or distributed financing to businesses throughout the United

States.

       8.    Defendant **Yitzhak D. Stern**, also known as Isaac Stern ("Stern"), is a founder

and the Chief Executive Officer of both Yellowstone and Fundry.  At all times material to this

Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the

authority to control, or participated in the acts and practices set forth in this Complaint.

Defendant Stern, in connection with the matters alleged herein, transacts or has transacted

business in this District and throughout the United States.

       9.    Defendant **Jeffrey Reece** ("Reece") is the President of both Yellowstone and

Fundry.  At all times material to this Complaint, acting alone or in concert with others, he has

formulated, directed, controlled, had the authority to control, or participated in the acts and

practices set forth in this Complaint.  Defendant Reece, in connection with the matters alleged

herein, transacts or has transacted business in this District and throughout the United States.

### COMMON ENTERPRISE

      10.    Defendants Yellowstone and Fundry (collectively, "Corporate Defendants") have

operated as a common enterprise while engaging in the deceptive and unfair acts and practices

alleged below.  Corporate Defendants have conducted the business practices described below

through interrelated companies that have common officers, managers, business functions,

employees, and office locations.  Because these Corporate Defendants have operated as a

common enterprise, they are partners in concerted wrongdoing and liable for the acts and

practices alleged below.  Defendants Stern and Reece have formulated, directed, controlled, had

the authority to control, or participated in the acts and practices of the Corporate Defendants that

3

Case 1:21-cv-06325   Document 1-1   Filed 07/22/21   Page 117 of 143

constitute the common enterprise and are partners in the concerted wrongdoing of the common enterprise.

## COMMERCE

11.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### Overview

12.     Since at least 2015, Defendants have advertised, marketed, and offered short-term, high-cost financing products to small business consumers in immediate need of funds. Defendants tout these products – often referred to as "merchant cash advances" ("MCAs") – as a quick source of funds for consumers that do not qualify for bank loans or other traditional forms of financing.  Defendants characterize their products as discounted purchases of consumers' future receivables to be repaid in a larger amount via daily installment payments purportedly based on a percentage of consumers' incoming business receipts.

13.     Defendants often advertise, market, and offer their MCAs through a vast, ever-changing network of agents.  Some of these agents include, but are not limited to, Green Capital Funding LLC, West Coast Business Capital, LLC, World Global Capital LLC, High Speed Capital LLC, Thryve Capital Funding LLC, and Mason Capital LLC.

14.     Defendants engage in a pattern of deceptive and unfair conduct in connection with the marketing, advertising, and offering of their MCAs.  They have misrepresented key aspects of their products, including their requirements that consumers provide collateral and personal guarantees, as well as the specific financing amount they will disburse to consumers.

4

Additionally, the Defendants have made excess, unauthorized withdrawals from consumers'

accounts after consumers already repaid the full amount that they owed.

<u>**Misrepresentations Regarding Collateral
and Personal Guarantees**</u>

15.    Since at least 2015, Defendants have disseminated advertisements that claim that

their MCAs do not require collateral or a personal guarantee.

16.    For example, Defendants have disseminated numerous online advertisements, on

websites including www.yellowstonecap.com, www.m.yellowstonecap.com,

www.smallbusinessfunders.com, www.sbfcash.com, and www.3hourfunding.com, that make the

following statements:

     a.    "We say yes to more small businesses, regardless of collateral" (**Exhibit A**);

     b.   "No collateral loans" & "We won't ask for any kind of collateral" (**Exhibit B**);

     c.   "No collateral, no personal guarantee" (**Exhibit C**);

     d.   "No collateral required" (**Exhibit D**);

     e.   "No Collateral Requirements" (**Exhibit E**);

     f.   "No Personal Guarantee Loans" & "We Provide Capital With No Personal

          Guarantee" (**Exhibit F**); and

     g.   "No Collateral Loans" (**Exhibit G**).

