UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____           │
│ DATE FILED: _9/29/2022_          │
└─────────────────────────────────┘
```

J.B. PLUMBING AND HEATING OF
VIRGINIA, INC. and JERRY BUSH, JR.,
*individually and on behalf of all those*
*similarly situated,*

                   Plaintiffs,

       -against-

YELLOWSTONE CAPITAL LLC,
CAPITAL ADVANCE SERVICES LLC,
CAPORLY LLC, DAVID GLASS,
YITZHAK STERN, and TSVI H. DAVIS,

                 Defendants.

21-cv-6386 (MKV)

<u>OPINION & ORDER DENYING
WITHOUT PREJUDICE
PLAINTIFFS' MOTION TO COMPEL
ARBITRATION AND
DEFENDANTS' MOTIONS TO DISMISS</u>

MARY KAY VYSKOCIL, United States District Judge:

      Plaintiffs J.B. Plumbing and Heating of Virginia, Inc. ("J.B. Plumbing") and Jerry Bush,

Jr. bring this putative class action alleging that Defendants Yellowstone Capital, LLC, Capital

Advance Services, LLC ("CAS"), Caporly, LLC, David Glass, Yitzhak Stern, and Tsvi H. Davis

participated in an illegal enterprise that makes fraudulent, usurious loans and engages in abusive

collection practices.  The defendants are companies and individuals in the "merchant cash

advance" ("MCA") industry.  MCA agreements are financial agreements, often marketed to small

businesses, that purchase a portion of a business's future receivables in exchange for immediate

cash payments.  Plaintiffs executed a series of agreements with CAS that purport to be purchases

of future receivables, but Plaintiffs allege the agreements were loans with unlawfully high interest

rates disguised to evade usury laws.

      Plaintiffs move to compel arbitration pursuant to provisions of the agreements with CAS

[ECF No. 27].  All of the defendants oppose that motion.  In particular, all of the defendants aside

from CAS argue that they cannot be compelled to arbitrate because they did not sign the

agreements containing the arbitration provisions. Plaintiffs argue that exceptions to the general rule that non-signatories cannot be compelled to arbitrate apply to the defendants based on their participation in the alleged scheme to make and collect on fraudulent, usurious loans. In addition, the defendants all move to dismiss Plaintiffs' complaint for failure to state a claim [ECF Nos. 23, 30, 33], and Plaintiffs oppose those motions.

As the Court explains below, there are triable issues as to whether any of the defendants aside from CAS can be compelled to arbitrate. Moreover, the Court cannot rule on defendants' motions to dismiss unless and until they prevail on the question of arbitrability. Accordingly, the parties' motions are denied without prejudice.

## I.   BACKGROUND[1]

### A. Facts

Plaintiff J.B. Plumbing and Heating of Virginia, Inc. ("J.B. Plumbing") was a family-owned plumbing business run by Plaintiff Jerry Bush, Jr. Cmpl. ¶¶ 85, 86. After a contractor failed to pay J.B. Plumbing hundreds of thousands of dollars, Mr. Bush sought a business loan. *See* Cmpl. ¶¶ 87, 88. Between July 2017 and May 2018, Plaintiffs executed six written agreements with Defendant Capital Advance Services, LLC ("CAS") [ECF No. 29-2; ECF No. 29-2 at 2 ("July 2017 Agreement")[2]; ECF No. 29-3; ECF No. 29-4; ECF No. 29-4 at 4 ("May 2018 Agreement")]. Cmpl. ¶¶ 99, 107, 115, 123, 131, 139.

---

[1] This section describes pertinent factual allegations in the complaint [ECF No. 1-1 ("Cmpl.")], documents attached to the complaint and incorporated therein by reference, and "relevant, admissible evidence submitted by the parties" in connection with Plaintiffs' motion to compel arbitration [ECF Nos. 29, 42]. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229, 230 (2d Cir. 2016).