17.    Defendants' video advertisements also represent that Defendants do not require

collateral or personal guarantees.  For example, one of Defendants' video advertisements,

attached as **Exhibit H**, makes the following prominent claims:



As this image is displayed, an audio voiceover makes the following representations: "No collateral required. No collateral, no personal guarantee."

18.    Defendants have also disseminated direct mail pieces that represent that they do not require personal guarantees. For example, one such direct mail piece, attached as **Exhibit I**, states: "You do not need excellent credit, or give us a personal guarantee."

19.    In reality, in many instances, Defendants do require business owners to sign a guarantee holding them personally responsible for the entire funded amount should the business default. Additionally, in many instances, Defendants do require that consumers provide collateral, by granting Defendants a purported security interest or lien in all business property consumers own, including all financial accounts, equipment, inventory and other assets.

20.    When consumers default on their financing agreements, Defendants frequently file lawsuits against them, including against the individual business owners who provided the personal guarantees, in order to collect the unpaid funded amount. Additionally, in many instances, as part of these lawsuits, the Defendants seek court orders to seize the collateral that

consumers have pledged. Defendants Stern and Reece have closely overseen and directed

Defendants' day-to-day advertising and marketing efforts. Among other things, they have

directly managed the work of Defendants' marketing agents. They have also frequently

reviewed and provided feedback and approval for advertising content and claims. In fact,

Defendants Stern and Reece have specifically reviewed copies of advertisements that claim the

Defendants do not require collateral.

## **Misrepresentations Regarding Financing Amount**

21.     Defendants promote that they provide immediate financing in a specific amount

in exchange for consumers' agreement to repay a higher amount out of consumers' future

business revenues. Consumers remit the repayment amount over a period of months through

daily debits from their bank accounts in installment amounts purportedly corresponding to an

estimated percentage of each day's receipts.

22.     Since at least early 2015 until at least October 2018, the first page of Defendants'

contracts has prominently set forth the "Purchase Price" (the total dollar amount to be provided

to the consumer), the "Specified Percentage" (the percentage of daily revenues used to calculate

daily installment payments to Defendants), and the "Purchased Amount" (the total amount to be

repaid from future receivables).

23.     For example, in an agreement to provide $10,000 in financing, the first page of

the contract provides as follows:

| PURCHASE PRICE: | SPECIFIED PERCENTAGE: | PURCHASED AMOUNT: |
|---|---|---|
| $10,000 | 25% | $14,000 |

24.     In this example, Defendants purportedly agree to provide $10,000 in funding, and

the consumer agrees to repay a total of $14,000 via daily withdrawals from the consumer's bank

account. The amount of those daily withdrawals is purportedly set at 25% of the consumer's
daily receipts. A redacted example of Defendants' entire financing agreement is attached to this
complaint as **Exhibit J**.

25.     In reality, however, Defendants routinely provide consumers with substantially
less than the total amount promised on the first page of the contract, by withholding fees that
range from hundreds to thousands of dollars prior to disbursement. These fees are mentioned
several pages into the contract without any indication that they are deducted from the "Purchase
Price" – the funds promised to consumers. As a result, consumers, in numerous instances, have
received significantly less funding than they were promised.

26.     In numerous instances, Defendants Stern and Reece have received messages
detailing the difference between the funding amount promised to specific consumers in
Defendants' contracts and the significantly lower amount disbursed to those same consumers
after additional fees were withheld.

27.     To the extent Defendants reveal the actual funding amount consumers will
receive, they sometimes do so in a brief telephone call only *after* consumers have signed their
contracts. In some instances, consumers express confusion and surprise when they learn that
they will receive significantly less funding than they were promised in their contracts. For
example, when one consumer learned that she would receive roughly $4,000 less than her
contract stated, she responded, "I think something is wrong," and "you guys are like highway
robbery."