[2] The Court notes that the document submitted by Plaintiffs at ECF No. 29-2 appears to be missing pages and is not signed, but Defendants do not appear to contest that the document accurately reflects portions of the contents of the July 2017 agreement between Plaintiffs and CAS.

The agreements that Plaintiffs executed with CAS each contain provisions allowing any party to elect to arbitrate.  For example, Section 4.14 of the July 2017 Agreement states, in pertinent part:

> If Purchaser, Merchant or any Guarantor requests, the other parties agree to arbitrate all disputes and claims arising out of or relating to the Agreement. If Purchaser, Merchant or any Guarantor seeks to have a dispute settled by arbitration, that party must first send to the other party, by certified mail, a written Notice of Intent to Arbitrate.  If Purchaser, Merchant or any Guarantor do not reach an agreement to resolve the claim within 30 days after the Notice is received, Purchaser, Merchant or any Guarantor may commence an arbitration proceeding with the American Arbitration Association ("AAA"), located in New York City.

July 2017 Agreement § 4.14.  "Merchant" refers to J.B. Plumbing.  *Id.* at 1.  Section 4.13 of the May 2018 Agreement contains precisely the same language, except that it says "CAS" where the July 2017 Agreement says "Purchaser."  *See* May 2018 Agreement § 4.13.  The agreements also provide that they "shall be governed by and construed in accordance with the laws of the State of New York."  July 2017 Agreement § 4.6; May 2018 Agreement § 4.6.

The agreements purport to buy a percentage of the future receivables of J.B. Plumbing in exchange for immediate cash payments.  *See* July 2017 Agreement at 1; May 2018 Agreement at 1.  Plaintiffs allege, however, that the agreements were in reality fraudulent loans with unlawfully high interest rates that were intentionally disguised as asset purchase agreements in order to evade usury laws.  *See* Cmpl. ¶¶ 7, 9, 93, 99–146.  Plaintiffs contend that, under a legitimate asset purchase agreement, "the purchaser assumes all risk of non-collection" if a business does not generate sufficient receipts to repay the cash that was advanced, but the payments at issue in this case were "absolutely repayable loans."  Cmpl. ¶¶ 8, 9; *see* Cmpl. ¶ 84.

For example, Plaintiffs allege, the agreements that Plaintiffs executed with CAS provided for fixed daily payments that were "not based upon any good-faith estimate of [J.B. Plumbing's] future account receivables."  Cmpl. ¶ 84(f).  The agreements also required J.B. Plumbing "to turn

over 100% of all of its receivables if its misse[d] just one fixed daily payment." Cmpl. ¶ 77. In order to obtain the alleged loans, Mr. Bush was required to sign confessions of judgment entitling CAS to collect the full amount of the "debt due . . . plus agreed-upon interest, attorneys' fees, costs, and disbursements" [ECF No. 29-4 at 16–21]. *See* Cmpl. ¶ 10.

Plaintiffs allege that CAS executed the agreements with Plaintiffs as part of a scheme to make and collect on fraudulent, usurious loans that was run by Defendants Yellowstone Capital, LLC ("Yellowstone"), David Glass, Yitzhak Stern, and Tsvi H. Davis and his company Caporly, LLC. *See* Cmpl. ¶¶ 4–7, 41, 43, 45–50, 180–196. According to Plaintiffs, the defendants, together with other investors, created non-party Pinnex Capital Holdings LLC ("Pinnex") "for the sole purpose of funding the . . . unlawful loansharking scheme." Cmpl. ¶ 45. Plaintiffs submit the 2015 operating agreement for Pinnex, which reflects that "Stern personally contributed $20 million," and "Davis and Caporly contributed $4,230,000." Cmpl. ¶¶ 47, 48 [ECF No. 29-6 ("2015 Pinnex Operating Agreement") at 63, 65]. "Although the [2015] Pinnex Agreement does not identify Glass as an investor," Plaintiffs allege that "Glass is a silent investor through Stern," who Plaintiffs allege is "Glass' brother-in-law." Cmpl. ¶¶ 35, 48.