### Unauthorized Withdrawals

28.     Defendants require consumers to provide authorization for Defendants to
withdraw daily payments – typically hundreds of dollars each day – from customers' accounts

using ACH debits until customers have fully repaid the "Purchased Amount" they owe under
their agreements.

29.     Since at least 2015, Defendants have withdrawn money from customers' accounts
in excess of the amounts customers authorized, by continuing to withdraw daily payments from
customers after they have already fully repaid the "Purchased Amount." These unauthorized
overpayments have been a typical occurrence for Defendants' customers, and have impacted at
least thousands of them, in amounts ranging from hundreds to thousands of dollars.

30.     Defendants have acknowledged that they take these overpayments from
customers knowingly. Specifically, Defendants' payment and recordkeeping processes create a
"lag" or "debit delay" that results in them collecting an additional 4-5 or more unauthorized
payments after customers have already fully repaid the "Purchased Amount." For example,
Defendants received one customer complaint stating: "My loan payoff was met and
exceeded . . . [by] 4 daily payments totaling in the amount of $3480." Defendants explained to
another customer who complained about excess, unauthorized debits that "there is a 4 day lag on
ACH debits . . . it's simply the way our processor works."

31.     In both internal communications and communications with customers in response
to complaints, Defendants' employees and agents have repeatedly acknowledged that the "lag"
or "debit delay" was common practice for Defendants. For example, in response to a customer
complaint about such overpayments, Defendants' Operations Manager wrote to one of
Defendants' in-house servicers: "Maybe send an account summary so [the customer]
understands the 5 day debit delay?" When another customer questioned these overpayments
during a telephone call, one of Defendants' in-house servicers responded that "there is *always* a
delay" (emphasis added) in the prompt cessation of daily withdrawals. In response to another

customer who noticed and complained after the first day of overpayment, one of Defendants'
servicers responded that he "made an exception" for the customer by stopping ACH debits
before the full 4-5 days of overpayments elapsed.

32.     Additionally, in numerous instances, Defendants' unauthorized payments have
exceeded the 4-5 days associated with their typical "lag" or "debit delay."  For example, one
customer submitted a complaint stating that Defendants continued making ACH debits from his
account "for another two weeks and only stopped after numerous calls," resulting in an
overpayment of $4,345.00.  Another customer reported that "[a]ccording to our contract which
we have, we would pay back $10,213.00. . . . Yellowstone has withdrawn $5,409 over the
amount we owed them."

33.     Beyond the unauthorized payments themselves, in some instances, customers
incur additional monetary and other harm, including overdraft fees charged by customers' banks
because their accounts were drained of funds by Defendants' unauthorized withdrawals.  For
example, one customer wrote to Defendants that she "ha[d] $140 in overdraft fees that would not
have happened if [Defendants] would of [*sic*] stopped withdrawing on Monday when I called to
confirm it was the last payment …. I'm still overdrawn and need it desperately."  When another
customer complained to Defendants about overpayments taken from her, and resulting bank
overdraft fees, one of Defendants' in-house servicers told his employee "if she busts your balls
again and doesn't stop – u can use ur judgment and throw her the $100 to go away," and
Defendants' Operations Manager stated "I think it's money well spent if you don't have to talk to
her."

34.     To the extent Defendants refund these unauthorized debits, in numerous instances,
they do so only in response to complaints from customers.  In fact, even after customers

10

complain to Defendants about these unauthorized withdrawals, Defendants sometimes take weeks or months to refund these payments to customers.

35. As indicated above, customers each typically pay hundreds (and sometimes thousands) of dollars in these excess, unauthorized payments. Defendants have charged at least millions of dollars in unauthorized overpayments.

36. Defendants Stern and Reece have closely overseen and managed Defendants' servicing and collection of payments from consumers. They have directly supervised their in-house servicers and disseminated relevant policies and practices to them. Additionally, Defendants Stern and Reece have known about, and communicated with their in-house servicers about, the existence of unauthorized overpayments by consumers.

37. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

## **VIOLATIONS OF THE FTC ACT**

38.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

39.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

40.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

### **Count I**

### **Misrepresentations Regarding**
### **Collateral and Personal Guarantees**

41.     In numerous instances in connection with the advertising, marketing, promotion, or offering of small business financing products, Defendants have represented, directly or indirectly, expressly or by implication, that Defendants:

       a.   require no collateral; and

       b.   require no personal guarantee from business owners.

42.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 41, such representations were false or misleading at the time Defendants made them.

43.     Therefore, Defendants' representations as set forth in Paragraph 41 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

12

## Count II

### Misrepresentations Regarding Financing Amount

44.     In numerous instances in connection with the advertising, marketing, promotion, or offering of small business financing products, Defendants have represented, directly or indirectly, expressly or by implication, that consumers will receive a specific amount of financing.

45.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 44, such representations were false or misleading at the time Defendants made them.

46.     Therefore, Defendants' representations as set forth in Paragraph 44 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count III

### Unfair Unauthorized Withdrawals

47.     In numerous instances, Defendants have withdrawn money from consumers' bank accounts in amounts in excess of consumers' authorization without the express informed consent of consumers.

48.     Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

49.     Therefore, Defendants' practices as described in Paragraph 47 above constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

Case Case 1:20-cv-03660-KBJ Document 1-1 Filed 08/03/21 Page 41 of 143

## CONSUMER INJURY

50.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

51.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) and the Court's own equitable powers, requests that the Court:

A.      Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

B.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

C.      Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated:  August 3, 2020

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

  /s/  *Christopher B. Leach*
EVAN R. ZULLOW
(ezullow@ftc.gov)
THOMAS C. KOST
(tkost@ftc.gov)
CHRISTOPHER B. LEACH
(cleach@ftc.gov)
IOANA R. GORECKI
(igorecki@ftc.gov)
Federal Trade Commission
600 Pennsylvania Ave. NW
Mail Stop CC-10232
Washington, DC 20580
Tel: 202-326-2914 (Zullow);
202-326-2286 (Kost);
202-326-2394 (Leach);
202-326-2077 (Gorecki)
Fax: 202-326-2752

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

Case 1:21-cv-06386-MKV   Document 1-1   Filed 07/27/21   Page 129 of 143

# EXHIBIT 4

# Small Business's Destroyed by Predatory Funding

## By Jerry Bush, Jr.

### *(Former owner of JB Plumbing and Heating of Virginia, Inc.)*

## June 26, 2019

Case 1:21-cv-06386-MKV   Document 1-1   Filed 07/27/21   Page 131 of 143

My father built JB Plumbing and Heating of Virginia, Inc. 30 years ago so he could give a good life for his family. When I graduated high school, I was given a work truck and tools so I could one day support my family like he did. My father served in the army and when his term was done, he came out and started to be a plumber. He had to do everything from scratch. He was never given anything. As I took more interest in the company, we incorporated in 2008. We had a very strong company and when the house market crashed, it hurt us pretty bad but we had a good name and never had to look for work. We started to do more commercial work. We mainly done all new work and sometimes you would have to wait up to 60 days to get your money and a year after the job was completed to receive your 10% retainage. When we done a large project in 2015 and was not paid around $350,000 this put us in a bad position as we tried to fight this contractor, we had personal guarantees that we had to pay suppliers and other subs in which this caused us to have judgements.

I went to our bank, Wells Fargo and they turned us down for loan but the gentlemen told me he knew some brokers and within a week I received a call from a broker telling me they could help me. I was at a point where I was hoping to win the lawsuit with the contractor who owed us money plus, I had to keep payroll going and jobs because of contracts. The broker said we can get you a better deal in 45 days that you have to earn their trust. So, I said ok. They sent me the contract and I have never seen a confessions of judgment before and asked about it and they said this is just there in case you run or change accounts and that they never use them and they will work with you, then they will do a funding company call from the lender as if the broker told you everything and they will work with you if you run into problems. Nobody explained what all they can do if they want to. 35 days go by and I am paying my daily's and the broker comes back and said hey, I have a sweet deal. I found another company will be there for the long haul and I said my contract says if I take another funding, I will go into default. They would respond saying, no, you are good, we got you.