Plaintiffs also submit a complaint that Pinnex and Yellowstone filed elsewhere in which Pinnex and Yellowstone represent that Pinnex "is the parent of Yellowstone and other related companies" [ECF No. 29-5 ¶ 11]. Yellowstone identified a different LLC as its parent company in its corporate disclosure statement in this Court [ECF No. 57]. Plaintiffs allege that CAS is a wholly owned subsidiary of Yellowstone. Cmpl. ¶ 5. CAS identified a different LLC as its parent company in its corporate disclosure statement in this Court [ECF No. 57].

Plaintiffs allege that Yellowstone is "one of the largest merchant cash advance ('MCA') companies in the country" and "is led and/or directed" by Mr. Glass and Mr. Stern. Cmpl. ¶ 4.

Plaintiffs further allege that CAS is merely one of many interchangeable "MCA companies that operate under [Yellowstone's] management and control but exist under other corporate names." Cmpl. ¶ 41.  Plaintiffs allege, for example, that "these other MCA companies," including CAS, all "use the same location of 30 Broad Street, 14th Floor, New York, NY 10004 on their contracts but are actually operated out of Yellowstone's headquarters at 1 Evertrust Plaza, Jersey City, New Jersey 07302." Cmpl. ¶ 41.  At least one of the CAS agreements that Plaintiffs submitted uses the Evertrust Plaza address [ECF No. 29-2 at 2, 4].

In connection with their motion to compel, Plaintiffs offer an affidavit from Desmond Miller, who was a "sales representative and a funder at Yellowstone Capital LLC and its affiliates" from 2011 until February 2018 [ECF No. 29-7 ("Miller Aff.") ¶¶ 2, 10].  "As a funder," he "was responsible for managing [his] own portfolio . . . of Yellowstone MCAs."  Miller Aff. ¶ 7.  According to Mr. Miller, however, "Yellowstone . . . includes dozens of different entities, including Yellowstone Capital LLC and Capital Advance Services LLC," and he "viewed these entities interchangeably."  Miller Aff. ¶ 10.

Mr. Miller asserts that, when he worked there, Yellowstone "was run" by Mr. Stern and Mr. Glass.  Miller Aff. ¶¶ 2, 10.  According to Mr. Miller, Mr. Stern was "Yellowstone's CEO and oversaw its marketing and other day-to-day business operations."  Miller Aff. ¶ 11.  Mr. Miller asserts that Mr. Stern was "actively involved with customer transactions."  Miller Aff. ¶¶ 14, 15.  Mr. Stern also "actively instructed Yellowstone personnel on how to characterize the MCA

transactions." Miller Aff. ¶ 16. Specifically, "in or around 2016, Stern instructed the Yellowstone staff to stop describing its MCAs as 'loans.'" Miller Aff. ¶ 16.[3]

Mr. Miller asserts that Mr. Glass "served as Yellowstone's principal financial officer and was responsible for managing its finances and determining when merchants had defaulted on their MCAs, among other responsibilities." Miller Aff. ¶¶ 11, 12. Mr. Miller further asserts that Mr. Glass "purportedly separated from Yellowstone in 2014 and again from 2015 to 2016 but in fact remained closely involved in its operations during these times." Miller Aff. ¶ 12. Indeed, Mr. Glass "continued to communicate" with Mr. Miller. Miller Aff. ¶ 12.

Mr. Miller represents that Mr. Davis was another "Yellowstone funder[.]" Miller Aff. ¶ 13. According to Mr. Miller, Mr. Davis was "known in the office as the funder responsible for Yellowstone's highest-dollar MCA deals." Miller Aff. ¶ 13. Mr. Miller asserts that Davis was also "known around Yellowstone's as its leader in charging [certain additional] fees. When Davis sent an email to the Yellowstone team announcing large . . . fees that Yellowstone would charge on a new MCA, Stern would often come to Davis's desk and congratulate him in person. The two would bump their fists and celebrate." Miller Aff. ¶ 18.