Then when the time came around for the first one to end, the funding company's would call and say hey, you ready to renew and you tell them no, they go into your account and see you are working with somebody else and they force you to renew or default so then they got you and you start to have two daily's then you get deeper and next thing you know they are taking $18,000 out daily. They know every day how much you bring in and everything else. They mostly all made hundreds of thousands off of us and the amounts the judgements showed was where they went back started the advance again. Example: if you had $10,000 left and the advance was $50,000 but the contract amount was $70,000, they would take the $10,000 and add $70,000 because they said it's in the contract to restart then add legal fees up to $34,000 or more then the judgements show $114,000 plus the $60,000 they already have taken out. This is a good reason for them to pay people like the New York marshals because they can and will force to get it.

When the time came where I needed help to try to get the payments reduced because I did not want to take anymore or funds was too tight because $18,000 daily added to $90,000 weekly. I asked for reduced payments from Yellowstone and they would only make you take a new funding contract with no money in return but you would still get charged up to the 400% others like Last Chance and Main Street. They would give you reduce payments for 5 days then come back in a week or so with no warning and make them up. August 7, 2018 when I had to make a choice to keep getting deeper or close doors, I warned all of the funding companies it was going to happen. That Tuesday, I had to tell my employees and my father it was over as I had to tell all the contractors as well. To watch my fathers face, to watch my 20 employees and everybody else still haunts me.

The chain reaction was awful, personal guarantees, frozen accounts, certain people holding our equipment and tools for hostage, our name smeared, I was to the end. The funding companies even took my fathers retirement and money that was in his account from social security around the end of August 2018. I had companies tell me two ways out. Win the lottery or the day you die we can't come after you. When all of this was going on before I closed doors and after my wife was going through cancer, one day in January 2018, I didn't want to renew the loan but the gentlemen from one of the funding companies, Yellowstone said if I did not, he would default me. I told him I was with my wife for her chemo treatment, his words were, I will send flowers to make her feel better.

The day when I was at my dark place, I said I would win. I would not let them take from my family no more. I sat on the bank and said to myself. I want to see my son grow up. I want to be there for my family but I can not take care of them if I will never have anything. They were right, and if I was gone, they can't come after me no more. I was not looking for a way out. I was looking for a way to fix it. I did it. It was my fault. I said my goodbyes on Facebook, begging people to make sure my family was ok and did the hardest thing I ever done and took the pills. I did not want to do this and I really hid myself in the heavy woods and went to sleep but as I look now, I was lucky and was found.

My second chance, after about a month, I started to fight again. Seeing my father at age 70 back to hard labor and not the best health and finding out how these companies was making millions. Pictures of them in sport cars, fancy trips, tables full of cash that they have taken from people all over the country, every man, every woman and every race. I started to make calls, sending emails, anything. No local news would hear me because nobody ever heard of this before and nobody could understand, even local lawyers.

2

I had one lawyer from New York connect me to Bloomberg News and the story came out but still missed a lot of details, but this was a very good start and when the story came out the funding companies hit harder. They did all kinds of crazy things. They sent letters to a credit card which was Discover card and asked and received any kind of bank account numbers to find any bank I use to they could freeze them. So, with this, I can never have a bank account and will have judgments on my record and paying of personal guarantees that happen after we closed doors and have a father who has to work the rest of his life.

What I would like to see is number one. That these companies to be investigated due to the way they handle things, the threats, the use of other names and accounts that show no records they are legit. Ways to solve these issues. Everybody has there right in court. Stop the confession of judgements. Educate the public better. No state or city officials should have the right to make money off companies like this. People should not be able to have companies like this if they been charged with federal charges.