Plaintiffs allege that Mr. Davis "induced Mr. Bush" to execute the agreements with CAS. Cmpl. ¶ 93. Plaintiffs further allege that Mr. Davis used abusive tactics. For example, Plaintiffs allege that Mr. Davis told Mr. Bush that if he did not "enter into a new MCA loan to payoff [sic] the existing one," Mr. Davis would freeze Mr. Bush's bank accounts to prevent him from paying for his wife's cancer treatments. Cmpl. ¶ 94. Mr. Davis allegedly told Mr. Bush there were only two ways to escape the debt: "(1) win the lottery, or (2) die because [Davis] could not collect

---

[3] Plaintiffs include in their complaint images and descriptions of promotional media that describe Yellowstone as offering "a loan," a "line of credit," and "a bad credit business loan." Cmpl. ¶¶ 55–70.

money from a dead body."  Cmpl. ¶ 96 (alteration in original).  Plaintiffs allege that "Mr. Bush took Mr. Davis's advice and attempted suicide shortly thereafter."  Cmpl. ¶ 97.

Mr. Davis submits an affidavit disputing some of Plaintiffs' account [ECF No. 42 ("Davis Aff.")].   Mr. Davis confirms that he is the president of Caporly, which owns a share of Pinnex, but asserts that "Caporly has had no other involvement with the merchant cash advance business run by" Yellowstone.  Davis Aff. ¶¶ 1, 2.  While Mr. Miller described Mr. Davis as a Yellowstone funder, Mr. Davis asserts that his "business relationship with Yellowstone was as an independent contractor."  Davis Aff. ¶ 4.  Mr. Davis also denies making the harsh statements that Plaintiffs allege he made.  Davis Aff. ¶ 6.

### B.  Procedural History

Plaintiffs initiated this action by filling a summons and complaint in New York Supreme Court [ECF No. 1-1 ("Cmpl.")].  The complaint asserts claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq*., as well as a claim for fraud. Cmpl. ¶¶ 157–229.  The same day that Plaintiffs filed the complaint, Plaintiffs' counsel sent an email to defense counsel, stating:

> Please be advised that Plaintiffs are demanding arbitration for the individual claims asserted in the action below. Please let me know if you will agree to accept service on behalf of your client, and whether your client agrees to arbitration.

[ECF No. 29-10].  Defendants removed the action to this Court [ECF No. 1].

Plaintiffs now move to compel arbitration [ECF Nos. 27, 28 ("Pl. Mem."), 29, 45 ("Pl. Reply")].  Defendants oppose that motion [ECF No. 40 ("Glass Op."); ECF No. 41 ("Yellowstone, CAS, and Stern Opp."); ECF No. 43 ("Davis and Caporly Opp.")].  Defendants raise three principal arguments.  First, Defendants argue that the Court should deny the motion to compel arbitration on the ground that Plaintiffs failed to satisfy a condition precedent to arbitration, since Plaintiffs

failed to send a written Notice of Intent to Arbitrate.  Glass Opp. at 3–5; Yellowstone, CAS, and Stern Opp. at 5–6.  Second, Defendants argue that Plaintiffs waived any right to arbitrate by filing a lawsuit first.  Yellowstone, CAS, and Stern Opp. at 7–8.  Third, all of the defendants except CAS argue that they cannot be compelled to arbitrate because they did not sign the agreements containing arbitration provisions that J.B. Plumbing executed with CAS.  Glass Opp. at 5–11; Yellowstone, CAS, and Stern Opp. at 1–5; Davis and Caporly Opp. at 6–11.

Defendants also move to dismiss the complaint for failure to state RICO and fraud claims [ECF Nos. 23, 32 ("Glass MTD"), 46; ECF Nos. 30, 31 ("Davis and Caporly MTD."), 49; ECF Nos. 33, 34, 35 ("Yellowstone, CAS, and Stern MTD"), 47, 48].  Plaintiffs oppose those motions [ECF No. 44 ("Pl. Opp.")].  Because the Court concludes that issues of fact require a trial on arbitrability, the Court cannot reach Defendants' motions to dismiss.