I want changes to help others. I don't want nobody to go through this. I am not saying all funding companies are bad, but there are plenty that has went too far because there is no regulations. Even if I had to sleep in my car and come back to DC, I want changes before it's too late. Trades like ours are already dying when you don't need things like this to make it worse for small businesses that built America and still is building America. Big industrial companies don't bring your flowers, fix your house, repair your car or serve your needs.

Since all of this has happened, I feel like I been given a life sentence. Because of the judgements, I cannot even have a checking account in my name. And as the story has came out, I have had merchant companies done many things to try and get the money back. And have even a couple times taken my fathers social security money which we got some of it back. So, you can imagine not even able to have a debit card is very hard for me every day.

I'm asking for more regulations and investigations to fix this problem. I want to thank the committee, the house, the media and other organizations for their time and support to try and put a stop to this.

3

## CONTACT INFORMATION

Jerry Bush, Jr.

Phone: 540-537-2414

Email: jerrybush76@gmail.com

Case 1:21-cv-06386-MKV   Document 1-1   Filed 07/27/21   Page 135 of 143

# EXHIBIT 5

https://richmond.com/opinion/columnists/jerry-bush-column-after-a-predatory-loan-destroyed-my-small-business-i-spoke-out-now/article_284e88cb-85e1-5b92-bcc3-efb504e81233.html

A call for change

# Jerry Bush column: After a predatory loan destroyed my small business, I spoke out. Now my creditors are retaliating.

By Jerry Bush
Aug 15, 2019

---

**B**y Jerry Bush

After a bad loan cost me my small business and ruined my family's finances, I felt so broken I did not want to live. But while in that dark place I realized I had the power to prevent other small-business owners from suffering like I did, so I decided to tell my story to reporters and testify before Congress. Now the creditors I spoke out against are coming after me again, and since my local representatives ignored my concerns, I want more people to know my story.

The events leading up to my fight began only four years ago, but focusing on just the past few years would do a disservice to the scope of my family's tragedy. After my father got out of the U.S. Army 30 years ago, he started JB Plumbing and Heating of Virginia Inc. in Roanoke so he could provide for his family. When I graduated high school, I received a truck and tools so I could join the business.

We were great at what we did and our business grew. Even though we were very successful, however, JB Plumbing and Heating's downfall started as a result of something that causes most startups and small businesses to fail: cashflow.

In 2015, we did not get paid after completing a $350,000 project. We fought for that money, but we also had bills to pay so I asked our bank for a loan. They turned me down but told me they knew some brokers who might help.

I quickly received a call from a broker promising a "great deal," but first I had to earn his trust. This meant accepting financing that required me to sign a confession of judgment, which I had never seen before. Confessions of judgment are legal instruments requiring borrowers to agree in advance to automatically lose any dispute with a lender.

Confessions of judgment are banned nationwide for consumer loans but remain legal for use in business loans in some states, including Virginia. When used against small businesses, they allow assets — even those unrelated to a borrower's business — to be seized quickly and easily.

Just 35 days after I accepted that first loan, my broker offered me "a sweet deal." He said he found another lender that would offer me longer-term financing, but I pointed out a serious problem with this idea. My loan stated I would be in automatic default if I obtained other funding. "You are good, we got you," the broker said.

I was not "good." I went into default, and I ended up signing confessions of judgment for at least six merchant cash advances to try to fix the situation. At one point, I owed $18,000 per day. One of my lenders gave me about $250,000 and I paid them back more than $600,000.

After three years I could not go on like that. In August 2018, I told my 20 employees and my father our business was over. The looks on their faces still haunt me.

The chain reaction was intense. Using confessions of judgment, my creditors took whatever they could, not only from my business, but from me. They even emptied my father's retirement account. At age 70, he went back to work.