## II.    DISCUSSION

"The Federal Arbitration Act (the 'FAA') provides that '[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of [the] contract . . . shall be valid, irrevocable, and enforceable.'"  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 228–29 (2d Cir. 2016) (quoting 9 U.S.C. § 2) (alterations in original).  The Supreme Court has repeatedly explained that the FAA "embod[ies] [a] national policy favoring arbitration."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (second alteration in original) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)).  "[T]his policy is founded on a desire to preserve the parties' ability to agree to arbitrate, rather than litigate, disputes."  *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012).  However, the FAA "does not require parties to arbitrate when they have not agreed to do so."  *Id*. (quoting V*olt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)).

The threshold "question of arbitrability," is an issue for judicial determination unless the parties unmistakably provide otherwise. *Nicosia*, 834 F.3d at 229 (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). "The district court must stay proceedings once it is 'satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding.'" *Id.* (quoting *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997)). In deciding a motion to compel arbitration, courts apply a standard similar to that applicable on summary judgment. *Id.* That "standard requires a court to 'consider all relevant, admissible evidence submitted by the parties,'" including any evidence "contained in pleadings" and in "affidavits." *Id.* (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002). If there are issues of fact as to arbitrability, "a trial is necessary." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (citing 9 U.S.C. § 4).

### A. The Court Cannot Deny Plaintiffs' Motion To Compel Arbitration for Failure To Satisfy a Condition Precedent.

The defendants argue that the Court should, at minimum, deny as premature Plaintiffs' motion to compel arbitration on the ground that Plaintiffs failed to satisfy a condition precedent to arbitration. Specifically, the arbitration provisions in issue state: "If Purchaser, Merchant or any Guarantor seeks to have a dispute settled by arbitration, that party must first send to the other party, by certified mail, a written Notice of Intent to Arbitrate." July 2017 Agreement § 4.14; *see* May 2018 Agreement § 4.13. Here, the day Plaintiffs filed their complaint in state court, Plaintiffs' counsel sent defense counsel an email stating: "Plaintiffs are demanding arbitration for the individual claims asserted in the action below. Please let me know if you will agree to accept service on behalf of your client, and whether your client agrees to arbitration" [ECF No. 29-10]. After Defendants removed, Plaintiffs filed a motion to compel arbitration.

Under New York law, "[a] condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.'"  *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 22 (2d Cir. 2018) (quoting *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 636 N.Y.S.2d 734, 660 N.E.2d 415, 418 (1995)).  Thus, defendants argue, Plaintiffs must "send . . . by certified mail, a written Notice of Intent to Arbitrate" before Defendants' duty to arbitrate arises.  May 2018 Agreement § 4.13.  Defendants cite *Marcus v. Frome*, 275 F. Supp. 2d 496, 505 (S.D.N.Y. 2003), and *Weiss v. Am. Express Nat'l Bank*, No. 19-cv-4720 (JPO), 2020 WL 71085, at *2 (S.D.N.Y. Jan. 7, 2020), in support of their position.

As a matter of strict contract interpretation, the Court might be inclined to agree with Defendants and deny Plaintiffs' motion as premature.  But Second Circuit guidance requires a different result.  In *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Lecopulos*, the relevant arbitration provision stated, in pertinent part: "Arbitration must be commenced within one year after the cause of action accrued by service upon the other of a written demand for arbitration or a written notice of intention to arbitrate, naming therein the arbitration tribunal."  553 F.2d 842, 843 n.1 (2d Cir. 1977).  The Second Circuit explained that the "only notice" the party opposing arbitration had received "was the motion to stay the court action pending arbitration, which was served on his attorneys," and ruled that motion was sufficient.  *Lecopulos*, 553 F.2d at 845.  The Second Circuit explained that "a motion for arbitration is a written demand for arbitration" and concluded that "no unfairness results from giving effect to the notice they actually received."  *Id.*; *cf. Texas American Shipping v. Intermarine Fin. Corp.*, 1994 WL 369285, at *3 (S.D.N.Y. July 13, 1994) (explaining that courts "will compel arbitration, notwithstanding technically defective service, so long as the party has had actual notice of the petition to compel arbitration").