I blamed myself. I thought it would be best to end my life because my business debts could not be pursued after my death. Fortunately, I made it through that time and decided to fight back. Eventually I was connected with Bloomberg News to share my story, and that publicity gave me an opportunity to testify before Congress.

By the time I spoke to the press, things had quieted down. After my story came out in November 2018, however, I started getting lots of phone calls again. People I didn't know would threaten me, then hang up. My father's Social Security money was taken several times, but we managed to get some of it back.

No one else should have to go through what I did, and there are ways to make that happen. First, confessions of judgment must be banned nationwide.

Fortunately, a bill that would do that already exists. Second, I want to see the companies that abused me and others through confessions of judgment be investigated.

Even if I have to sleep in my car and testify before Congress again and again to bring about change, I will. My creditors took my business and my money, but they will never take my fighting spirit.



Jerry Bush is a former small business owner who lives in Roanoke. Contact him at **jerrybush76@gmail.com**.

# EXHIBIT 6



I want you to finish school buddy alway will love you be good to your mom be a weilder be what you want am very proud of you don't think I was ever weak I was not grandpa work hard and all this happen I be dame if they will take more from him or you. They didn't win I will I never could be any proud of you take care of your mom she getting better every day because y'all are strong. You are so much like you grandpa take care of him please I will always be there in your heart and watching over you the best I can am not running from a problem they are right this is the only way I can save what I can.

You will be always my chest baby lol love you son . Nobody's fault am just doing what it takes to take care of the ones I love
Love you buddy
Always your dad



Dad,

You always thought you had to work hard for us you built this company with your own hands sorry way things went you did not deserve this you are not in the best health and you should be enjoying retirement not be working hard labor at age 70 but please do me one wish be there for Zach and Terri don't let these people win don't let me do this for nothing I will die before they take anymore or hurt anybody they can't take my sole but just my body love you dad don't put none of this on you you need so much you are my hero.

Love you dad

Jay



# EXHIBIT 7

JB Plumbing and Heating v Capital Advance
Measure of Damages, and Interest Rates

| Formula | | A | B | C | D=CxB | E=C/250 | F=D-A | G=A/2 | H=F/G | I=H/E | J=Gx.25xE | K=F-J | L=3xK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Loan Number | | Original Principal | Daily Repayments | Actual Days | Total Repayments | Portion of Year | Interest Total | Average Balance | Nominal Interest Rate | Effective Simple Interest | Allowable Interest | Excess Interest | 3 Times Excess Interest |
| Capital Advance | 1 | As Advertised 80,000 | 1,699.00 | 70 | 119,600 | 0.28 | 39,600 | 40,000 | 99.0% | 351.6% | 2,816 | 36,784 | $ 110,353 |
| Capital Advance | 2 | As Advertised 130,000 | 2,430.00 | 80 | 194,350 | 0.32 | 64,350 | 65,000 | 99.0% | 309.5% | 5,199 | 59,151 | $ 177,454 |
| Capital Advance | 3 | As Advertised 125,000 | 2,999.00 | 65 | 194,875 | 0.26 | 69,875 | 62,500 | 111.8% | 430.1% | 4,061 | 65,814 | $ 197,441 |
| Capital Advance | 4 | As Advertised 150,000 | 2,999.00 | 75 | 224,250 | 0.30 | 74,250 | 75,000 | 99.0% | 331.0% | 5,608 | 68,642 | $ 205,926 |
| Capital Advance | 5 | As Advertised 100,000 | 2,999.00 | 50 | 149,500 | 0.20 | 49,500 | 50,000 | 99.0% | 496.5% | 2,492 | 47,008 | $ 141,023 |
| Capital Advance | 6 | As Advertised 100,000 | 1,994.00 | 75 | 149,500 | 0.30 | 49,500 | 50,000 | 99.0% | 330.1% | 3,749 | 45,751 | $ 137,254 |