Defendants' cases are distinguishable.  In *Marcus v. Frome*, the defendant in a securities fraud case filed a motion to dismiss for failure to state a claim and, in that motion, argued the court should stay the claims against him because his alleged misrepresentations appeared in a purchase agreement that contained an arbitration provision.  275 F. Supp. 2d at 504.  The court rejected the request to stay the case "because Frome has not actually demanded arbitration."  *Id.*  Unlike the defendant in *Marcus*, Plaintiffs here "actually demanded arbitration."  *Id.*

In *Weiss v. American Express National Bank*, the relevant arbitration provision required the party seeking arbitration to send a claim notice and to "identify either JAMS or AAA as the party's preferred arbitrator."  2020 WL 71085, at *2.  The arbitration provision further specified that in the absence of such a notice, a party could elect to litigate in a judicial forum.  *Id.*  Citing *Marcus*, the court denied the motion of American Express to compel arbitration because "AMEX has not suggested that it ever sent a claim notice or selected an arbitrator."  *Id.*  Again, Plaintiffs here did send written notice "demanding arbitration," although it was not sent "by certified mail" [ECF No. 29-10].  In the light of the guidance of the Second Circuit in *Lecopulos*, the Court must "giv[e] effects to the notice" defense counsel "actually received."  553 F.2d at 845.  Thus, the Court will not deny Plaintiffs' motion as premature for failure to satisfy a condition precedent.

## B. Plaintiffs Did Not Waive The Right To Arbitrate.

Defendants argue that Plaintiffs waived any right to arbitrate by filing a lawsuit before sending the arbitration demand.  Yellowstone, CAS, and Stern Opp. at 7–8.  They further argue that New York law governs the question of waiver because "Plaintiffs commenced this action in state court."  Yellowstone, CAS, and Stern Opp. at 7.  Binding precedent clearly forecloses both of these arguments.

First, federal law governs questions of arbitrability, including waiver.  *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 130 (2d Cir. 1997); *see Chehebar v. Oak Fin. Grp., Inc.*, 2017 WL 946292, at *3 (E.D.N.Y. Mar. 7, 2017) (applying federal law to waiver question in an action removed from state court); *Sierra Telcom Servs., Inc. v. Ericsson Bus. Commc'ns, Inc.*, 1993 WL 322805, at *6 (S.D.N.Y. Aug. 17, 1993) (ruling that federal arbitration law governs waiver). Second, the mere filing of an action clearly does not constitute a waiver of the right to arbitrate. *See Lecopulos*, 553 F.2d at 845.

In determining whether a party has waived its right to arbitrate through litigation, courts in this circuit consider: "(1) the time elapsed from when litigation was commenced until the request for arbitration; (2) the amount of litigation to date, including motion practice and discovery; and (3) proof of prejudice." *La. Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 626 F.3d 156, 159 (2d Cir. 2010). "The key to a waiver analysis is prejudice," and waiver "may be found only when prejudice to the other party is demonstrated." *Thyssen, Inc. v. Calypso Shipping Corp.*, S.A., 310 F.3d 102, 105 (2d Cir. 2002).  There is a "strong presumption in favor of arbitration," and waiver "is not to be lightly inferred." *Thyssen*, 310 F.3d at 104–05.  As noted above, Plaintiffs requested arbitration the same day they commenced this action [ECF No. 29-10]. No discovery has taken place, and Plaintiffs' motion to compel arbitration was filed the same day as Defendants' motions to dismiss.  Defendants have not "demonstrated" prejudice. *Thyssen*, 310 F.3d at 105.  Plaintiffs did not waive their right to arbitrate.

### C.  Issues of Fact Require a Trial as to Whether Non-Signatories are Bound.

Because the arguments about conditions precedent and waiver fail, it is clear that CAS may be compelled to arbitrate.  However, all of the defendants aside from CAS argue they cannot be compelled to arbitrate because they did not sign the agreements providing for arbitration.  Glass

Opp. at 5–11; Yellowstone, CAS, and Stern Opp. at 1–5; Davis and Caporly Opp. at 6–11.  The Second Circuit has recognized five theories under which non-signatories may be bound to arbitration agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel.  *Thomson-CSF, S.A. v. American Arb. Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995).  On the record before the Court in connection with the pending motion to compel arbitration, there are issues of fact whether the non-signatories may be bound under agency and veil-piercing theories.

"Traditional principles of agency law may bind a nonsignatory to an arbitration agreement."  *Thomson-CSF*, 64 F.3d at 777.  Agency involves a relationship where "the agent acts subject to the principal's direction and control."  *Shulman Transport Enterprises, Inc. v. Pan American World Airways, Inc.*, 744 F.2d 293, 295 (2d Cir. 1984).  Allegations of corporate affiliation, ownership, and control, by themselves, are insufficient to support a finding of agency.  *See Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 130 (2d Cir. 2003).  However, courts applying New York law will pierce the corporate veil where (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) such domination was used to commit a fraud or wrong against the plaintiff.  *DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 432 (S.D.N.Y. 2010); *Morris v. N.Y. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 623 N.E.2d 1157 (1993).  The "party seeking application of the alter ego doctrine must come forward with factual allegations as to both elements."  *DirecTV Latin Am.*, 691 F. Supp. 2d at 432 (quoting *Bravado Int'l Group Merch. Servs., Inc. v. Ninna, Inc.*, 655 F. Supp. 2d 177, 197 (E.D.N.Y. 2009)).

"Determining that veil-piercing is appropriate is a 'fact specific' inquiry, and courts consider many factors, including: (1) disregard of corporate formalities; (2) inadequate

capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities." *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (quoting F*reeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997)).

There are issues of fact regarding whether Yellowstone, Glass, Stern, Davis, and Caporly may be bound to arbitrate by the agreements CAS signed under theories of agency or veil-piercing/alter ego. The threshold matter of the ownership of CAS is in dispute. Plaintiffs allege that CAS is a wholly owned subsidiary of Yellowstone. Cmpl. ¶ 5. In its corporate disclosure statement in this Court, however, counsel for both CAS and Yellowstone identified a different parent company for CAS [ECF No. 57]. Yet Plaintiffs have come forward with an affidavit from a former employee, Mr. Miller, stating that CAS was part of Yellowstone. Miller Aff. ¶ 10.

Mr. Miller also offers evidence that Yellowstone and CAS were treated "interchangeably." Miller Aff. ¶ 10. In addition, Plaintiffs offer evidence of "common office space." *MAG Portfolio*, 268 F.3d at 63. At least one the agreements Plaintiffs executed with CAS uses the Evertrust Plaza address of Yellowstone's headquarters [ECF No. 29-2 at 2, 4]. Moreover, Plaintiffs submit evidence that Mr. Davis, who allegedly "induced" Mr. Bush to sign the agreements with CAS, Cmpl. ¶ 93, worked at a desk in the Yellowstone office, Miller Aff. ¶ 18.

With respect to Mr. Stern and Mr. Glass, Plaintiffs offer at least some relevant, admissible evidence that they owned and dominated CAS, through Yellowstone, and used that domination to

14

commit a fraud or other wrong against Plaintiffs. Plaintiffs offer the 2015 Pinnex Operating Agreement, together with the complaint in which Yellowstone represents that it is a wholly owned subsidiary of Pinnex, as evidence of Mr. Stern's ownership interest [ECF Nos. 29-5, 29-6]. While that complaint is not a judicial admission, the Court may take judicial notice of it. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006); *Banks v. Yokemick*, 214 F. Supp. 2d 401, 405 (S.D.N.Y. 2002).

Plaintiffs allege that, although the 2015 Pinnex Operating Agreement does not list Mr. Glass as an investor, he maintained an ownership interest in the business through Mr. Stern. Cmpl. ¶¶ 35, 48, 183. Plaintiffs offer evidence that Mr. Glass publicly purported to divest and disassociate from the company but, in reality, maintained his involvement. In particular, Plaintiffs offer Mr. Miller's affidavit to that effect. Miller Aff. ¶ 12. Plaintiffs also cite text messages that Mr. Glass sent in 2019, which Plaintiffs contend reflect his continued involvement in the scheme to make fraudulent, usurious loans, including awareness of his potential "personal liability." Cmpl. ¶ 184. Mr. Glass disputes Plaintiffs' interpretation of the text messages. Glass MTD at 3.

In the light of the evidence that Yellowstone and CAS were treated as interchangeable parts of one organization, Mr. Miller also offers some evidence that Mr. Stern and Mr. Glass "actively" directed CAS decisions about making and collecting on allegedly fraudulent loans. *See* Miller Aff. ¶¶ 11, 12, 14, 15. Mr. Miller represents that Mr. Stern and Mr. Glass ran the business. Miller Aff. ¶ 11. They oversaw "day-to-day . . . operations." Miller Aff. ¶ 11. Mr. Stern instructed staff how to market their financial products and to stop calling agreements "loans." Miller Aff. ¶ 16. Mr. Glass decided when a merchant had defaulted. Miller Aff. ¶ 12. Defendants respond that "Miller

has spent the last two years making spurious accusations" against them "in retaliation for [a] successful lawsuit against" him.  Yellowstone, CAS, and Stern Opp. at 5 n.1.

As noted above, Plaintiffs allege that Davis "induced" Mr. Bush to execute the agreements with CAS and, now, argue that CAS acted at his direction.  *See* Pl. Mem. at 11; *Shulman Transport*, 744 F.2d at 295.  With respect to Davis and Caporly, Plaintiffs offer evidence of Caporly's multi-million-dollar investment in Pinnex and Mr. Miller's affidavit about Davis's role in the Yellowstone operation.  *See* 2015 Pinnex Operating Agreement; Miller Aff. ¶¶ 13, 18.  Mr. Davis submits an affidavit disputing some of Plaintiffs' account and asserting that he was merely an "independent contractor."  Davis Aff. ¶ 4.

Defendants stress that Plaintiffs have not made a "full showing" that either agency or alter ego applies to each defendant.  Davis and Caporly Opp. at 5 (quoting *Thomson-CSF*, 64 F.3d at 780).  The Court agrees.  The Court cannot compel the defendants aside from CAS to arbitrate on the current record.  Nevertheless, considering all of the "relevant, admissible evidence submitted" in connection with the motion to compel, Plaintiffs have raised issues of fact as to arbitrability. *Nicosia*, 834 F.3d at 229.  Accordingly, "a trial is necessary" to resolve the threshold issue of whether any of the non-signatory defendants are bound by the agreement of CAS to arbitrate. *Bensadoun*, 316 F.3d at 175.

### III.    CONCLUSION

For the reasons set forth above, Plaintiffs' motion to compel arbitration is DENIED without prejudice to renewal after a trial on arbitrability.  While it is clear that CAS is bound to arbitrate, the Court will not compel CAS to proceed to arbitration until the Court determines whether any of the other defendants is bound to arbitrate.  Defendants' motions to dismiss are likewise DENIED without prejudice to renewal if, after the trial, Defendants' arguments are appropriate for resolution

by this Court. The Clerk of Court is respectfully directed to terminate the motions pending at

docket entries 23, 27, 30, and 33.

**SO ORDERED.**

**Date:   September 29, 2022**                    **MARY KAY VYSKOCIL**
**New York, NY**                                           **United States District Judge**